No. 2012-1221

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MONOLITHIC POWER SYSTEMS, INC.,

*Plaintiff/Counterclaim Defendant-Appellee,*

and

ASUSTeK COMPUTER INC. and
ASUSTeK COMPUTER INTERNATIONAL AMERICA,

*Counterclaim Defendants-Appellees,*

v.

O2 MICRO INTERNATIONAL LTD.,

*Defendant/Counterclaimant-Appellant.*

Appeal from the United States District Court for the Northern District of California in Case no. 08-cv-04567, Judge Claudia Wilken.

**BRIEF OF APPELLANT**

| | Edward R. Reines |
|---|---|
| | *Principal Attorney* |
| | Timothy C. Saulsbury |
| | WEIL, GOTSHAL & MANGES LLP |
| | 201 Redwood Shores Parkway |
| | Redwood Shores, CA 94065 |
| | (650) 802-3000 |
| | *Counsel for O2 Micro International Ltd.* |

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MONOLITHIC POWER _____ v. O2 MICRO _____

No. 2012-1221

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

O2 Micro International Ltd.

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

O2 Micro International Ltd. has no parent corporation.  No publicly held corporation owns 10% or more of O2 Micro International Ltd.'s stock.

_____

4.  ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

See attachment.

_____

_____10/15/2012_____                    _____/s/Edward R. Reines_____
            Date                                            Signature of counsel

                                                _____Edward R. Reines_____
                                                  Printed name of counsel

Please Note: All questions must be answered
cc: Principal attorney for each party. _____

## <u>ATTACHMENT</u>

4.      Weil, Gotshal & Manges LLP – Edward R. Reines, David D. Lydon and Timothy C. Saulsbury.

Pillsbury Winthrop Shaw Pittman LLP – Duane H. Mathiowetz

Howrey LLP (now dissolved) – Frank P. Cote, Henry C. Su, and Korula T. Cherian

The Lanier Law Firm – Richard Cheng-hong Lin

Sedgwick LLP – Robert Michael Harkins, Jr.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... I

TABLE OF AUTHORITIES ................................................................ IV

TABLE OF ABBREVIATIONS AND CONVENTIONS .................................. VIII

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................. 2

I.     THIS DECLARATORY JUDGMENT ACTION WAS RESOLVED BY A COVENANT NOT TO SUE AFTER THE COURT'S EXPERT ISSUED ADVERSE OPINIONS ...................................... 2

II.    ALTHOUGH O2 DISMISSED ITS CASE JUST DAYS AFTER THE ADVERSE EXPERT OPINION, THE DISTRICT COURT FOUND THIS CASE EXCEPTIONAL AND SANCTIONED O2 $9,082,580 IN FEES AND COSTS ...................................................... 5

       A.     THE DISTRICT COURT'S VEXATIOUS LITIGATION STRATEGY FINDING ........................................... 6

       B.     THE DISTRICT COURT'S LITIGATION MISCONDUCT FINDING ............................................................ 7

       C.     THE DISTRICT COURT'S $9 MILLION PLUS SANCTION .......... 7

STATEMENT OF THE FACTS ............................................................ 8

I.     THE PARTIES .................................................................. 8

       A.     O2 ........................................................................ 8

       B.     MPS ...................................................................... 8

C.     ASUSTEK ..................................................................9

II.   THE LITIGATION HISTORY BETWEEN THESE COMPETITORS.........9

     A.     THE CONSOLIDATED 2000/2001 CASES ......................................9

     B.     THE '722 CASES ..............................................................11

     C.     THE '129 CASES ..............................................................12

     D.     THE PARALLEL ITC INVESTIGATION ........................................14

SUMMARY OF THE ARGUMENT .....................................................16

ARGUMENT ........................................................................20

I.    STANDARD OF REVIEW:  THIS COURT REVIEWS WITH
      SPECIAL CARE AN ATTORNEYS' FEE AWARD BASED ON AN
      "EXCEPTIONAL CASE" FINDING ...............................................20

II.   THE DISTRICT COURT'S "EXCEPTIONAL CASE" FINDING IS
      LEGALLY AND FACTUALLY UNSUPPORTED ...................................23

     A.     THE DISTRICT COURT'S VEXATIOUS LITIGATION
            STRATEGY FINDING IS WHOLLY UNSUPPORTED.................24

            1.    Because The District Court Did Not Find O2's
                  (Counter)claims In This, Or Any Case, Baseless, The
                  Sanctions Award Must Be Reversed. .......................24

            2.    O2's Pursuit Of Its Counterclaims Was Not Objectively
                  Baseless. ..................................................26

            3.    O2's Pursuit Of Its Counterclaims Was Not In Subjective
                  Bad Faith ..................................................27

            4.    None Of O2's Claims Were Brought For Harassment Or
                  Without A Bona Fide Intent to Pursue Such Claims. ...............29

III.  THE DISTRICT COURT'S LITIGATION MISCONDUCT
      FINDING IS WHOLLY UNSUPPORTED ...................................32

A.    O2'S GOOD FAITH MISTAKE ABOUT HOW THE SCHEMATICS CAME TO BE DATED CANNOT SUPPORT SANCTIONS UNDER § 285 ............................................................ 33

    1.    Dr. Lin Did Not Intentionally Misrepresent How The Schematics Came To Be Dated, And The District Court Did Not Find He Did.................................................... 33

    2.    O2's Investigation Was Not Negligent And, In Any Event, Negligence Is Insufficient To Support § 285 Sanctions. .................................................................. 40

    3.    Whether The Schematics Were Dated "Automatically" Based On Dr. Lin's System Clock Or Manually Entered Was Not Important, And The District Court Undertook No Materiality Analysis .............................................. 41

B.    O2 DID NOT DISSEMBLE. ............................................. 43

    1.    O2's Interrogatory Response Was Clear, Specific And Accurate ................................................................ 44

    2.    The District Court's "Finding" That O2 Filed "Baseless Motions" Fails To Apply The Proper Standard And Is Wholly Unsupported .............................................. 46

IV.    THE DISTRICT COURT'S ATTORNEYS' FEES AWARD IS LEGALLY IMPROPER BECAUSE IT DOES NOT EVEN PURPORT TO TRACE FEES TO THE ALLEGED WRONGS ................ 55

A.    BEFORE REQUIRING AN OPPONENT TO PAY ITS ADVERSARY'S ATTORNEYS FEES, THOSE FEES MUST BE *CAUSED* BY THE ALLEGED WRONGDOING ...................... 56

B.    THE DISTRICT COURT ERRED BY FAILING TO APPLY A "BUT FOR" ANALYSIS TO THE FEES INCURRED ................ 58

V.    THE DISTRICT COURT'S AWARD CANNOT STAND IF ANY GROUND FOR ITS "EXCEPTIONAL CASE" FINDING FAILS ............. 62

CONCLUSION ....................................................................... 62

iii

# TABLE OF AUTHORITIES

## Cases

*Bard Peripheral Vascular, Inc. v. W.L.Gore & Assocs., Inc.*,
 682 F.3d 1003 (Fed. Cir. 2012) ...............................................................47

*Beckman Instruments, Inc. v. LKB Produkter AB*,
 892 F.2d 1547 (Fed. Cir. 1989) ...............................................................27

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
 393 F.3d 1378 (Fed. Cir. 2005) ...................................................... *passim*

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993) .................................................................................47

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
 567 F.3d 1314 (Fed. Cir. 2009) ...............................................................50

*Digeo, Inc. v. Audible, Inc.*,
 505 F.3d 1362 (Fed. Cir. 2007) ...............................................................40

*FDIC v. Maxxam, Inc.*,
 523 F.3d 566 (5th Cir. 2008) ...................................................................59

*Forest Labs., Inc. v. ONY, Inc.*,
 339 F.3d 1324 (Fed. Cir. 2003) ...............................................................22

*Fox v. Vice*,
 131 S. Ct. 2205 (2011) .................................................................. *passim*

*Highmark, Inc. v. Allcare Health Mgm't Sys.*,
 687 F.3d 1300 (Fed. Cir. 2012) ...................................................... *passim*

*iLOR, LLC v. Google, Inc.*,
 631 F.3d 1372 (Fed. Cir. 2011) ...................................................... *passim*

*In re Certain Concealed Cabinet Hinges and Mounting Plates*,
 No. 337-TA-289, 1989 ITC LEXIS 236 (July 18, 1998)....................59

*Kian v. Mirro Aluminum Co.*,
88 F.R.D. 351 (D. Mich. 1980) ............................................................17

*Matrixx Initiatives, Inc. v. James Siracusano*,
563 U.S. 2011 (2011) .........................................................................41

*Medtronic Navigation, Inc. v. Brainlab*,
603 F.3d 943 (Fed. Cir. 2010) ...................................................... 21, 22

*Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573
(Fed. Cir. 1994) .................................................................................12

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, No. 07-2363, 2007 WL
2318924, 1 (N.D. Cal. Aug. 13, 2007) ...............................................13

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd*, Nos. 04-2000, 06-2929, 2007
WL 801886, at *5-6 (N.D. Cal. Mar. 14, 2007)........................... 14, 31

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*,
558 F.3d 1341 (Fed. Cir. 2009) ...........................................................2

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
No. 04-359 (E.D. Tex. 2004)...............................................................12

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
No. 00-4071 (N.D. Cal. 2000) ..............................................................9

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
No. 01-3995 (N.D. Cal. 2001) ..............................................................9

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*,
Nos. 00-4071, 01-3995, 2004 U.S. Dist. LEXIS 30244
(N.D. Cal. Feb. 11, 2004) ...................................................................10

*O2 Micro Int'l, Ltd. v. Taiwan Sumida Elecs., Inc.*,
2009 U.S. App. LEXIS 4382 (Fed. Cir. Mar. 5, 2009) ........................12

*O2 Micro Int'l, Ltd. v. Taiwan Sumida Electronics, Inc.*,
No. 03-0007 (E.D. Tex. 2003)..............................................................11

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
399 F.Supp.2d 1064 (N.D. Cal. 2005) .................................................30

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
   420 F.Supp.2d 1070 (N.D. Cal. 2006) ..................................................10

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
   467 F.3d 1355 (Fed. Cir. 2006) ..................................................... 2, 10

*Old Reliable Wholesale, Inc. v. Cornell Corp.*,
   635 F.3d 539 (Fed. Cir. 2011) ..........................................................21

*Professional Real Estate Investors v. Columbia Pictures Industries*,
   508 U.S. 49 (1993) ........................................................... *passim*

*Reactive Metals and Alloys Corp. v. ESM, Inc.*,
   769 F.2d 1578 (Fed. Cir. 1985) ........................................................18

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ..........................................................26

*Stephens v. Tech Int'l, Inc.*,
   393 F.3d 1269 (Fed. Cir. 2004) .................................................. *passim*

*Therasense, Inc. v. Becton, Dickinson & Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) ........................................... 22, 39, 41

**Statutes**

18 U.S.C. § 1621 ..........................................................................41

28 U.S.C. §§ 1292(c)(1), 1295(a) ...........................................................2

28 U.S.C. §§ 1331, 1338(a), 2201 .........................................................1

35 U.S.C § 285 ..................................................................... *passim*

42 U.S.C. § 1988 .........................................................................56

**Rules and Regulations**

19 C.F.R. § 210.4(c)-(d)........................................................ 15, 20, 59, 60

19 C.F.R. § 210.9-10........................................................... 59, 60

FED. R. CIV. P. 30(a)(2) ..................................................................14

vi

FED. R. CIV. P. 33(a) ...................................................................................... 15

FEDERAL RULE OF EVIDENCE 706 ........................................................... 4, 17

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| ASUSTeK | ASUSTeK Computer Inc. and ASUSTeK Computer International America |
| BenQ | BenQ Corporation and BenQ America Corp |
| LG | LG Electronics, Inc., LG Electronics USA, Inc., LG Display Co., Ltd., and LG Display America, Inc. |
| LG Display | LG Display Co., Ltd. and LG Display America, Inc. |
| Microsemi | Microsemi Corporation |
| MPS | Monolithic Power Systems, Inc. or Appellees[1] |
| O2 | O2 Micro International Limited |
| Sumida | Taiwan Sumida Electronics, Inc. |
| '129 Patent or '129 | U.S. Patent No. 6,804,129 |
| '382 Patent or '382 | U.S. Patent No. 7,417,382 |
| '519 Patent or '519 | U.S. Patent No. 6,856,519 |
| '615 Patent or '615 | U.S. Patent No. 6,259,615 |
| '722 Patent or '722 | U.S. Patent No. 6,396,722 |

---

[1] Consistent with the practice of the parties and the court below, this brief refers to appellees collectively as "MPS," unless otherwise noted.

| | |
|---|---|
| ALJ | Administrative Law Judge |
| LCD | Liquid Crystal Display |
| LED | Light Emitting Diode |
| ITC | International Trade Commission |

## STATEMENT OF RELATED CASES

No other appeal from the same civil action was previously before this or any other appellate court. Counsel knows of no other case pending in this Court or any other court that may directly affect, or be directly affected by, the Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this declaratory judgment case under 28 U.S.C. §§ 1331, 1338(a), 2201. Declaratory judgment defendant O2 Micro International Limited issued a broad covenant not to sue after the court appointed its own technical expert who rendered uniformly adverse opinions. JA4568-69. Based on that covenant, the district court entered final judgment dismissing all claims and counterclaims. JA13282.

After the case was dismissed, ASUSTeK and MPS brought an "exceptional case" motion under § 285 for attorneys' fees and costs. JA4633-34. The district court found the case exceptional and granted related motions to quantify the sanction amount. JA74-75; JA91-92; JA101-102. In the end, it levied a sanction of $9,082,580 in attorneys' fees and costs.[2]

---

[2] Because both the attorneys' fees and non-taxable cost awards stem from the district court's "exceptional case" finding, the arguments in this brief apply to both.

O2 timely appealed, JA13279, and jurisdiction is proper pursuant to 28

U.S.C. §§ 1292(c)(1), 1295(a).

## STATEMENT OF THE ISSUES

1.    Is the district court's "exceptional case" finding legally and factually supported?

2.    Is the award of $9,082,580 in fees and costs warranted and proportionate?

## STATEMENT OF THE CASE

## I.    THIS DECLARATORY JUDGMENT ACTION WAS RESOLVED BY A COVENANT NOT TO SUE AFTER THE COURT'S EXPERT ISSUED ADVERSE OPINIONS

This declaratory judgment case is the latest chapter in a long-standing patent

battle between these competitors, which has found its way to this Court more than

once. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 558 F.3d 1341 (Fed.

Cir. 2009); *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355

(Fed. Cir. 2006).

MPS filed this action in October 2008 against O2 for non-infringement and

patent invalidity declarations on four related patents in the family of U.S. Patent

No. 6,856,519.[3]  JA103-05.  MPS amended its declaratory judgment complaint to

include U.S. Patent No. 7,417,382.  JA162-65.

_____

[3] The four patents are:  the '519 Patent and U.S. Patent Nos. 6,809,938; 6,900,993; and 7,120,035.  JA104.

Before MPS served its complaint, O2 initiated an ITC action based on the same patent families, naming as respondents MPS, ASUSTeK, BenQ, and three additional companies. JA275. After review of the matter, the ITC decided to institute the investigation. JA327. MPS did not serve its complaint until January 8, 2009. JA276.

O2 answered and counterclaimed in February 2009, alleging that MPS, ASUSTeK and BenQ infringed the patents-in-suit, JA265-69, and moved the district court to stay this case in favor of the ITC action. JA272. O2 explained that judicial economy favored the prevailing practice of staying the case until the ITC investigation closes, particularly because the ITC proceedings were substantially underway. JA272-74. The district court denied the stay motion, so both actions moved forward in parallel, even though they involved the same patents. JA383. In denying the stay, the district court ruled that discovery from the ITC action could also be used in this case. *Id*. As it turned out, the vast bulk of the discovery related to the patents-in-suit was actually performed in the ITC action.

The initial case management order issued in March 2009 and set the case schedule. JA383-84. A few months later, in June 2009, the parties stipulated to an early dismissal of the '519 Patent family from the case. JA446-448; JA491-94. That left only the '382 Patent for the claim construction process and discovery period from June 2009 forward.

3

On February 16, 2010, the Court construed the '382 Patent and ruled on the parties' summary judgment motions. The district court *denied* MPS's summary judgment motions, including its motion seeking to establish it did not infringe the '382 Patent and that it is invalid. JA3994. The district court concluded that, given the supporting evidence, a trial was necessary because a reasonable juror could properly conclude that MPS infringed the '382 Patent and reject MPS's invalidity challenge. JA3988-3990. MPS sought leave to file a reconsideration motion, arguing that the district court was wrong to conclude the case had a substantial factual basis, but the district court denied MPS's request. JA3996; JA4372-73.

Over O2's objections, the district court appointed its own expert under FRE 706 – in addition to the experts retained by the parties. JA4012-13. On June 15, 2010, the Court's expert issued an opinion that rejected O2's technical positions, by concluding that all asserted claims of O2's patent were invalid. He also rejected O2's infringement positions. JA5276-77. He opined that one MPS product definitely did not infringe and the remaining products were likely *not* to infringe. *Id.*

Within only a few days of receiving the adverse opinions from the Court's technical expert, O2 granted MPS a covenant not to sue and sought to dismiss its counterclaims. *See* JA4374-75; JA4568-70. Based on the covenant, and MPS's

4

non-opposition to dismissal, the district court dismissed all claims in the case. JA4630-32.

## II. ALTHOUGH O2 DISMISSED ITS CASE JUST DAYS AFTER THE ADVERSE EXPERT OPINION, THE DISTRICT COURT FOUND THIS CASE EXCEPTIONAL AND SANCTIONED O2 $9,082,580 IN FEES AND COSTS

After the case was voluntarily dismissed with MPS's consent, MPS moved for attorneys' fees pursuant to 35 U.S.C § 285. JA4633-34. MPS argued that O2 supposedly pursued baseless counterclaims and engaged in "litigation misconduct."[4] JA4635. The district court granted the sanctions motion and ordered MPS to submit a motion to quantify its fees, which it did. JA74-75. The district court largely granted the quantification motion, but requested final documentation. JA91-92. The Court issued its final sanction order for $9,082,580 in fees and costs. JA101-02.

The district court's "exceptional case" finding against O2 was based on both (1) an alleged "vexatious litigation strategy" and (2) alleged "litigation misconduct." JA63.

---

[4] MPS also alleged inequitable conduct. JA4645 [MPS's Fees Motion]. The district court did not reach that argument.

## A.   THE DISTRICT COURT'S VEXATIOUS LITIGATION STRATEGY FINDING

The district court's vexatiousness finding was apparently based on assumptions made from the fact that, in five cases between the parties identified by the court, three times O2 resolved the dispute pretrial with covenants not to sue. JA64.  The district court dismissed O2's explanation that: (1) it acted in good faith in pursuing its infringement claims, (2) each case had merit, and (3) it was MPS, and not O2, who initiated most of the cases.  JA64-65.

This case was initiated by MPS, not O2, and the district court itself had found a reasonable juror could find for O2 on infringement and validity.  *See* JA3994; JA4372-73 (denying MPS's request for leave to seek reconsideration of the district court's denial of MPS's summary judgment motion).  Moreover, O2's grant of a covenant to MPS was completely understandable in view of the opinion of the court's technical expert, rejecting O2's positions.  Critically, in sanctioning O2 for pursing its counterclaims, the district court *refused* to find that O2's claims lacked merit.  *See* JA63.  In addition, it failed to make any finding that O2 acted in bad faith.  In truth, the district court's opinion contained barely any analysis to support such a serious finding of vexatiousness.  *See* JA63-65.

As explained further below, the district court made no findings at all regarding the propriety of O2's actions in prior cases.  *See* JA55-65.  It did not find

that O2 brought those prior cases for reasons other than the legitimate pursuit of its

rights. *See id*. It did not find those cases were meritless. *See id*.

## B. THE DISTRICT COURT'S LITIGATION MISCONDUCT FINDING

The district court's "litigation misconduct" finding concerns schematics

dated February 18, 1998. O2 originally believed the dates on the schematics were

automatically created, rather than manually entered. JA65-67. It turned out that

the forensic evidence suggests that the dates were manually entered and O2

promptly acknowledged that when it came to light through expert analysis. *See*

*infra* Argument, III.

The district court did *not* find that O2's belief that then-existing software

automatically entered the date was fraudulent or even that the February 18, 1998

conception date was wrong. *See* JA65-67. Rather, the district court found that O2

supposedly "dissembled" and "masked" the issue after the mistake came to light.

JA67. As demonstrated below, the evidence does not support this finding, which is

inconsistent with O2's showing of good faith for all its positions.

## C. THE DISTRICT COURT'S $9 MILLION PLUS SANCTION

After making its "exceptional case" finding, the district court ordered MPS

to quantify the amount of fees and costs. JA74-75. MPS originally filed a motion

seeking $13,290,091.89 and revised it down to $11,519,987 during briefing.

JA9421. In response, the district court issued an order overruling most of O2's

objections, but ordering a further submission of documentation to quantify the fee amount. Accordingly, MPS filed such documentation, this time for $9,084,580 in fees and costs. JA12994. The Court granted that motion, ordering sanctions of $8,419,429 in fees and $663,151 in costs, plus interest. JA101-02. In levying the $9 million plus sanction, the district court granted fees for the entire case and made no attempt to trace fees to particular perceived transgressions. JA86. The district court also included, wholesale, the expenditures in the fee award for discovery taken in the ITC action because it could be used in the district court action. *See* JA68-69; JA86-88; JA100-01.

## STATEMENT OF THE FACTS

### I.     THE PARTIES

#### A.     O2

Founded in April 1995, O2 designs analog and mixed-signal integrated circuit products that control LCD and LED lighting. Among these products are the cold cathode fluorescent lamp ("CCFL") inverter circuits involved in this action. O2's products are primarily used in the consumer electronics, computer, communications, and automotive markets.

#### B.     MPS

MPS is a direct competitor of O2. Like O2, MPS designs analog and mixed-signal integrated circuit products that control LCD and LED lighting, including

CCFL inverter circuits. Like O2, the company serves consumer electronics, computer, communications, and automotive markets.

### C. ASUSTeK

ASUSTeK, a customer of MPS, is an international computer hardware and electronics manufacturer. Its products include motherboards, monitors, video cards, mobile phones, servers, and desktop, notebook, and tablet computers.

## II. THE LITIGATION HISTORY BETWEEN THESE COMPETITORS

### A. THE CONSOLIDATED 2000/2001 CASES

The litigation history between O2 and MPS dates back to November 2000. O2 filed a declaratory judgment action in the Northern District of California in response to MPS's marketplace assertions that O2's products infringed MPS's patents. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.,* No. 00-4071 (N.D. Cal. 2000). MPS counterclaimed for infringement of U.S. Patent Nos. 6,144,814 and 6,316,881.

In October 2001, after learning that MPS improperly misappropriated O2's confidential technical information, O2 filed a related suit against MPS asserting trade secret misappropriation and infringement of U.S. Patent No. 6,259,615. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.,* No. 01-3995 (N.D. Cal. 2001). This case was consolidated with the November 2000 case and they were ultimately tried together.

9

Regarding the '615 Patent, O2 presented alternative theories as to how the accused devices satisfied a key limitation of the asserted claims, one of which was disclosed after the due date for amending contentions without leave. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys.*, Nos. 00-4071, 01-3995, 2004 U.S. Dist. LEXIS 30244, at *13-14 (N.D. Cal. Feb. 11, 2004). Following the district court's denial of O2's request for leave, MPS brought a non-infringement summary judgment motion for the '615 Patent. *Id*. The district court granted the motion, noting that it would not consider O2's alternative infringement theory. *Id*. at *14-15.

On appeal, this Court affirmed. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1357-59 (Fed. Cir. 2006). This Court did *not* reject O2's $V_{SENSE}$ infringement theory, or find that it lacked merit. *Id*. Rather, it upheld the district court's discretionary decision to deny leave to add the alternative infringement theory. *Id*. Against this background, neither the district court nor MPS seriously asserted that O2's infringement claim was; (1) baseless, (2) intended to harass, or (3) otherwise anything but brought in good faith – and certainly no such finding was made.

The remaining claims were tried in June 2005. The jury found MPS guilty of "willfully and maliciously" misappropriating four O2 trade secrets. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 420 F.Supp.2d 1070, 1074 (N.D. Cal.

2006).  It further found *against* MPS's asserted patent infringement claims.  *Id.*; JA5306-07.

Thus, the first two cases between the parties were ultimately resolved with O2 obtaining a verdict that MPS "willfully and maliciously" misappropriated its trade secrets, and all of MPS's claims were rejected.

### B.    THE '722 CASES

In January 2003, O2 filed suit against Taiwan Sumida Electronics alleging infringement of U.S. Patent Nos. 6,396,722 and 6,259,615.  *O2 Micro Int'l, Ltd. v. Taiwan Sumida Electronics, Inc.*, No. 03-0007 (E.D. Tex. 2003).  The suit was based on Sumida's use of MPS inverter controllers.  In response, MPS sued O2 in the Northern District of California seeking a declaratory judgment that the '722 Patent was invalid, not infringed, and unenforceable. *Monolithic Power Sys., Inc. v. O2 Micro Int'l. Ltd.*, No. 04-2000 (N.D. Cal. 2004).  During the pendency of the California action, the '722 Patent proceeded to trial in Texas, where the jury upheld the validity of O2's patent and that found Sumida willfully infringed.  The court awarded O2 enhanced damages and a permanent injunction.  JA5310-11.  Subsequently, O2 received a jury verdict in the California action that MPS infringed some of the '722 Patent claims, but the jury found the asserted claims invalid due to an unspecified combination of on-sale bar and obviousness.  JA590.  MPS and ASUSTeK asserted inequitable conduct against O2, but the court denied

11

those claims. *See* JA5308. Neither MPS nor ASUSTeK sought an "exceptionality" finding.

The parties appealed the conflicting California and Texas verdicts to the Federal Circuit, which upheld the California invalidity verdict as supported by substantial evidence. Based on that decision, the Federal Circuit vacated the Eastern District of Texas judgment in favor of O2 under the *Mendenhall* rule. *See O2 Micro Int'l, Ltd. v. Taiwan Sumida Elecs., Inc.*, 2009 U.S. App. LEXIS 4382 (Fed. Cir. Mar. 5, 2009) (citing *Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1577 (Fed. Cir. 1994) ("[O]nce the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under principles of collateral estoppel.")).

Given that O2 won the Texas case based on the '722 Patent, there was of course no serious assertion that O2's '722 infringement claim in California was baseless, intended to harass, or otherwise brought in bad faith – and certainly no such finding.

## C.   THE '129 CASES

In October 2004, O2 sued MPS in the Eastern District of Texas alleging infringement of U.S. Patent No. 6,804,129. *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, No. 04-359 (E.D. Tex. 2004). O2 amended its complaint to add

MPS customers who used the accused MPS devices. At defendants' behest, the Eastern District of Texas transferred the case to the Northern District of California, where it was consolidated with the above '722 Patent declaratory judgment action. To streamline the proceedings, and with only a specific type of MPS inverter controller left in the case, O2 decided not to pursue its '129 infringement claims. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, No. 07-2363, 2007 WL 2318924, 1 (N.D. Cal. Aug. 13, 2007). O2 thus dismissed the '129 infringement claims against defendants as to MPS's full bridge inverter controllers. *Id.*

On May 1, 2007, MPS sued O2 for a declaratory relief regarding the '129 Patent. *Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, No. 07-02363 (N.D. Cal. 2007). MPS asserted that the new declaratory judgment action was warranted notwithstanding O2's covenant not to sue because the covenant was limited to certain products and to parties named in the 2004 Action. MPS noted that O2 had asserted the '129 Patent against Hon Hai Precision Industry Company, which was not a party to the stipulated dismissal in the 2004 Action. Believing that there was no case or controversy between MPS and O2 in light of the covenant not to sue MPS, O2 sought dismissal for lack of jurisdiction. When the district court asserted jurisdiction, the parties stipulated to a broader dismissal that encompassed additional products, as well as MPS's direct and indirect customers. *See* JA5408-10.

In the wake of that dismissal, the district court rebuffed MPS's contention that O2's '129 allegations were baseless. Specifically, in rejecting MPS's unfair competition counterclaim on summary judgment, the district court held that, in light of O2's trial victory against MPS customers in a previous action, O2's '129 allegations were legitimate. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd*, Nos. 04-2000, 06-2929, 2007 WL 801886, at *5-6 (N.D. Cal. Mar. 14, 2007).

## D. THE PARALLEL ITC INVESTIGATION

A day after MPS served its complaint in this case, the ITC opened a § 337 investigation based on the same patent families involved here against respondents MPS, ASUSTeK, BenQ, Microsemi, and LG. JA5494-98. As in this action, the '519 family was dismissed at an early stage, terminating BenQ from the proceedings. JA4033. Shortly thereafter, O2 and LG settled on condition that LG Display refrain from importing the accused devices. JA4033-34. This left only O2's '382 infringement allegations against MPS, ASUSTeK, and Microsemi.

Unconstrained by the Federal Rules, the parties undertook substantial discovery. For instance, O2 and MPS collectively noticed nearly seventy depositions, more than tripling the number permitted under Rule 30's presumptive limits that applied in the California case. JA7151; *see* FED. R. CIV. P. 30(a)(2) (limiting parties to ten depositions without seeking leave). Likewise, ASUSTeK propounded more than seventy interrogatories, which is nearly three times the

number presumptively allowed under Rule 33(a).   JA4877;  *see* FED. R. CIV. P. 33(a) (twenty-five interrogatories).  Attorneys' fees for the ITC discovery make up a large part of the sanction at issue on this appeal.

Notwithstanding the extensive discovery, the action proceeded on an accelerated pace, culminating in a two-week evidentiary hearing.  JA7666.  On April 19, 2010, ALJ Gildea issued an Initial Determination, finding the '382 valid and infringed by Microsemi, but not infringed by MPS or ASUSTeK.  *Id.*  Notably, though ALJ Gildea found that O2 did not present sufficient evidence to corroborate its asserted conception date of February 1998, he nevertheless rejected appellees' anticipation defense based on MPS's MP1010 device, as well as their obviousness arguments.  JA4157; JA4181.  ALJ Gildea also found that O2 did not meet the technical prong of the domestic industry requirement.  JA4209.

All parties filed petitions for Commission review.  JA7666-67.  Upon examination of the record, the Commission reversed ALJ Gildea's no domestic industry finding, but also reversed his finding that Microsemi infringed.  *Id.*  The Commission left the remainder of Judge Gildea's findings intact, resulting in an affirmance on alternate grounds.  *Id.*

ITC Commission rules permit it to award sanctions for unwarranted actions and representations, just as a district court can.  *See* 19 C.F.R. § 210.4(c)-(d); *Certain Inkjet Cartridges with Printheads and Components Thereof,* U.S. Int'l

Trade Comm'n, Inv. No. 33-7-TA-723, Order No. 24, at 2-3 (Dec. 23, 2010). Neither MPS nor ASUSTeK sought a determination that O2's infringement claims were baseless, intended to harass or otherwise anything but brought in good faith – and there was certainly no such finding.

## SUMMARY OF THE ARGUMENT

The district court's massive $9,082,580 sanction must be reversed. Foremost, the sanction is legally erroneous because, although the district court labeled O2's pursuit of its infringement claims "vexatious," it actually *refused* to find that O2's claims were baseless. With the troubling growth in attorneys' fees charges, this Court has emphasized that the pursuit of a patent infringement claim is a privileged act that can only be sanctioned if the claim is found objectively baseless *and* pursued in bad faith. *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citing *Professional Real Estate Investors v. Columbia Pictures Industries*, 508 U.S. 49, 60-61 (1993)). Accordingly, the district court's refusal to find O2's claims lacked merit, standing alone, warrants reversal of this punitive sanctions award.

The district court's labeling O2's counterclaims "vexatious," rather than "frivolous," simply cannot nullify the legal requirement that claims *must* be objectively baseless to support an "exceptional case" finding. Moreover, the district court's vexatiousness conclusion is mainly based on the fact that O2 issued

16

a covenant not to sue that terminated this case in MPS's favor shortly before trial. But the settlement of litigation is to be encouraged, and O2's decision to grant the covenant was very understandable and in good faith. Although the district court recognized O2's claims had merit by ruling for it on summary judgment and allowing the case to go to trial, the court appointed its own technical expert that uniformly sided with MPS on infringement and validity. Less than a week after receiving the adverse report from the district court's own expert, O2 granted MPS the broad covenant not to sue at the heart of the sanctions award.

One need not have much litigation experience to appreciate that it is a bad bet to go to trial with the judge's expert testifying against you. This concern has long been acknowledged by the judiciary. *See, e.g.*, *Kian v. Mirro Aluminum Co.*, 88 F.R.D. 351, 356 (D. Mich. 1980) ("The presence of a court-sponsored witness, who would most certainly create a strong, if not overwhelming, impression of 'impartiality' and 'objectivity,' could potentially transform a trial by jury into a trial by witness.").[5] In that light, sparing all parties the cost and burden of trial by

---

[5] *See also* Joe S. Cecil & Thomas E. Willging, COURT-APPOINTED EXPERTS: DEFINING THE ROLE OF EXPERTS APPOINTED UNDER FEDERAL RULE OF EVIDENCE 706, at 55 (Federal Judicial Center 1993), microformed on Sup. Docs. No. JU 13.2:C 83/4 (U.S. Gov't Printing Office) ("The Advisory Committee notes accompanying Rule 706 warn that 'court-appointed experts acquire an aura of infallibility to which they are not entitled,' " and "our findings . . . . seem[] to justify this concern."); *id*. at 56 (concluding, based on a survey of 431 federal

granting the covenant was not only in good faith, it was wise. Moreover the record of this hard-fought case demonstrates, beyond peradventure, that O2 was seriously pursuing its claims to protect the validity of its patent and gain relief for infringement – not for some other nefarious purpose that might support a vexatiousness finding.

The core of the district court's vexatiousness analysis is that the otherwise laudatory act of resolving claims pretrial through a covenant not to sue took on a different "hue" here because: (1) the parties are competitors, and (2) O2 previously issued covenants not to sue to end litigation. The district court did not find that the prior covenants granted by O2 were issued for an improper purpose or in bad faith. Nor could it given the record. The district court's razor thin findings, as a matter of law, fail to support a conclusion of improper purpose, much less a nearly $10 million punitive sanction. *See Reactive Metals and Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed. Cir. 1985) (it is "incumbent on the trial court not only to make the ultimate finding that the case is exceptional, but also to articulate the

---

district court judges, that "concerns of judges and commentators that court-appointed experts will exert a strong influence on the outcome of litigation seems to be well founded"); Elwood S. Levy, IMPARTIAL MEDICAL TESTIMONY-REVISITED, 34 TEMP. L.Q. 416, 424 (1961) ("by designating [an expert] witness as court-appointed and 'impartial' the court has in effect cloaked him with a robe of infallibility").

more particular factual findings from which the finding of 'exceptional circumstances' follows"). Because the district court failed to make findings that could support its vexatiousness determination, that determination was improperly based on undue speculation. *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1276 (Fed. Cir. 2004) ("an exceptional case finding is not to be based on speculation or conjecture but upon clear and convincing evidence").

The district court separately found "litigation misconduct" based on O2's actions regarding the method by which documents relating to conception were dated. While O2 made a mistake about which software it used ten years earlier to create such documents, when that mistake was brought to its attention, it acknowledged the error and apologized. The district court did *not* find that the original mistake was intentional or in bad faith. The district court found instead that O2 "dissembled" in response.

This "dissembling" finding is clear error. O2 was candid in acknowledging its mistake and took reasonable positions in response. In any event, this mistake and its aftermath was a discrete and short chapter in this case that had no bearing on the final result. This finding cannot possibly support the massive sanction, particularly given that sanction included virtually all of MPS's expenditures in this case.

19

Finally, the sanction amount is legally improper, even if the "exceptional case" finding itself were viable. The lion's share of the fee award relates to discovery work in the parallel ITC proceedings because MPS claimed that it planned to use that discovery in the district court case. However, the Supreme Court in *Fox v. Vice,* 131 S. Ct. 2205 (2011) held that fees expended for work relevant to both proper and improper claims are not recoverable because they would have been incurred anyway to address the legitimate claims. There is no finding that the ITC's investigation was improper and it would not be within the district court's power to make such a finding in any event. Sanctions for conduct before the ITC are the province of the ITC and were not requested or awarded here. *See* 19 C.F.R. § 210.4(c)-(d). Consequently, it was improper to include in the fee award expenditures MPS would have incurred in any event in the ITC. The sanction should be reversed on this ground as well. For all these reasons, the district court's massive sanction should be reversed.

## ARGUMENT

### I. STANDARD OF REVIEW: THIS COURT REVIEWS WITH SPECIAL CARE AN ATTORNEYS' FEE AWARD BASED ON AN "EXCEPTIONAL CASE" FINDING

In view of the proliferation of § 285 motions, this Court has provided fresh guidance on the standard of review applicable to "exceptional case" findings. As explained recently in *Medtronic*, because of the "substantial economic and reputational consequences for both litigants and counsel," this Court has the

20

responsibility to "examine the record *with care* to determine whether the trial court clearly erred in its "exceptional case" finding." *Medtronic Navigation, Inc. v. Brainlab*, 603 F.3d 943, 953 (Fed. Cir. 2010) (reversing "exceptional case" finding based on a "close study" of the record) (emphasis supplied).  And this Court has also explained that the legal limitations on the exceptional case doctrine are "exacting." *See, e.g.*, *Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 543 (Fed. Cir. 2011) ("we conclude that the 'exacting standard' for establishing that a case is exceptional under section 285 has not been met") (citation omitted); *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011) (reversing "exceptional case" finding after applying the "exacting" legal standards).

In light of the serious consequences of a "litigation misconduct" ruling, both "the underlying improper conduct and characterization of the case as exceptional must be established by clear and convincing evidence." *Brooks Furniture*, 393 F.3d at 1382.

This Court's review of "exceptional case" determinations "with care" after "close study" and based on "exacting" legal standards promises to help diminish it as a problem area – much as the careful review of inequitable conduct findings has helped address the problems in that area.

Litigation misconduct allegations under § 285 are similar to inequitable conduct allegations in that they both can:

21

- unduly besmirch the reputations of professionals

- distract from the merits

- fuel satellite litigation[6]

- inflate the expense of patent cases, and

- discourage settlement

Just as this Court concluded in *Therasense* that these considerations warrant tight legal standards and close supervision, those same considerations underline the key role this Court plays in carefully reviewing "exceptional case" findings by using "exacting" legal standards. *Compare Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) *with Medtronic*, 603 F.3d at 953. Where, as here, such a finding becomes the basis for a nearly $10 million sanction award, this Court's commitment to carefully review "exceptional case" findings of this type is a particularly reassuring safeguard.

When it is based on a sound "exceptional case" fact finding, this Court reviews an award of attorneys' fees for abuse of discretion. *Forest Labs., Inc. v. ONY, Inc.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003). "A district court abuses its

---

[6] For example, here the sanctions process took twenty-two months, involved three rounds of briefing, and the district court ordered O2 to pay MPS $343,035 for its attorneys to litigate the sanctions issue on top of O2 paying its own attorneys. *See* JA100 at 8:10-12.

discretion when its decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful." *Id.* at 1328. Particularly apropos for this record is the cardinal rule that, while fact finding is reviewed for clear error, this Court reviews de novo the legal principles applied, and overlooked, by the district court. *Id.*

This is consistent with the Supreme Court's latest pronouncements regarding sanctions in *Fox v. Vice*, 131 S. Ct. 2205. There, the Court explained that when making sanctions rulings, a "trial court has wide discretion when, but only when, it calls the game by the right rules." *Id.* at 2216-17. Although appellate micro-management of sanctions rulings has no place, the Supreme Court emphasized that the circuit courts play a vital role in the sanctions area because "the trial court must apply the correct standard, and the appeals court must make sure that has occurred." *Id.*

## II. THE DISTRICT COURT'S "EXCEPTIONAL CASE" FINDING IS LEGALLY AND FACTUALLY UNSUPPORTED

The district court based its "exceptional case" finding on two separate grounds. First, it found that O2 pursued its counterclaims in this case with a "vexatious litigation strategy." JA63. Second, it found that O2 engaged in "litigation misconduct" relating to whether schematics were dated automatically or manually. JA65-67. As demonstrated below, neither ground survives review.

23

## A.    THE DISTRICT COURT'S VEXATIOUS LITIGATION STRATEGY FINDING IS WHOLLY UNSUPPORTED

The district court's analysis supporting its finding that O2 supposedly engaged in a "vexatious litigation strategy" is slim.  Essentially, the district court finds two basic facts from which it apparently assumes vexatiousness.

First, the district court observed that on several occasions O2 brought claims or counterclaims and then dropped the claims pretrial.  Second, it observed that the parties are commercial competitors.  This is the key passage in the district court's opinion, which is the guts of its analysis:

> Settlement and dismissal of claims on the eve of trial is not uncommon and, indeed, is preferable to no settlement.  However, O2 Micro's conduct takes on a different hue when viewed in light of its competitive relationship with MPS and its resort to this litigation strategy on multiple occasions in its cases before this Court.

JA64.

As explained below, even if these findings were correct, they are insufficient to support a sanctions award.  Moreover, the legally required findings of objective baseless and subjective bad faith would not have been supported by the record.

## 1.    BECAUSE THE DISTRICT COURT DID NOT FIND O2'S (COUNTER)CLAIMS IN THIS, OR ANY CASE, BASELESS, THE SANCTIONS AWARD MUST BE REVERSED.

To find a violation of § 285 based on the improper filing of patent infringement clams, sanctions may be imposed "only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless."

24

*iLOR*, 631 F.3d at 1377. This rule was adopted by this Court in *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005).

The foundation of the *Brooks Furniture* rule is this Court's observation that "Section 285 must be interpreted against the background of the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993)." *iLOR,* 631 F.3d at 1376. In *Professional Real Estate*, the Supreme Court "recognized that the right to bring and defend litigation implicated First Amendment rights." *Id.* The Supreme Court explained that only "if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.*

The district court did *not* acknowledge these fundamental legal principles or attempt to apply them. On the contrary, the district court expressly stated it did *not* consider whether O2's counterclaims were baseless. JA63 ("the court does not consider" whether "O2 filed baseless litigation"). Indeed, it insisted that any alleged frivolousness was *not* the basis for its "exceptional case" finding. JA86 at n.11. Nor did the district court find that O2's counterclaims were brought in subjective bad faith in any of its three orders relating to its imposition of sanctions.

The district court's sanctions order is thus legally flawed because there was no finding that O2's counterclaims in this or any case were objectively baseless and that is a legal requirement. It is that simple.

### 2. O2'S PURSUIT OF ITS COUNTERCLAIMS WAS NOT OBJECTIVELY BASELESS.

Although the district court's failure to find objective baselessness for any claim ever brought by O2, standing alone, requires reversal of the district court's sanctions award, it is worth appreciating that the record would not have supported such a finding.

"To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Highmark, Inc. v. Allcare Health Mgm't Sys.*, 687 F.3d 1300, 1310 (Fed. Cir. 2012). O2's filing of its counterclaims was legitimate. Indeed, for the primary litigated patent, the '382 Patent, the district court *denied* summary judgment, finding triable issues of fact. JA3988-3990. That is the counterclaim upon which the district court's vexatiousness finding is apparently keyed. JA64 ("In this case, for instance, O2 Micro sought to dismiss its counterclaims of infringement, based on a covenant not to sue, only after MPS and ASUSTeK completed their filings for the parties' impending final pretrial conference.").

Denial of summary judgment is strong evidence confirming that O2's counterclaim was not baseless. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d

26

860, 875 (Fed. Cir. 2010) (The "district court's denial of summary judgment of noninfringement reflects the belief that it was reasonable for ResQNet to have retained that patent for suit."); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989) (finding "it difficult to agree that the inequitable conduct defense was 'baseless' when it survived a motion for summary judgment and was rejected only after findings were made on disputed facts."). The district court's failure to find objective baselessness, despite sanctioning O2 nearly $10 million, is also compelling record evidence that MPS did not present clear and convincing evidence that O2's counterclaims were objectively baseless.

In sum, the district court's failure to find objective baselessness makes sense given the absence of supporting evidence, much less the required clear and convincing evidence.

### 3. O2'S PURSUIT OF ITS COUNTERCLAIMS WAS NOT IN SUBJECTIVE BAD FAITH.

Although the district court's failure to find subjective bad faith in O2's pursuit of its counterclaims standing alone provides a second independent ground for requiring reversal of the district court's sanctions award, it is worth appreciating that the record would not have supported such a finding in any event.

An infringement action "does not become unreasonable in terms of [§285] if the infringement can reasonably be disputed." *Brooks Furniture*, 393 F.3d at 1384. As this Court has repeatedly observed a "patentee's ultimately incorrect view of

how a court will find does not of itself establish bad faith." *Id.* "Under this exacting standard, the plaintiff's case must have no objective foundation, and the plaintiff must actually know this." *iLOR*, 631 F.3d at 1377.

Here, the district court did not find that O2 believed that its counterclaims lacked merit. Nor could it have properly done so. This is because the record contains many indisputable facts inconsistent with a finding that O2 believed its claims lacked merit:

- MPS initiated the case, not O2

- O2 expended millions pursuing this case through claim construction and summary judgment

- O2 initiated an ITC investigation and attempted to stay this case, not litigate it

- O2 pursued the ITC investigation to a Final Determination, which upheld the '382's validity, but reversed the ALJ's finding that Microsemi infringed

- O2 successfully fought off MPS's summary judgment motions

- O2 brought its own summary judgment motions

O2 sought to dismiss the '382 Patent only after the court appointed expert issued adverse opinions that rejected most of O2's positions. O2's actions are inconsistent with the actions of a litigant that believes its counterclaims have no

legitimate chance of success.  On the contrary, but for the lethally adverse opinions of the court's expert, O2 would have presented its case to the jury, and, as confirmed by the district court, a reasonable jury could have found in its favor.

### 4.  NONE OF O2'S CLAIMS WERE BROUGHT FOR HARASSMENT OR WITHOUT A BONA FIDE INTENT TO PURSUE SUCH CLAIMS.

Although the district court labeled O2's litigation vexatious, it made no findings about any of O2's claims or counterclaims that would support such a conclusion.   As explained above, the district court tacitly acknowledged that none of O2's claims were objectively baseless.  Moreover, the record to support such a finding is totally absent, and the concept of clear and convincing evidence is rendered irrelevant because of the absence of analysis of the record.  *Stephens*, 393 F.3d at 1276 (reversing an "exceptional case" finding for lack of analysis because a "district court must provide reasoning for its determination that a case is exceptional for us to provide meaningful review").

But even if one looks at the record at the appeal stage, it is straightforward to see that O2 has never brought any claim for reasons other than as a *bona fide* attempt to enforce its rights.   At the outset, it is legally *presumed* that claims are made in good faith, absent clear and convincing proof to the contrary.  *Highmark*, 687 F.3d at 1311 ("there is a presumption that an assertion of infringement of a duly granted patent is made in good faith").

The parties' litigation started in 2000 when O2 sought to be free from MPS's marketplace assertions of infringement. O2 prevailed after trial with MPS's patents being found invalid and not infringed. JA5306-08. This trial win highlights O2's good faith.

O2's responsive 2001 suit was successful in proving MPS misappropriated O2's trade secrets willfully and with malice. *See O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1078 (N.D. Cal. 2005). Because O2 prevailed in both these two consolidated cases, O2's presumed good faith is further confirmed.

In the parties' co-pending litigations relating to the '722 Patent, O2 prevailed before a Texas jury against users of MPS's products, but that was nullified by MPS successful invalidation of the patent in its declaratory judgment action in the Northern District of California. Given that O2 pursued both cases through trial and prevailed in the Texas action, there is no basis to believe its claims in those cases was brought for any reason other than the legitimate pursuit of its rights. *Professional Real Estate Investors,* 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

That leaves the cases involving the '129 Patent. O2 originally brought that case, but ultimately decided to covenant MPS for the products at issue and the case

was dismissed. There was no assertion that this rendered the case exceptional. MPS then brought a declaratory judgment action on the '129 Patent, arguing that the covenant was not broad enough to include some of its other products. O2 explained that there was no case or controversy and when that argument was rejected, promptly issued a broader covenant before the parties undertook meaningful discovery.

There is nothing in the record to suggest O2's infringement claim based on the '129 Patent was objectively meritless or that it brought that claim for illegitimate reasons. Indeed, O2's willingness to issue a broader covenant to avoid a second litigation on that patent would be inconsistent with any ruling to the contrary.

Even more significantly, this district court has already *rejected* MPS's contention that O2's '129 allegations were baseless or pursued in bad faith, holding that O2's claims had probable cause as a matter of law. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd*, Nos. 04-2000, 06-2929, 2007 WL 801886 (N.D. Cal. Mar. 14, 2007). Specifically, in the '129 action, MPS advanced essentially the same theory that it does here: that O2's issuance of a covenant not to sue indicated that it brought its claims in bad faith. *Id*. at *5. In response, O2 argued that, as a matter of law, its '129 infringement allegations could not be baseless because it had already prevailed at trial against MPS customers on validity and infringement

31

of the '129 Patent. *Id.* The district court agreed, holding that, in light of O2's prior victory, it necessarily had "probable cause to bring claims against MPS and other based on that patent." *Id.* (citing *Professional Real Estate Investors*, 508 U.S. at 60 n.5). As such, the district court granted summary judgment for O2 on MPS's counterclaim because MPS could not show that O2's infringement actions were "objectively baseless." *Id.* at *6.

In summary, labeling O2's litigation strategy "vexatious" is completely unsupported by fact-finding or analysis with respect to any case, claim or counterclaim. This absence of support is particularly intolerable given that labeling O2 a "vexatious" litigant is such a serious and pejorative determination. The mere fact that O2 and MPS are competitors and that O2 issued a covenant not to sue in some of the cases between the parties is insufficient as a matter of law to support the district court's finding that O2 had a vexatious litigation strategy. This finding should be reversed.

## III.    THE DISTRICT COURT'S LITIGATION MISCONDUCT FINDING IS WHOLLY UNSUPPORTED

The district court's "litigation misconduct" ruling also cannot withstand scrutiny. The district court analyzed two factors in connection with its litigation misconduct finding: (1) O2's initial representations concerning how schematics came to be dated, which turned out to be mistaken; and (2) its alleged attempts to "mask" these misstatements through motion practice. JA65-67.

32

As explained below, this episode was the product of an innocent mistake regarding the software used to create the schematics in question almost ten years earlier. Dr. Lin, the inventor of the '382 patent, originally testified – and believed – that it was his recollection that the date on his schematics were automatically generated rather than manually entered. Importantly, the district court made no findings that this apparent misstatement was intentional or even reckless, nor could it have on this record. Moreover, the misstatement was not important, and had no bearing on the verdict in any of the cases between O2 and MPS.

Furthermore, the notion that O2 somehow sought to cover up this mistake does not withstand scrutiny. On the contrary, O2 promptly corrected the record and repeatedly conceded that it appears it had been mistaken, including in the very motions that the district court suggested were some kind of half cover-up.

**A. O2's GOOD FAITH MISTAKE ABOUT HOW THE SCHEMATICS CAME TO BE DATED CANNOT SUPPORT SANCTIONS UNDER § 285**

**1. DR. LIN DID NOT INTENTIONALLY MISREPRESENT HOW THE SCHEMATICS CAME TO BE DATED, AND THE DISTRICT COURT DID NOT FIND HE DID.**

The district court's litigation misconduct findings stem from apparent misstatements by O2 representatives about the process originally used to date some old schematic drawings. *See* JA65. As demonstrated below, not only did the district court refuse to find that these misstatements were intentional, but the record

33

shows that O2's representations were based on its good faith and reasonably held beliefs regarding the software used to create the schematics.

During the declaratory judgment action involving O2's '722 Patent, O2 produced a number of documents from the early- to mid-1998 timeframe to demonstrate that Dr. Lin's conception of the '722's subject matter predated MPS's asserted prior art. Among those documents were lab notebook excerpts, circuit simulation results, meeting notes and circuit schematics, some of which were dated February 18, 1998. JA1401-16 ['722 Trial Lin Direct] at 605:19-622:20. During the proceedings, MPS argued that Lin backdated the schematics and that they were not created until sometime in 1999. *See, e.g.,* JA1250-51.

In May 2007, the case proceeded to trial, during which Dr. Lin explained that he had designed and simulated the claimed inverter controller circuit as of February 1998. JA4867 at 569:2-12. During his direct examination, Dr. Lin testified regarding the various corroborating documents from early 1998. With respect to the schematics, Dr. Lin was asked about the significance of their date stamps, and he stated his recollection that his computer automatically generated the date when he saved the file. *Id.* at 570:16-19. Separately, in the context of laying the foundation for a series of O2 exhibits, O2's Director of Operations, Adam Badgett also testified that the 1998 date printed on the schematics was "automatically inserted by the software program." JA4675 at 748:6-22. A jury

34

nevertheless found the '722 Patent invalid based on an unspecified combination of on-sale bar and obviousness.

In this suit, MPS sought a declaratory judgment of non-infringement and invalidity with respect to the '382 patent. JA164-65. Like the '722, the '382 Patent claimed priority to Provisional Application No. 60/145,118, which O2 filed in July 1999. JA223. As such, O2 again sought to demonstrate conception as of February 1998 based on the same schematics introduced in the '722 trial.

During discovery, MPS served O2 with an interrogatory requesting a description of, among other things, the preparation and maintenance of the schematics, to which O2 responded:

> Dr. Yung-Lin Lin used a PSPICE simulation program on February 18, 1998 to create the identified document, which was printed out. The program automatically provided a date stamp on the day it was created.

JA4876.

Steve Krems, O2's Director of Information Technology, who verified the interrogatory, also provided 30(b)(6) testimony on the subject. While Mr. Krems was not an engineer and, thus, did not use schematic capture software packages often, he testified that he verified the interrogatory response based on his conversations with O2 engineers and his personal testing using a version of OrCAD capture made available to him in 2009:

> Q. Which engineers did you speak with?

35

A. Dr. Lin, and I cannot remember the other engineer that was there and using the same program. I don't recall his name.

Q. What program were they using?

A. OrCAD Capture.

Q. And so you were talking with Dr. Lin and this other engineer about the schematic capture program that they were using in 2009; is that right.

A. Correct.

Q. All right. And Dr. Lin told you that the schematic capture program that he's using now automatically provided a date stamp on the date that the schematic was created; is that right?

A. Yes. He basically said he does not – he can't edit these. It's automatically put in before he starts the program. And I asked another engineer who I happened to see who was running OrCAD at the time. He said the same behavior.

Q. And that's the OrCAD Capture program that O2 Micro is using today in 2009; right?

A. Correct.

JA2825 at 66:9-67:11; JA2824 at 63:21-22. Mr. Krems admitted that he did not

know what schematic capture software O2 was using in the 1998 timeframe.

JA548 at 70:1-5. He explained, however, that he did not "think" he was mistaken

about whether Dr. Lin used a schematic capture program other than OrCAD

Capture to create the February 18, 1998 schematics because OrCAD Capture was

"all anyone recalls ever using. That's the only software ever seen at O2 Micro."

JA2825 at 68:16-19. Mr. Krems started at O2 in February 1998. JA2822 at 8:11-

16. Mr. Krems admitted, however, that the company did not have a copy of the

36

OrCAD Capture version that was in use in 1998 and was, thus, unable to confirm absolutely what schematic printouts from that version of OrCAD Capture would look like.  JA547 at 68:2-10.

Subsequently, on July 30, 2009, MPS served O2 with the corrected expert report of Dr. Herniter, MPS's expert on schematic capture software.   JA628.  According to Dr. Herniter, who compared the February 18, 1998 schematics to others he had created using a variety of schematic capture programs, the schematics must have been created using a program called MicroSim Schematics – not OrCAD Capture, as O2 had believed.  JA609 at ¶20.  Moreover, unlike OrCAD Capture (and other circuit design software, such as MicroSim PSpice Probe), which automatically date stamp the schematic based on the computer's system clock, MicroSim Schematics has no such "automatic" dating feature.  *Id.* at ¶26.  The user must enter the date into a "date" field; thereafter, the software inserts that date on print outs of the schematic.   *Id.*   Dr. Herniter also opined that a typographical error in the date stamp – the date contained a comma after the month: "Feb., 18, 1998" – further suggested that it had been entered by a user.  JA610-11 (emphasis supplied).  Accordingly, it was Dr. Herniter's opinion that the date stamps on the February 18, 1998 schematics were not "automatically" generated.  JA620 at ¶44.

Upon receiving Dr. Herniter's report, O2 promptly conducted a thorough investigation, including hiring its own schematic capture expert. JA5819 at 550:20-25. Based on this investigation, O2 concluded that the schematics appeared to have been created with a version of MicroSim Schematics that O2 acquired as part of a "MicroSim PSpice A/D Basics+ with Schematics" bundle. JA4900 [O2's Suppl. Resp. to 3rd ASUSTeK Rogs]. As such, the February 18, 1998 date apparently was not generated by Dr. Lin's system clock – it appears that he entered the date in the software's date field. Contrary to O2's collective recollection in 2007, O2 did at one time in 1998 have schematic software that lacked the "automatic" date stamp feature.

Upon discovering this mistake, O2 promptly took corrective measures, including amending its interrogatory responses to reflect this newly discovered information. JA4899-4901. O2 also clarified the record by admitting that it: (1) did "not contest" that the February 18, 2008 schematics "were printed using MicroSim Schematics and not OrCAD capture"; and (2) "does not contest that the date on the schematics must have been entered into the software by the program's user." JA2673.

Based on O2's prompt acknowledgement of its mistake, it is unsurprising that the district court did not find O2's misstatements intentional or even reckless, and the record confirms that O2's representations were based on nothing but a

good faith (albeit mistaken) belief that the "Feb., 18, 1998" date was automatically generated. As MPS's own expert acknowledged, it appears that O2 began using OrCAD Capture – which indisputably automatically generates date stamps – shortly after February 1998, by May 1998. *See* JA5865-5867 [Herniter Depo.] at 53:5-55:9, 83:18-84:25; JA5873 [Herniter Depo. Ex. 7]. Ten years later, OrCAD Capture was "all anyone recall[ed] ever using" at O2 because that is what was used from 1998 to 2008. JA4887 at 68:16-19. In fact, as Mr. Krems explained in his 2009 deposition, "That's the only [schematic capture] software ever seen at O2 Micro." *Id.* As such, it is not surprising that Dr. Lin's recollection nine years after O2 began using OrCAD Capture was that it was the program he used and it automatically generated the date stamp.

In sum, nothing about O2's representations regarding the schematic supports a finding of misconduct, much less litigation misconduct sufficient to justify an "exceptional case" finding. In fact, the *only* reasonable inference that can be drawn from these facts is that O2 believed in good faith that the schematics were automatically dated because "automatic" date stamping was a standard feature, not only in the OrCAD capture software O2 had used since May 1998, but in other circuit design programs as well. *See Therasense*, 649 F.3d at 1291 (To "meet the clear and convincing evidence standard," the presence of a culpable mental state

"must be the single most reasonable inference able to be drawn from the evidence."). Deceit is not even close to the single most reasonable inference.

**2. O2'S INVESTIGATION WAS NOT NEGLIGENT AND, IN ANY EVENT, NEGLIGENCE IS INSUFFICIENT TO SUPPORT § 285 SANCTIONS.**

The district court appears to fault O2 for its alleged negligence in failing to undertake an independent investigation into the veracity of its representations until after MPS served it with Dr. Herniter's report. *See* JA66. As an initial matter, as Mr. Krems explained during his 30(b)(6) deposition, he *did* investigate the basis for O2's representations in its interrogatory response in connection with verifying the response. JA4885-87. Though his investigation ultimately proved unsuccessful, it demonstrates that O2 abided by its obligations to the court, and was not negligent in making its representations.

In any event, even if O2 had negligently failed to investigate, which it did not, negligence cannot support a § 285 sanction. *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1369 (Fed. Cir. 2007) ("merely negligent conduct does not suffice to establish that a case is exceptional"). Moreover, the mere suggestion that O2 may have been negligent, without any analysis of duty, breach, or the relevant standard of care, cannot support an exceptionality finding. *See Stephens*, 393 F.3d at 1276 (reversing an "exceptional case" determination for lack of supporting analysis).

Furthermore, to the extent the district court is suggesting that O2 had a duty to hire an expert to determine whether the schematics were created with software that lacked automatic date stamping – when no one at O2 could recall ever using such software – such a duty is belied by MPS's conduct in the '722 action. Specifically, as the party who believed the manner in which the software dated the schematic was important, MPS had every incentive in that prior litigation to establish that the date had been manually entered. Given MPS did not believe it worth investigating with expert analysis in the '722 action, notwithstanding its keen interest, there was certainly not sufficient basis to create an affirmative duty for O2 to investigate beyond the investigation by Mr. Krems.

### 3. WHETHER THE SCHEMATICS WERE DATED "AUTOMATICALLY" BASED ON DR. LIN'S SYSTEM CLOCK OR MANUALLY ENTERED WAS NOT IMPORTANT, AND THE DISTRICT COURT UNDERTOOK NO MATERIALITY ANALYSIS

In addition to showing a culpable mental state, the party alleging an actionable misrepresentation must demonstrate that the fact in question was material to the proceedings. *See, e.g.,* 18 U.S.C. § 1621 (requiring "materiality" to establish perjury); *Therasense*, 649 F.3d at 1291 (requiring "but-for" materiality to establish inequitable conduct); *Matrixx Initiatives, Inc. v. James Siracusano*, 563 U.S. 2011 (2011) (securities fraud requires proof that the misrepresentation or omission was material). Consistent with these principles, this Court requires that a party seeking an "exceptionality" finding demonstrate the materiality of the alleged

41

misconduct. *See Brooks Furniture*, 393 F.3d at 1381 ("The prevailing party must demonstrate *material* inappropriate conduct related to the matter in litigation.").

The district court's opinion contains no analysis of materiality.[7] MPS did not, and could not, make such a showing because whether the schematics were dated "automatically" based on Dr. Lin's system clock or manually entered is not important to whether they were accurately dated. Specifically, during the '722 case, MPS alleged, as it does now, that Dr. Lin had "backdated" the schematics and that they were really created in July 1999. *See, e.g.,* JA1250-51. They asserted that there was no corroborating evidence such as computer files, only a paper printout whose date could have been altered. *Id.* O2 did not dispute that someone *could* alter the date, JA548 at 71:2-72:1, but maintained that this is not what occurred here. In fact, any user could alter even an "automatic" date stamp by changing the date in the system clock of her computer, as Dr. Herniter and MPS themselves asserted. *See* JA2720 [Herniter Report]; JA548 at 71:2-72:1. Because a user is equally able to "backdate" an "automatically" generated date stamp as she can backdate a date field in MicroSim Schematics by typing an earlier date,

---

[7] Though the district court characterized this issue as "material" in passing, it provides no reasoning supporting this description. *See* JA66; *Stephens*, 393 F.3d at 1276 (reversing an "exceptional case" finding for failure to provide supporting reasoning).

whether the date stamp was "automatically" generated or manually entered is not important to whether the schematics were, in fact, backdated.

Where the allegation is that the document is fraudulent, as MPS argued in the earlier trial, the "source" of the information contained within the document is not important because the whole point is that the document was altered.

As such, Dr. Lin's failure to properly recall whether he entered the date cannot support a litigation misconduct finding.

## B.    O2 DID NOT DISSEMBLE.

It appears that the district court actually based its litigation misconduct finding on its belief that O2 "dissembled," rather than "straightforwardly" admit the truth about its mistaken representations.    Specifically, the court's analysis identified three items to support its "dissemble" finding:

    i.     O2's supplemental interrogatory response contained a "convoluted" paragraph in which O2 allegedly hid the fact that Dr. Lin had entered the date;

    ii.    O2 moved to strike Dr. Herniter's report on grounds that his opinions were not relevant in light of the parties' agreement regarding the material aspects of how the schematic came to be dated;

    iii.    O2's assertion of collateral estoppel in: (1) its motion to strike Dr. Herniter's report; and (2) its motion for summary adjudication that Dr. Lin conceived of the '382 patent's subject matter in February 1998.

JA66-67.

As an initial matter, the notion that these acts were part of an effort to somehow conceal O2's misstatements is irreconcilable with record regarding O2's prompt and frank admissions detailed above. That notion is further belied by Dr. Lin's candid admission during the ITC hearing that, prior to the expert report of Dr. Herniter, he had always believed that the software program he used automatically inserted the "Feb., 18, 1998" date, but that his recollection must have been "wrong." JA5821 at 552:2. The opposite of "dissembling," Dr. Lin straightforwardly admitted his mistake, offering his "sincere apologies" to all involved. *Id.* at 552:4-5. Because the litigation misconduct finding was grounded on the clearly erroneous notion that O2 tried to conceal its mistake, this alone is grounds for reversal, even if it could be sufficient to support an "exceptional case" finding under § 285.

Moreover, each of the three challenged acts was reasonable and legitimate, as explained below.

### 1. O2'S INTERROGATORY RESPONSE WAS CLEAR, SPECIFIC AND ACCURATE

Without explanation, the district court faulted O2 for providing a "convoluted" interrogatory response that supposedly "obfuscated" the fact that "Dr. Lin manually entered the date." JA66. Nothing about the interrogatory response was improper, nor did it obfuscate that Dr. Lin had entered the date.

The interrogatory response at issue asked O2 to:

44

> Explain **how** the **PSpice program** used by Dr. Lin to create the circuit diagram dated "Feb., 18, 1998" [sic] . . . allegedly "automatically **provided a date stamp** on the day it was created" when the date in the title block contains a typographical error – i.e., "Feb., 18, 1998."

JA4901.

Though O2 was unable to find the exact version of the software Dr. Lin had used a decade earlier, based on its investigation, O2 believed Lin likely used a version of PSpice Schematics similar to version 6.2j[8] (formerly "MicroSim Schematics") and explained that program's date stamp functionality in detail:

> When version 6.2j of PSpice Schematics is used to create a new schematic, the program automatically populates the "date" field of "titlblk" with the default date January 1, 2000, and will print that date in the title block of the schematic unless changed by the user. The program automatically prints the date that has been entered into the "date" field of "titleblk" using the Attributes edit function. The date in the title block remains the same until it is edited. If the "date" attribute was changed using the edit function on the date the document was created and the document was printed on that date, the software would automatically print that date in the title block at the lower right hand comer of the schematic.

JA4901.

As an initial matter, this discovery request was *not* a request for an admission that Dr. Lin entered the date – it was an interrogatory regarding *how* the

---

[8] Based on O2's investigation, it appeared likely that Lin used either MicroSim PSpice AID Basics+ with Schematics version 6.2j or a subsequent version of PSpice Schematics. JA4900 [O2 Suppl. Resp. to 3rd ASUSTeK Rogs].

date stamp function of the PSpice program operates. Accordingly, it is no surprise that the response details precisely and neutrally the *process* by which the software "automatically print[s]" in the title block the date entered into the "date" field by the user, rather than simply stating: "Dr. Lin entered the date." JA4901. The response is perfectly accurate and does not mislead in any way whatsoever. It straightforwardly states that the software would have printed "January 1, 2000" on the schematic "unless changed by *the user*." *See id.* (defining the user as Dr. Lin: "Explain how the PSpice program used by Dr. Lin . . ."). Because the discovery request itself acknowledges that the schematic is *not* dated January 1, 2000, it is readily apparent from O2's response that Dr. Lin entered the date.

The district court's conclusion that this interrogatory is somehow improper, and failure to explain why, calls into question how carefully it was reviewed and understood by the district court. In any event, the district court's finding is clear error because it conflicts with the plain terms of the discovery response itself.

### 2. THE DISTRICT COURT'S "FINDING" THAT O2 FILED "BASELESS MOTIONS" FAILS TO APPLY THE PROPER STANDARD AND IS WHOLLY UNSUPPORTED

It is well-established that arguments made during litigation are not sanctionable unless they were objectively unreasonable when made, which is a question of law. *Highmark*, 687 F.3d at 1316 (A "party cannot be sanctioned for making frivolous arguments during the course of the litigation if the arguments

themselves were not objectively unreasonable at the time they were made."). This Court reviews whether a particular argument was objectively unreasonable without deference. *Id*. at 1316 (citing *Bard Peripheral Vascular, Inc. v. W.L.Gore & Assocs., Inc.*, 682 F.3d 1003, 1004–06 (Fed. Cir. 2012)).

The district court did not undertake any analysis into the reasonableness of O2's arguments or so much as acknowledge the governing legal standard. Instead, it merely labeled O2's motions "baseless." JA66. Because the court did not even attempt to apply the proper inquiry, its "exceptional case" order contains no findings as to whether O2's arguments were "objectively unreasonable." *See* JA65-67. For this reason alone, these motions cannot support an exceptionality finding. *See Stephens*, 393 F.3d at 1276 (an "exceptional case" finding must be supported by articulated underlying fact findings).

In any event, as demonstrated below, each of O2's arguments was reasonable.

> ### a) IT WAS REASONABLE FOR O2 TO SEEK TO EXCLUDE DR. HERNITER'S REPORT REGARDING THE DATING MECHANISM

Because O2's concessions eliminated the question of whether the February 18, 1998 date was manually entered, Dr. Herniter's report did not address any material, disputed issue. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ("Rule 702 . . . requires that the evidence or testimony assist the trier of fact

47

to understand the evidence or determine a fact *in issue*.  This condition goes primarily to relevance.") (internal quotation marks omitted and emphasis supplied).

As noted above, upon receipt of Dr. Herniter's report, O2 conducted its own investigation into how the schematics came to be dated and reached the same conclusions as Dr. Herniter.  JA5819 at 550:20-25.  Accordingly, each of Dr. Herniter's contributions either: (1) addressed an undisputed issue; (2) failed to aid the jury's understanding; or (3) prejudicially misrepresented undisputed facts:

|   | **MPS's Description of the "General Issues" Dr. Herniter Was to Address**[9] | **O2's Position With Respect to the Issue** |
|---|---|---|
| 1. | The "schematics with the phrase 'Feb. 18, 1998' were created using PSpice, not OrCAD Capture." | O2 agreed that the schematics were created with PSpice and stated that much in its supplemental interrogatory response.  *See* JA4901-02. |
| 2. | The "phrase 'Feb., 18, 1998 was not automatically entered by the program, but instead was entered by the user." | O2 agreed that the date on the schematic was not based on the system clock's date, which is what MPS meant by "automatic."  *See* JA4901-02. |

---

[9] *See* JA2695 [MPS's Opp. to O2's Motion to Strike].

| 3. | Because "O2 Micro destroyed Dr. Lin's computer, hard drive and all electronic copies of the 'Feb. 18, 1998' schematics, it is not possible to determine when Lin actually created the schematics." | This "opinion" merely misstates O2's interrogatory response regarding O2's maintenance of electronic versions of the schematics. For example, consistent with its discovery obligations, O2 affirmed that it found no electronic copies after a reasonable search. O2 never indicated that it had "destroyed . . . all electronic copies" of the schematics. JA2695. Dr. Herniter's misstatements served no purpose other than to prejudice the jury. |
|---|---|---|
| 4. | The "earliest simulation results from the PSpice program that O2 Micro has produced in this case were created on June 24, 1999." | The simulation results speak for themselves – the produced results bear the date "June 24, 1999" and it is undisputed that the simulations that generated the results were run on June 24, 1999. |
| 5. | "On some of the June 24, 1999 simulation result printouts, someone redacted the directory pathway that is automatically generated by the PSpice Probe software" and those "redactions concealed the fact that the schematics were stored in a file folder labeled 'MPS.' "[10] | Again, the documents speak for themselves. Dr. Herniter adds nothing beyond what the jury can determine by viewing the otherwise identical documents side-by-side. O2 did not dispute that PSpice probe automatically generated the directory paths. |

---

[10] Dr. Herniter's report alleged that O2 redacted the directory paths to conceal the fact that the schematics were stored in a folder referring to "Monolithic Power Systems." JA1630-31. As Dr. Lin testified, however, the "MPS" folder referred to "multiple power supplies," and O2 produced documents confirming use of that term within the relevant field. JA5890.

49

As MPS's "general issues" list confirmed, MPS's goal was not to assist the jury's resolution of disputed issues, but, rather, to use Dr. Herniter as a mouthpiece to influence the jury with unsupported accusations of spoliation, evidence tampering and fraud. As such, Dr. Herniter's testimony could only prejudice the jury against O2 by unfairly elevating MPS's unsupported allegations to the level of opinions signed off by an expert – when O2 had acknowledged the discovery mistake. Accordingly, it was only sensible to request that the court exercise its discretion and exclude Dr. Herniter on grounds that, to the extent any of his report was relevant, it was unfairly prejudicial and would mislead the jury. *See* JA2677 (citing FED. R. EVID. 403).

The district court disagreed with O2's contentions and ruled that that the jury would not be prejudiced by Dr. Herniter's testimony. JA2947-48. That an argument failed, however, does not render it baseless. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1339 (Fed. Cir. 2009).

### b) O2'S COLLATERAL ESTOPPEL ARGUMENTS WERE REASONABLE

As noted above, the '722 litigation involved the identical dispute MPS raised in this case: whether the dates on the February 1998 schematics accurately reflect

when they were created.[11]  MPS's contention in both actions was that its own

MP1010, which it allegedly developed by March 1998, invalidated O2's patent

because O2 could not demonstrate prior conception in February.   JA992-93

[Silzars Report ¶¶243-46]; JA722.  In both actions, that inquiry turned on whether

the schematics established a pre-March 1998 invention date.  MPS's strategy was

the same then as it was below: accuse Dr. Lin of backdating the schematics.  *See,*

*e.g.,* JA1250-51.  As MPS noted, there were *multiple* ways someone *could* have

altered the date, such as changing the system clock.  *See* JA2720 [Herniter Report];

JA548 at 71:2-72:1. That was not the issue.  The issue was when Dr. Lin conceived

of his invention.  That issue was submitted to the jury, and the verdict form reflects

that the jury credited Dr. Lin's testimony and affirmed O2's position that Dr. Lin

conceived his invention in February 1998 and diligently reduced it to practice

thereafter.  *See* JA1183-87.

Specifically, the jury accepted MPS's MP1010 on-sale bar defense, which

means it necessarily believed that the MP1010 contained every element of the

claimed invention.  JA1187.  Notwithstanding that determination, the jury rejected

MPS's 102(g)(2) prior invention defense.  JA1186.  Because the jury believed that

---

[11] Because the '722 traced priority to the same disclosure as the '382 (Provisional
Application No. 60/145,188), the conception date inquiry in both cases was
materially the same.

the MP1010 met every claim limitation, it necessarily must have decided that Dr. Lin conceived of his invention prior to March 1998 – otherwise, the MP1010 would have invalidated the '722 under 102(g)(2). Further, because the corroborating evidence that disclosed sufficient elements of the invention was the February 18, 1998 schematics, in addition to Dr. Lin's testimony, the jury must have decided that those schematics were, in fact, created in February 1998.

Notwithstanding the jury's rejection of MPS's backdating claims and determination that the schematics were created in February 1998, the district court deemed O2's collateral estoppel assertions sanctionable. Though the district court did not articulate its reasoning, it appears that it objected to the "implicit[] suggesti[on] that MPS had ASUSTeK had a full and fair opportunity to litigate the 'Feb. 18, 1998' " date in the '722 litigation in light of Dr. Lin's and Mr. Badgett's mistaken testimony. JA66.

As noted above, however, the district court did not find, nor does the record reflect, that any O2 representative affirmatively hid anything from MPS or intentionally testified falsely in the prior proceedings. Dr. Lin and Mr. Badgett simply were mistaken about how the date was originally made part of the document, not mistaken about the date of the creation of the document. No new evidence came to light in this case that was unavailable in the last, and since the '722 action, MPS has contended that Dr. Lin somehow backdated the document.

52

*See, e.g.,* JA1250-51. To the extent MPS believed this issue was critical, it had every incentive and opportunity in the '722 action to hire a schematics expert to investigate what software was used to create the February 1998 schematics, as it did in this case. Consequently, while reasonable minds may disagree, it was not unreasonable to contend that MPS had a full and fair opportunity to litigate the accuracy of the schematics' date.

Perhaps more significantly, whether the date was "automatically" or "manually" entered is not important to whether the date printed on the schematics accurately reflects when they were created. The date is selectable by the user in either case, as discussed above. Regardless of how the schematic capture software sourced the date that it printed in the Title Block, Dr. Lin was subject to MPS's accusations of backdating, as evidenced by its credibility attacks in the '722 litigation. As discussed above, even an "automatically" entered date can be changed by changing the date in the computer's system clock. So the issue was not whether Dr. Lin could have caused the document to bear a different date than the date it was created, but whether he actually did backdate the document or not. The '722 jury heard and rejected MPS's backdating attacks. JA1186.

O2 alternatively argued that collateral estoppel at least precluded MPS from relitigating the authenticity of the February 1998 schematics. *See* JA719-21. Specifically, O2 contended that, because the district court twice rejected MPS's

attempts to keep the schematics out of the '722 case, and because the jury necessarily deemed the schematics authentic in reaching its 102(g) verdict, that issue should not be rehashed. *Id*; JA2906-07.

The district court declined to apply collateral estoppel, but not because O2's position was baseless. Rather, the district court simply stated that the jury did not necessarily decide the issue. JA 2949. It did not address, or even acknowledge, O2's argument that the 102(g) verdict meant the jury necessarily found the schematics authentic. *See* JA 2949. Nothing about this assertion was frivolous, however, particularly given the flexibility in collateral estoppel's application. *See Costello v. IBM*, No. 02-5870, 2006 U.S. Dist. LEXIS 57390, at *14-15 (S.D.N.Y Aug. 16, 2006) (refusing to impose sanctions because "collateral estoppel is a flexible doctrine which can never be rigidly or mechanically applied").

The district court also appears to fault O2 for "repeating" its collateral estoppel arguments in different motions. *See* JA66. But, there was nothing improper about O2's reliance on a single legal doctrine to seek *multiple forms of relief*: (1) striking Dr. Herniter's report; and (2) summary adjudication of the '382's invention date. Moreover, any notion that this was some sort of improper attempt to rehash arguments is irreconcilable with how O2 presented its contentions. Specifically, to ensure their efficient evaluation, O2 advanced its collateral estoppel arguments in one place – its summary judgment brief – and

incorporated them by reference in its motion to strike. *See* JA597 [Motion to Strike] (referring the court to O2's collateral estoppel arguments "set forth in detail in a Motion for Summary" Judgment "[ra]ther than repeating those arguments here"). Nothing about this was baseless or otherwise improper.

Because MPS had the identical opportunity to investigate the schematic software as it did in this action, and because the specific dating functionality is not important in any event, it was not unreasonable to contend that collateral estoppel precluded MPS from relitigating whether the February 1998 schematics were authentic and accurately dated. It surely was not sanctionable.

## IV. THE DISTRICT COURT'S ATTORNEYS' FEES AWARD IS LEGALLY IMPROPER BECAUSE IT DOES NOT EVEN PURPORT TO TRACE FEES TO THE ALLEGED WRONGS

Independent of the errors in the Court's "exceptional case" finding described above, the district court's attorneys' fee award is legally improper. This is because the massive $9 million plus fee award is not proportionate, much less tailored, to the putative wrongs found by the district court. It is also flatly inconsistent with the Supreme Court's "but for" causality rule adopted in *Fox*. Moreover, the district court failed to apportion its fee award to the different alleged wrongs, so there is no way the undifferentiated award can survive the correction of even one of the errors in the "exceptional case" finding documented above.

## A. BEFORE REQUIRING AN OPPONENT TO PAY ITS ADVERSARY'S ATTORNEYS FEES, THOSE FEES MUST BE *CAUSED* BY THE ALLEGED WRONGDOING

In developing and applying the sanctions principles of § 285, this Court has drawn heavily on Supreme Court precedent relating to sanctions. *See, e.g., iLOR*, 631 F.3d at 1376 ("Section 285 must be interpreted against the against the background of the Supreme Court's decision in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)").

In particular, § 285 has been interpreted in light of Supreme Court cases applying the sanction provision for federal civil rights actions, § 1988, which includes *Hensley v. Eckerhart*, 461 U.S. 424 (1983) and *Texas State Teachers Ass'n v. Garland Independent School Dist.,* 489 U.S. 782 (1989). *See*, *e.g.*, *Brooks Furniture,* 393 F.3d at 1381; *Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1459 (Fed. Cir. 1991); *PPG Indus. v. Celanese Polymer Specialities Co.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988).

The most recent Supreme Court decision on sanctions is *Fox v. Vice*, 131 S. Ct. 2205 (2011), which involved a sanctions claim under 42 U.S.C. § 1988.  In *Fox*, the Court observed that the purpose of the sanction in favor of a litigant who had to defend against a baseless claim is "to relieve a defendant of expenses attributable to frivolous charges." *Id*.

56

The key question in *Fox* was whether fees that would have been incurred *anyway* because of claims not found to be baseless would be recoverable if those same fees were also incurred defending against baseless claims. The Court explained that unless fees were "but for" caused by the wrongful conduct, they are not recoverable: "The defendant would have incurred the expense in any event; he has suffered no incremental harm from the frivolous claim." *Fox*, 131 S. Ct. at 2215. The Supreme Court explained at length why this makes sense, including its explanation that a "standard allowing more expansive fee-shifting would furnish windfalls to some defendants, making them better off because they were subject to a suit including frivolous claims." *Id.* The dispositive question is whether "the costs would have been incurred in the absence of the frivolous allegation." *Id.* If so, as a matter of law they are *not* recoverable. *Id.* ("the defendant may not receive compensation for any fees that he would have paid in the absence of the frivolous claims").

Consistent with this standard, in *Highmark*, this Court recently explained that for a fee award based on litigation misconduct, the amount should be that necessary to "compensate a party for the "extra legal effort to counteract the misconduct." *Highmark*, 687 F.3d at 1316 (internal citation omitted). This highlights the compensatory nature of a fee award for sanctions under § 285.

## B. THE DISTRICT COURT ERRED BY FAILING TO APPLY A "BUT FOR" ANALYSIS TO THE FEES INCURRED

The district court included in its judgment "an award of fees for the entire case" because O2's misconduct was supposedly "pervasive." JA86. This indiscriminate and punitive approach fails.

As O2 repeatedly explained below, because most of the discovery in this case was taken in the ITC case with potential dual use in this case, it was *not* properly within any award.[12] *See supra* Statement of the Facts, II.D. As an example of just how little discovery was unique to this case, of the nearly forty depositions MPS noticed, it served all but six (relating to damages) in the ITC action. *See* JA7014-79 [MPS's ITC Deposition Notices]; JA7747. Likewise, ASUSTeK produced more than 4.5 million pages of documents in the ITC investigation, but zero in this case. *See* JA5304 at ¶76; JA8102.

The district court made no finding that O2's participation in the ITC investigation was baseless or itself constituted misconduct and did not purport to award fees involved in the ITC investigation. It also did not find the ITC action

---

[12] JA5291-92 [O2's Opposition to MPS's Fees Motion, § V.A.: "Fees Related to the ITC Investigation Are Not Recoverable"] ("only conduct that occurred during the present litigation can be considered . . . [t]he parties stipulated that evidence produced in ITC investigation was useable in this case to avoid additional discovery, not to bootstrap ITC costs into this case."); JA9534-9538 [O2's Opposition to MPS's Fee Award Request]; JA10485-86.

58

exceptional.  This is consistent with the fact that the ITC investigation is a public investigation and private fee awards of the type authorized by § 285 are unavailable in such proceedings.[13]  In all ITC investigations, the ITC staff ensures a proper basis exists before an investigation is commenced and the ITC staff actively participates in the case throughout this investigation.  *See* 19 C.F.R. § 210.9-10 (The ITC "shall examine a complaint for sufficiency" and "determine whether the complaint is properly filed and whether an investigation should be instituted on the basis of the complaint."); *In re Certain Concealed Cabinet Hinges and Mounting Plates*,  No. 337-TA-289, 1989 ITC LEXIS 236 (July 18, 1998) (explaining the Office of Unfair Import Investigations's role in examining and evaluating a complaint).

Here, the district court did not purport to sanction O2 for its actions before the ITC.  A "court generally should sanction 'conduct beyond that occurring in trial [only] when a party engages in bad-faith conduct which is in direct defiance of the sanctioning court.'"  *Highmark*, 687 F.3d at 1319 (quoting *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 591 (5th Cir. 2008)) (hard brackets in original).   In *iLOR*, a district court sanctioned a defendant for conduct before a different court earlier in

---

[13] While the ITC rules do incorporate Rule 11 type sanctions, no such sanctions were awarded here.  *See* 9 C.F.R. § 210.4.

the case before transfer. *Id.* This Court resoundingly reversed the finding insofar as it was based on conduct before a different tribunal because it was proper only to sanction the defendant for conduct before the sanctioning court itself. *Id.* ("The district court offered no justification for sanctioning conduct before a different tribunal.").

Under *Fox* and *Highmark*, it was improper for the district court to include in its fee award, attorney time and any other expenditure that would have been expended in any event on the ITC action. That legal work was necessary anyway for the ITC and the district court did not, and could not, find O2's pursuit of that action in any way improper. Moreover, the ITC itself could have awarded sanctions if the case or any part of it was found to be improper, but it did not. *See* 19 C.F.R. § 210.4(c)-(d). On the contrary, the ITC Office of Unfair Imports reviewed the allegations in O2's complaint and itself decided to bring an investigation as to infringement; had it believed the allegations unwarranted or unsupported, it would not have undertaken the investigation. 19 CFR §§ 210.9 - 210.10. In other words, in the language of *Fox*, "but for" this case such attorney work would nevertheless have taken place and is not properly included. In the language of *Highmark*, the work performed for the ITC and considered for use in this case too was not "extra legal effort" that would not otherwise have been undertaken. Likewise, the ITC was not asked to, and did not find it improper.

This is huge because most of the discovery expense in the sanctions award was incurred in the ITC discovery process.

The district court rejected this position below. As to *Fox,* the district court stated that it never found O2's arguments frivolous and thus presumably it found *Fox* irrelevant altogether. *See* JA86 at n.4. As a threshold matter, sanctioning a party for asserting non-frivolous claims is improper and cannot be used to side-step Supreme Court principles regarding the proper scope of sanctions awards. Moreover, the teaching of *Fox* and *Highmark* is that expenditures that would be incurred regardless of the sanctionable conduct are not properly included in an award. The district court did not determine whether the wrongdoing it found caused the fees it awarded, nor did it attempt to trace fees to the improper conduct.

As an example of how far this error reached, the district court even awarded $341,100 for MPS's legal expenditures in the ITC even *before* the district court allowed the parties to use ITC discovery in this case. JA89. The district court did so by wrongly asserting that O2 had not objected to this expense. *Id.* But, in fact, it had done so clearly. JA9536 at n.9 ("O2 also separately objects to any ITC Discovery costs incurred before this Court entered the order allowing parties to use ITC discovery in this case."). The district court later acknowledged O2 had preserved its objection, but overruled that objection without reasoning. JA100-01.

Accordingly, the fee award is improper because it includes substantial expenditures incurred in the ITC action, which would have been incurred even if this case were never filed.

## V. THE DISTRICT COURT'S AWARD CANNOT STAND IF ANY GROUND FOR ITS "EXCEPTIONAL CASE" FINDING FAILS

Because the district court made no attempt to attribute costs incurred by MPS to any of its misconduct findings, if any of those findings are reversed, and they all should be, the entire award must fall. Both tracing and "but for" causality are required as explained above.

## CONCLUSION

For all the above reasons, the district court's "exceptional case" finding, and all attorneys' fees and costs based thereon, should be reversed.

Dated:  October 15, 2012                     Respectfully submitted,

                                             */s/Edward R. Reines*_____
                                             Edward R. Reines
                                             WEIL, GOTSHAL & MANGES LLP
                                             201 Redwood Shores Parkway
                                             Redwood Shores, CA  94065

                                             *Counsel for O2 Micro International Ltd.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)((B). This brief contains 13,967 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: October 15, 2012        <u>/s/Timothy C. Saulsbury</u>

Timothy C. Saulsbury

*Counsel for Defendant/Counterclaimant-*
*Appellant O2 Micro International Limited*

## CERTIFICATE OF SERVICE
## MONOLITHIC POWER v. O2 MICRO, 2012-1221

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, I certify that on

October 15, 2012, I served the foregoing via the Court's CM/ECF on:

John R. Alison
Finnegan, Henerson, Farabow, Garrett and Dunner, LLP
907 New York Avenue, NW
Washington, DC  20001
(202) 408-4153

Mark A. Flagel
Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA  90071
(213) 485-1234

Dean G. Dunlavey
Latham & Watkins LLP
650 Town Center Drive, Suite 2000
Costa Mesa, CA  92626
(714) 540-1235

Dan L. Bagatell
Perkins Coie LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
(602) 351-8250

Dated:  October 15, 2012

/s/ Timothy C. Saulsbury

Timothy C. Saulsbury

*Counsel for Defendant/Counterclaimant-Appellant O2 Micro International Limited*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONOLITHIC POWER SYSTEMS, INC., | No. C 08-4567 CW |
| Plaintiff, | JUDGMENT ON ATTORNEYS' FEES AND COSTS |
| v. | |
| 02 MICRO INTERNATIONAL LIMITED, | |
| Defendant. | |

———————————————————/

02 MICRO INTERNATIONAL LIMITED,

Counterclaimant,

v.

MONOLITHIC POWER SYSTEMS, INC;
AUSUSTEK COMPUTER INC.; ASUSTEK
COMPUTER INTERNATIONAL AMERICA; BENQ
CORPORATION; and BENQ AMERICA CORP.,

Counterclaim-Defendants.

———————————————————/

Judgment is hereby entered consistent with the Court's Order Granting MPS's motion for attorneys' fees and non-taxable costs.

MPS shall recover from 02 Micro International Limited attorneys' fees in the amount of $8,419,429 and non-taxable costs in the amount of $663,151, with interest accruing as set forth in the Court's Order.

IT IS SO ORDERED.

Dated: 5/3/2012

CLAUDIA WILKEN
United States District Judge

1

2

3

4

5

6

7               IN THE UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10                                      No. C 08-04567 CW

MONOLITHIC POWER SYSTEMS, INC.,

11                                      ORDER GRANTING IN
                                        PART MPS AND
            Plaintiff,                  ASUSTEK'S MOTION FOR
12                                      ATTORNEYS' FEES AND
     v.                                 NON-TAXABLE COSTS,
13                                      GRANTING MPS AND
O2 MICRO INTERNATIONAL LIMITED,         ASUSTEK'S MOTION FOR
14                                      REVIEW OF THE
            Defendant.                  CLERK'S TAXATION OF
15   _____/ COSTS AND GRANTING
                                        IN PART AND DENYING
16   O2 MICRO INTERNATIONAL LIMITED,    IN PART O2 MICRO'S
                                        MOTION FOR REVIEW OF
17          Counterclaimant,            THE CLERK'S TAXATION
                                        OF COSTS
18   v.                                 (Docket Nos. 410,
                                        438 and 439)
19   MONOLITHIC POWER SYSTEMS, INC.;
     ASUSTEK COMPUTER INC.; ASUSTEK
20   COMPUTER INTERNATIONAL AMERICA; BENQ
     CORPORATION; and BENQ AMERICA CORP.,
21
            Counterclaim-Defendants.
22
     _____/
23

24       Plaintiff and Counterclaim-Defendant Monolithic Power Systems,

25   Inc. (MPS) and Counterclaim-Defendants ASUSTeK Computer, Inc., and

26   ASUS Computer International (collectively, ASUSTeK) move for an

27   award of reasonable attorneys' fees and non-taxable costs.

28   Defendant and Counterclaimant O2 Micro International Limited

**United States District Court**
For the Northern District of California

opposes MPS and ASUSTeK's motion. MPS and ASUSTeK also move for a
review of the Clerk's taxation of their costs against O2 Micro. O2
Micro opposes MPS and ASUSTeK's motion for review and seeks review,
for other reasons, of the Clerk's taxation of MPS and ASUSTeK's
costs against it. MPS and ASUSTeK oppose O2 Micro's motion for
review. The motions were taken under submission on the papers.
Having considered the papers submitted by the parties, the Court
GRANTS in part MPS and ASUSTeK's motion for attorneys' fees and
non-statutory costs, GRANTS MPS and ASUSTeK's motion for review of
their costs against O2 Micro and GRANTS in part and DENIES in part
O2 Micro's motion for review of the Clerk's taxation of MPS and
ASUSTeK's costs against it.

BACKGROUND

I.   Previous Litigation

     Since 2001, O2 Micro and MPS, or MPS customers, have litigated
before this Court five lawsuits in which O2 Micro asserted patent
infringement claims.[1] This lawsuit was the fifth.

     In October, 2001, O2 Micro filed suit against MPS, alleging
infringement of its U.S. Patent No. 6,259,615 ('615 patent). See
generally O2 Micro Int'l Ltd. v. Monolithic Power Sys, Inc., Case
No. C 01-3995 CW. The Court granted summary judgment of
noninfringement in favor of MPS, which was affirmed by the Federal

---

[1] In November, 2000, O2 Micro filed suit against MPS, seeking
declarations that MPS's U.S. Patent Nos. 6,144,814 ('814 patent)
and 6,316,881 ('881 patent) were invalid and not infringed by O2
Micro's products. See generally O2 Micro Int'l Ltd. v. Monolithic
Power Sys, Inc., Case No. C 00-4071 CW. In 2005, a jury concluded
that O2 Micro did not infringe the asserted claims of the patents-
at-issue and that the patents were invalid as anticipated by prior
art.

2

**United States District Court**
For the Northern District of California

1   Circuit.  <u>See generally</u> <u>O2 Micro Int'l Ltd. v. Monolithic Power

2   Sys. Inc.</u>, 467 F.3d 1355 (Fed. Cir. 2006).

3        In May, 2004, MPS filed a declaratory judgment action against

4   O2 Micro based on a patent infringement lawsuit O2 Micro filed in

5   the Eastern District of Texas against an MPS customer.  <u>See

6   generally</u> <u>Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.</u>, Case

7   No. C 04-2000 CW (N.D. Cal.).  MPS sought declarations that O2

8   Micro's U.S. Patent No. 6,396,722 ('722 patent) was not infringed

9   and invalid.  O2 Micro counterclaimed for infringement.  During the

10  litigation, O2 Micro proffered schematics bearing the text, "Feb.,

11  18, 1998 [sic]," to corroborate its assertion that O2 Micro

12  engineer Dr. Yung-Lin Lin conceived of subject matter claimed in

13  the '722 patent before MPS's development of its MP1010 product,

14  which MPS asserted rendered the '722 patent invalid.  At trial, Lin

15  testified as follows:

16       Q:   There's a printed date in the title block of
            February 18, 1998.  What does that date indicate,
17            Dr. Lin?

18       A:   That's the program date, which is when the file, the
            circuit diagram generated.  That computer
19            automatically print the date when I save the file.

20  Dunlavey Decl., Ex. 24, at 570:14-19.  O2 Micro executive Adam

21  Badgett echoed Lin's claim that the software automatically inserted

22  the "Feb., 18, 1998" text.  Badgett testified at trial as follows:

23       Q:   These have a date in the title block of February
            18th 1998.  Can you explain to us how that date is
24            put on these documents?

25       A:   This date is automatically inserted by the software
            program.
26
    <u>Id.</u>, Ex. 1, at 748:18-22.  A jury found the '722 patent invalid
27
    based on the on-sale bar and obviousness.
28

3

In October, 2004, O2 Micro filed a lawsuit against two MPS customers in the Eastern District of Texas, accusing them of infringing its U.S. Patent No. 6,804,129 ('129 patent). The case was subsequently transferred to this district and consolidated with the '722 patent action discussed above. See generally O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., Case No. C 06-2929 CW (N.D. Cal.). Thereafter, O2 Micro stipulated to the dismissal of the infringement claims and covenanted not to sue MPS and its two customers for infringement of the '129 patent.

In May, 2007, MPS filed a declaratory judgment action against O2 Micro based on a patent infringement lawsuit O2 Micro filed in the Eastern District of Texas against another MPS customer. See generally Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd., Case No. C 07-2363 CW (N.D. Cal.). MPS sought declarations that the '129 patent was invalid and not infringed by MPS products. O2 Micro counterclaimed for infringement. After the Court denied O2 Micro's two motions to dismiss for lack of subject matter jurisdiction, O2 Micro stipulated to the dismissal of an infringement counterclaim and covenanted not to sue MPS and its customers for infringement of the '129 patent.

II.  Current Litigation

MPS brought the current declaratory judgment action, which initially involved O2 Micro's U.S. Patent Nos. 6,856,519 ('519 patent), 6,809,938 ('938 patent), 6,900,993 ('993 patent) and 7,120,035 ('035 patent) (collectively, '519 patent family). Later, MPS amended its complaint to include U.S. Patent No. 7,417,382 ('382 patent), which was part of the same family as the '722 patent. MPS sought declarations of non-infringement and invalidity

4

1  with respect to these patents.

2      After MPS initiated this lawsuit, O2 Micro filed a complaint

3  in the International Trade Commission (ITC), alleging infringement

4  of these patents by MPS and its customers, including ASUSTeK, BenQ

5  Corporation and BenQ America Corp. (collectively, BenQ).[2]  See

6  generally In the Matter of Certain Cold Cathode Flourescent Lamp

7  ("CCFL") Inverter Circuits and Products Containing Same, Inv. No.

8  337-TA-666.  O2 Micro moved to stay MPS's lawsuit pending

9  completion of the ITC proceeding.  The Court denied O2 Micro's

10 motion.  To avoid duplication and a waste of resources, the Court

11 ordered that all discovery in the ITC proceeding would apply in

12 this action.

13      In this lawsuit, O2 Micro counterclaimed against MPS and BenQ

14 for infringement of the '519 patent family and counterclaimed

15 against MPS, ASUSTeK and BenQ for infringement of the '382 patent.

16 On June 10, 2009, O2 Micro and BenQ stipulated to dismiss the

17 infringement claims asserted against BenQ.  Shortly thereafter, O2

18 Micro dismissed all claims concerning infringement of the '519

19 patent family, both in this case and in the ITC proceedings.  O2

20 Micro also covenanted not to sue MPS or its customers for past or

21 future infringement of the '519 patent family by certain MPS

22 products.  At this point, only claims concerning the '382 patent

23 remained in this action.

24      Because they were part of the same family, the '382 patent

25 claimed subject matter claimed by the '722 patent.  Also, like the

26 _____

27      [2] Although MPS filed its lawsuit in October, 2008, it did not
   serve O2 Micro with process until January, 2009.  However, O2 Micro

28 learned of the lawsuit during the intervening period.  Tr. of March
   3, 2009 Hrg. 8:10.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   '722 patent, the '382 patent claimed priority based on Provisional

2   Application No. 60/145,118, which was filed on July 22, 1999.  To

3   defend against MPS and ASUSTeK's assertions of invalidity based on

4   prior art, O2 Micro again relied on Lin's "Feb., 18, 1998"

5   schematics to establish an invention date before the date the

6   provisional application was filed.

7       Throughout the litigation, O2 Micro asserted, as it had in the

8   trial regarding the '722 patent, that Lin's software automatically

9   inserted the "Feb., 18, 1998" date in the schematics.  On May 11,

10  2009, in response to an interrogatory regarding the schematics, O2

11  Micro stated, "Dr. Yung-Lin Lin used a PSPICE simulation program on

12  February 18, 1998 to create the identified document, which was

13  printed out.  The program automatically provided a date stamp on

14  the day it was created."  Dunlavey Decl., Ex. 26, at 6.  Then, on

15  July 21, 2009, O2 Micro's Rule 30(b)(6) designee Stephen Krems

16  testified that the schematics were created using OrCAD Capture,

17  which was "the only software ever seen at O2 Micro," and that the

18  software "automatically put in" the "Feb., 18, 1998" text.  Id.,

19  Ex. 27, 67:4-5, 68:19.  On July 23, 2009, in interrogatory

20  responses, O2 Micro repeated that the "program automatically

21  provided a date stamp on the day the" schematics were created and

22  referred to Krems's testimony.  Id., Ex. 28, at 6-7.  O2 Micro,

23  however, acknowledged that it did "not have information as to who

24  else saw the" schematics between the alleged February 18, 1998

25  conception date and June 24, 1999.  Id. at 8.

26      On July 31, 2009, MPS served O2 Micro with the report of its

27  expert, Dr. Marc E. Herniter.  MPS had retained Dr. Herniter to

28  testify regarding the functions of relevant software packages,

6

**United States District Court**
For the Northern District of California

 1   including PSpice and OrCAD, and to address whether the "Feb., 18,

 2   1998" text in Lin's schematics was automatically generated by

 3   software or manually entered by a user.  Dr. Herniter concluded

 4   that the schematics were created using PSpice, not OrCAD as Krems

 5   had represented.  Further, Dr. Herniter opined that PSpice "did not

 6   automatically provide a date stamp on the day the schematic

 7   diagrams were created" and that the text, which clearly contained a

 8   typographical error, was manually entered.  Dunlavey Decl., Ex. 30

 9   ¶ 26.  Finally, Dr. Herniter noted that, on some of the other

10   schematics proffered by O2 Micro that were attributed to Lin, the

11   directory path of the file, which appeared in the header of the

12   printouts, had been redacted.  On the printouts in which the header

13   did appear, the directory path indicated that the files had been

14   stored in a file folder named "MPS."  Id. ¶¶ 60-62.  Lin testified

15   that "MPS" referred to "multiple power systems" or "multiple power

16   supplies," not Monolithic Power Systems.  Id., Ex. 15, at 165:16-

17   17.

18        After receiving Dr. Herniter's report, O2 Micro investigated

19   the matter.  On August 24, 2009, O2 Micro supplemented its

20   interrogatory responses, stating that Lin used PSpice to create the

21   schematics, contrary to Krems's testimony and its July 23

22   interrogatory responses.  With regard to the software's date

23   function, O2 Micro stated,

24        When version 6.2j of PSpice Schematics is used to create
         a new schematic, the program automatically populates the
25        "date" field of "titlblk" with the default date January
         1, 2000, and will print that date in the title block of
26        the schematic unless changed by the user.  The program
         automatically prints the date that has been entered into
27        the "date" field of "titleblk" using the Attributes edit
         function.  The date in the title block remains the same
28        until it is edited.  If the "date" attribute was changed

                                    7

using the edit function on the date the document was created and the document was printed on that date, the software would automatically print that date in the title block at the lower right hand corner of the schematic.

Dunlavey Decl., Ex. 29, at 7-8.  Approximately one week later, O2 Micro moved to strike Dr. Herniter's report, asserting that his opinion was irrelevant because he did not offer any testimony regarding any disputed issue.  O2 Micro asserted that it agreed that the "'Feb., 18, 1998' date was printed by the simulation software on the day the schematics were created to the extent the information was entered by the user into the 'date' attribute of the file."  O2 Micro's Mot. to Strike Herniter Expert Report 3-4. O2 Micro also argued that the doctrine of collateral estoppel precluded MPS and ASUSTeK from re-litigating the "authenticity of the schematics" because this issues was settled in the '722 litigation.  Id. at 6.  The Court denied O2 Micro's motion to strike.

On October 20, 2009, Lin admitted in testimony in the parallel ITC proceeding that he entered the "Feb., 18, 1998" text on his schematics and that his assertion that software automatically inserted the date was incorrect.

On February 16, 2010, the Court construed claims of the '382 patent and ruled on the parties' motions for summary judgment and summary adjudication.  The Court denied O2 Micro's motion for summary adjudication of the authenticity of the schematics dated "Feb., 18, 1998," which repeated arguments raised in O2 Micro's motion to strike Dr. Herniter's report.  The Court also denied O2 Micro's motion for summary adjudication that Lin conceived of subject matter claimed in the '382 patent in February, 1998.

8

**United States District Court**
For the Northern District of California

1    After the parties completed their briefing for the pretrial

2  conference, but approximately one week before the conference was to

3  be held, O2 Micro filed a motion to dismiss with prejudice all

4  claims concerning the '382 patent.  Similar to what it had done

5  with respect to the '519 patent family, O2 Micro covenanted not to

6  sue MPS and its customers for past and future infringement of the

7  '382 patent by certain MPS products.  The Court granted O2 Micro's

8  motion and dismissed all claims and counterclaims with prejudice

9  for lack of subject matter jurisdiction.  The Clerk entered

10 judgment accordingly.

11    MPS and ASUSTeK filed a timely bill of costs.  On August 9,

12 2010, the Clerk taxed costs against O2 Micro in the amount of

13 $429,693.31, which was the sum of $2,130.26 for service of

14 subpoenas; $18,169.37 for deposition transcripts; $392,171.73 for

15 exemplification and copying costs; and $17,221.95 for the

16 compensation of court-appointed experts.  The Clerk had disallowed

17 $70.00 from MPS and ASUSTeK's request for subpoena costs and

18 $96,624.28 from their request for exemplification and copying

19 costs.  Am. Bill of Costs.

20                    DISCUSSION

21 I.   MPS and ASUSTeK's Motion for Attorneys' Fees and Non-Statutory
         Costs

22
23    In patent infringement actions, courts "may award reasonable

   attorney fees to the prevailing party" in "exceptional cases."  35
24
   U.S.C. § 285.  O2 Micro does not dispute that MPS and ASUSTeK were
25
   prevailing parties in this action.
26
      To determine whether attorneys' fees are warranted, a court
27
   undertakes a two-step process: (1) the court considers whether
28
                             9

clear and convincing evidence supports a finding that a case is
exceptional and, if so, (2) the court then decides whether it
should exercise its discretion to award attorneys' fees. <u>Wedgetail</u>
<u>Ltd. v. Huddleston Deluxe, Inc.</u>, 576 F.3d 1302, 1304 (Fed. Cir.
2009).

    A.   Exceptionality

    "A case may be deemed exceptional when there has been some
material inappropriate conduct related to the matter in litigation,
such as willful infringement, fraud or inequitable conduct in
procuring the patent, misconduct during litigation, vexatious or
unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or
like infractions." <u>Brooks Furniture Mfg., Inc. v. Dutallier Int'l,</u>
<u>Inc.</u>, 393 F.3d 1378, 1381 (Fed. Cir. 2005). In evaluating whether
a case is exceptional, a court must consider "the totality of the
circumstances." <u>Yamanouchi Pharm. Co. Ltd. v. Danbury Pharmacal,</u>
<u>Inc.</u>, 231 F.3d 1339, 1347 (Fed. Cir. 2000).

    Here, MPS and ASUSTeK assert that O2 Micro engaged in an
abusive and vexatious litigation strategy, inequitable conduct
before the Patent and Trademark Office (PTO) and litigation
misconduct. They also assert that this litigation was baseless.

    As explained below, the Court finds this case exceptional
because O2 Micro engaged in a vexatious litigation strategy and
litigation misconduct. Because these bases sufficiently support an
exceptionality finding, the Court does not consider whether O2
Micro committed inequitable acts before the PTO or filed baseless
litigation.

    1.   Vexatious Litigation Strategy

    As noted above, O2 Micro and MPS, which are competitors, have

**United States District Court**
For the Northern District of California

10

**JA 00063**

**United States District Court**
For the Northern District of California

1   litigated a series of patent cases before this Court.  The Court is

2   familiar with the parties, the technology and the patents-at-issue.

3        In three of the five cases discussed above, O2 Micro undertook

4   a strategy by which it sued MPS customers, prompting MPS to file

5   declaratory judgment actions in this Court.  Thereafter, in each of

6   the three cases, O2 Micro covenanted not to sue, thereby enabling

7   it to avoid litigation on the validity of its patents.  However,

8   this only occurred after substantial litigation had taken place.

9   In this case, for instance, O2 Micro sought to dismiss its

10  counterclaims of infringement, based on a covenant not to sue, only

11  after MPS and ASUSTeK completed their filings for the parties'

12  impending final pretrial conference.  This wasted MPS's, ASUSTeK's

13  and the Court's resources.  Settlement and dismissal of claims on

14  the eve of trial is not uncommon and, indeed, is preferable to no

15  settlement.  However, O2 Micro's conduct takes on a different hue

16  when viewed in light of its competitive relationship with MPS and

17  its resort to this litigation strategy on multiple occasions in its

18  cases before this Court.

19       O2 Micro asserts that most of the actions in which the parties

20  were involved were initiated by MPS.  This is false.  Including the

21  ITC investigation, precipitated by O2 Micro's complaint filed after

22  MPS initiated this lawsuit, the parties have initiated an equal

23  number of proceedings involving infringement of O2 Micro's patents:

24  O2 Micro initiated three coercive proceedings against MPS or its

25  customers, and MPS initiated three declaratory judgment actions

26  against O2 Micro.  Further, MPS's actions were prompted by O2

27

28

11

**United States District Court**
For the Northern District of California

1    Micro's patent enforcement activity against MPS customers.[3]   O2

2    Micro's representation that it was a passive party, haled into this

3    Court only because of MPS's filing of declaratory judgment actions,

4    is not true.

5         Based on its knowledge of the series of cases discussed above,

6    the Court finds that O2 Micro engaged in a vexatious litigation

7    strategy that supports finding this case to be exceptional.

8              2.    Litigation Misconduct

9         "Litigation misconduct and unprofessional behavior are

10   relevant to the award of attorney fees, and may suffice to make a

11   case exceptional."  Taltech Ltd. v. Esquel Enters. Ltd., 604 F.3d

12   1324, 1329 (Fed. Cir. 2010) (citation and internal quotation marks

13   omitted).

14        MPS and ASUSTeK assert that this case is exceptional because

15   O2 Micro engaged in litigation misconduct through its

16   representations concerning how Lin's schematics came to be dated

17   "Feb., 18, 1998" and its insistence, in two separate motions, that

18   the authenticity of these schematics could not be re-litigated.

19   Further, as noted above, O2 Micro sought summary adjudication that

20   Lin invented subject matter claimed by the '382 patent in February,

21   1998.  This conduct, along with O2 Micro's vexatious litigation

22   strategy, supports finding this case to be exceptional.

23        Notwithstanding the clear typographical error in the "Feb.,

24   18, 1998" date block, O2 Micro insisted in the '722 trial, in the

25   ─────────────────────

26        [3] O2 Micro notes that, in this case, no evidence has been
     offered suggesting that it was attempting to enforce its patents
     against MPS customers, suggesting that this action was not
27   necessary.  However, O2 Micro did not move to dismiss this action
     for lack of subject matter jurisdiction and, as a result, MPS was
28   not required to proffer such evidence.

                                   12

United States District Court
For the Northern District of California

ITC investigation and in this litigation that computer software, not Lin, inserted this text.  O2 Micro presented three witnesses who testified that the text was computer-generated and offered verified interrogatory responses stating the same.  O2 Micro admits that it did not perform its own investigation into the veracity of these representations, despite their materiality, until after MPS served it with Dr. Herniter's report.  And, after concluding based on its own investigation "that the 'Feb., 18, 1998' date must have been manually inserted," O2 Micro Opp'n to MPS/ASUS Fee Mot. 12:26, O2 Micro supplemented its interrogatory responses with a convoluted paragraph in which it obfuscated the fact that Lin had entered the date.

O2 Micro then filed baseless motions, prolonging litigation on the "Feb., 18, 1998" schematics.  O2 Micro moved to strike Dr. Herniter's report, arguing that his opinions were irrelevant because it agreed that "the 'Feb., 18, 1998' date was printed by the simulation software on the day the schematics were created to the extent the information was entered by the user into the 'date' attribute."  O2 Micro's Mot. to Strike Herniter Expert Report 3:26-27.  Thus, O2 Micro argued, "the parties agree on this point, eliminating any need for expert testimony on the subject."  Id. 4:1-2.  O2 Micro then asserted that the doctrine of collateral estoppel precluded MPS and ASUSTeK from re-litigating this issue, implicitly suggesting that MPS and ASUSTeK had a full and fair opportunity to litigate the "Feb., 18, 1998" date in the '722 trial, even though Lin and Badgett had offered false testimony.  O2 Micro repeated these arguments in a motion for summary adjudication that Lin conceived of the subject matter claimed by the '382 patent

**United States District Court**
For the Northern District of California

1  in February, 1998.

2       Rather than straightforwardly admit the truth, O2 Micro

3  dissembled and sought, through motion practice, to mask its proffer

4  of false testimony.  This constitutes litigation misconduct that,

5  along with O2 Micro's vexatious litigation strategy, warrants

6  designating this case exceptional.

7       B.   Attorneys' Fees and Non-Statutory Costs

8       Based on O2 Micro's vexatious litigation strategy, litigation

9  misconduct and unprofessional behavior, MPS and ASUSTeK are

10 entitled to reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

11      The Court, however, reserves its decision on the amount of

12 attorneys' fees to which MPS and ASUSTeK are entitled.  MPS and

13 ASUSTeK seek $13,507,643.50 in attorneys' fees.  In support of this

14 request, MPS and ASUSTeK proffer a "high-level 'Statement of

15 Services Rendered,'" Flagel Decl. ¶ 3, which does not indicate the

16 tasks for which hours were billed.  This is not sufficient for the

17 Court to evaluate their fee request.  Further, MPS and ASUSTeK

18 represent that their fee request may include some amounts that were

19 taxed as costs, which makes double recovery possible.

20      Within twenty-eight days of the date of this Order, the

21 parties shall meet and confer to attempt to resolve any disputed

22 issues concerning the amount in light of this ruling.  If the

23 parties cannot reach an agreement, MPS and ASUSTeK shall file

24 documents supporting its fee request.  Such documentation must

25 include detailed records from which the Court can determine the

26 nature of the tasks billed.  Additionally, the fees request shall

27 not contain any amounts for costs taxed.

28

14

**United States District Court**
For the Northern District of California

II.  Motions for Review of the Clerk's Taxation of Costs Against O2 Micro

Federal Rule of Civil Procedure 54(d)(1) authorizes the Court to grant the prevailing party its costs.  The determination of taxable costs is governed by 28 U.S.C. § 1920 and, more particularly, Civil L.R. 54-3, which specifically enumerates the standards for costs recoverable in this District.  This Court may only tax costs explicitly authorized by § 1920.  See Alflex Corp. v. Underwriters Labs., Inc., 914 F.2d 175, 177-78 (9th Cir. 1990); see also Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 442 (1987).

The parties seek review of the Clerk's taxation of MPS and ASUSTeK's costs against O2 Micro.  MPS and ASUSTeK object only to the Clerk's disallowance of $96,624.28 for deposition expenses incurred in the ITC investigation.  O2 Micro objects to the Clerk's taxation of costs on several grounds: (1) costs for documents produced in the ITC proceeding should not be recovered in this case; (2) costs taxed for exemplification and copying costs include duplicate entries and charges for non-taxable services; (3) costs taxed for deposition transcripts include amounts for multiple copies and non-taxable services; and (4) costs taxed for service of subpoenas include amounts for third parties subpoenaed but not deposed.

A.  Costs Attributable to Discovery Obtained for Use in This Action and the ITC Proceeding

O2 Micro attributes a large portion of MPS and ASUSTeK's costs to the ITC proceeding and argues that such costs should be disallowed because they did not arise in this case.  This broad objection is not well-taken.  As noted above, in the interest of

15

**United States District Court**
For the Northern District of California

1  efficiency, the Court ordered all discovery obtained through the

2  ITC parallel investigation to pertain to this case, and vice versa.

3  Had O2 Micro not precipitated the ITC investigation, the same

4  discovery-related costs would have been incurred in this

5  litigation.  Indeed, O2 Micro does not dispute that it used -- in

6  this case -- discovery obtained in the ITC proceedings.  In seeking

7  to stay this case in favor of the ITC investigation, O2 Micro

8  acknowledged the overlap between the two proceedings, stating that

9  "all of the patents that are issue in this case are certainly at

10 issue in the ITC."  Tr. of Mar. 3, 2009 Hrg. 7:18-19.  Despite now

11 claiming ignorance, O2 Micro was on notice that discovery obtained

12 through the ITC proceeding was deemed to apply to this action.  O2

13 Micro offers no authority that bars recovery of discovery-related

14 costs simply because they related to discovery obtained through an

15 ITC proceeding.  Accordingly, subject to exceptions discussed

16 below, MPS and ASUSTeK may recover deposition, exemplification and

17 copying costs, incurred during the ITC investigation, relating to

18 discovery relevant and obtained for use in this case.

19    B.   Exemplification and Copying Costs

20    Under 28 U.S.C. § 1920(4), a court may tax costs "for

21 exemplification and [for] making copies of any materials where the

22 copies are necessarily obtained for use in the case."  "Fees for

23 exemplification and copying 'are permitted only for the physical

24 preparation and duplication of documents, not the intellectual

25 effort involved in their production.'"  Zuill v. Shanahan, 80 F.3d

26 1366, 1371 (9th Cir. 1996) (citing Romero v. City of Pomona, 883

27 F.2d 1418, 1428 (9th Cir. 1989), abrogated on other grounds,

28 Townsend v. Holman Consulting Corp., 914 F.2d 1136 (9th Cir.

1    1990)).

2         O2 Micro objects to various costs attributed to

3    exemplification and copying.  MPS and ASUSTeK did not respond

4    specifically to O2 Micro's objections, but instead asserted

5    generally that the costs to which O2 Micro objects are recoverable

6    under Civil L.R. 54-3(d).

7         MPS and ASUSTeK also seek to recover costs for the preparation

8    of visual aids used in the ITC proceeding; O2 Micro objects to

9    recovery of such costs.  Costs may be recoverable for visual aids

10   that are "reasonably necessary to assist the jury or the Court in

11   understanding the issues at the trial."  Civil L.R. 54-3(d)(5).

12   The costs to which O2 Micro objects were billed between October,

13   2009 and December, 2009, which was before the Court ruled on the

14   parties' motions for summary judgment.  Thus, at that time, it was

15   not evident that those visual aids were necessary for trial in this

16   action.  Further, these costs are not related to discovery-related

17   expenses.  The Court accordingly disallows recovery of $84,125.61

18   in costs related to the preparation of visual aids used in the ITC

19   proceeding.

20        O2 Micro argues that costs for optical character recognition

21   (OCR) are not taxable as reproduction or exemplification costs.

22   Courts have concluded that OCR processing of documents are

23   generally for the convenience of counsel and, thus, expenses

24   related to it are not recoverable.  See, e.g., Computer Cache

25   Coherency Corp. v. Intel Corp., 2009 WL 5114002, at *4 (N.D. Cal.).

26   Accordingly, recovery of $17,655.57 in OCR processing costs is

27   disallowed.

28        O2 Micro also objects to costs for the conversion of documents

**United States District Court**
For the Northern District of California

17

United States District Court
For the Northern District of California

in excess of the first set.  For instance, one invoice contains two charges for $9,799.88 related to the conversion of documents from their native file format to a generally-accessible file format: one charge was for conversion services with Bates stamping, whereas the other was for such services without Bates stamping.  See, e.g., Bill of Costs, Ex. 3, at 23.  Although electronic conversion charges are generally recoverable, MPS and ASUSTeK have not established the necessity of multiple conversions of the same documents.  Thus, recovery of $26,702.86 in such costs is disallowed.

O2 Micro also contests costs related to creating duplicate copies of DVDs containing electronic discovery and copying a DVD entitled "Preparing for a Deposition in a Business Case," Bill of Costs, Ex. 3, at 69.  For reasons stated above, costs for duplicate copies of electronic discovery DVDs are disallowed.  Costs related to duplicating the deposition preparation DVD are disallowed because this DVD does not appear to be discovery material.  Thus, recovery of $1,160.75 related to such services is disallowed.

Additionally, O2 Micro contends that costs related to copies made for use at the ITC hearing should not be recoverable.  In particular, O2 Micro objects to costs to create witness binders for the ITC hearing and to duplicate briefs filed in the ITC proceeding.  See, e.g., Bill of Costs, Ex. 3, at 58; id. at 79. Although the "cost of reproducing disclosure or formal discovery documents when used for any purpose in the case is allowable," Civil L.R. 54-3(d)(2), MPS and ASUSTeK have not established that the copies of discovery documents used in the ITC hearing were used for any purpose in this case.  Further, the cost of reproducing

18

**United States District Court**
For the Northern District of California

1  "motions, pleadings, notices, and other routine papers is not

2  allowable."  Civil L.R. 54-3(d)(3).  Thus, the Court disallows

3  recovery of $5,480.26 for duplication costs incurred around the

4  date of the ITC hearing and evidently related to that hearing.

5       O2 Micro also objects to $390.59 in costs related to the

6  deposition of "M. Grover," who O2 Micro claims was not deposed in

7  this case.  This amount is disallowed.

8       O2 Micro objects to various costs for "Native Processing Plus

9  Images."  See Bill of Costs, Ex. 3, at 44-45.  Unlike other

10 electronic discovery expenses, these costs bear no indication that

11 they related to document production.  Compare id. at 44 with id. at

12 36.  Thus, recovery of $25,214.17 for costs related to "Native

13 Processing Plus Images" services is disallowed.

14      Finally, O2 Micro objects to recovery for the "auto-coding" of

15 documents.  Bill of Costs, Ex. 3, at 83.  MPS and ASUSTeK do not

16 establish that such coding related to exemplifying or copying

17 documents.  Thus, recovery of $26,247.65 for coding documents is

18 disallowed.

19      O2 Micro's remaining objections are not well-taken.  O2 Micro

20 complains of costs related to multiple copies for exhibits used

21 during depositions.  However, the three prevailing parties are

22 entitled to recovery of these costs.

23      The Clerk taxed $392,171.73 for exemplification and copying

24 costs.  Of this amount, the Court disallows $186,977.46 for the

25 reasons stated above.  This reduces MPS and ASUSTeK's award for

26 such costs to $205,194.27.

27      C.   Deposition Costs

28      As noted above, MPS and ASUSTeK may recover costs related to

19

**JA 00072**

United States District Court
For the Northern District of California

1 depositions taken for both this action and the ITC proceeding.  In
2 addition to its general objection concerning discovery used in the
3 ITC proceeding, O2 Micro also argues that the ten-deposition limit
4 provided under Federal Rule of Civil Procedure 30(a)(2) precludes
5 MPS and ASUSTeK from recovering costs for more than ten
6 depositions.  However, 28 U.S.C. § 1920(2) does not link recovery
7 for deposition costs to Rule 30(a)(2).  Further, in the ITC
8 investigation, all parties evidently exceeded the number of
9 depositions permitted under Rule 30(a)(2).  Accordingly, O2 Micro's
10 objection on this point is not well-taken.

11      O2 Micro also objects to costs to make additional copies of
12 deposition transcripts.  However, MPS and two ASUSTeK entities were
13 prevailing parties in this action.  Thus, recovery of costs for
14 additional copies is allowable.

15      Finally, O2 Micro objects to $25.00 for FedEx charges
16 attributed to deposition costs.  This amount is disallowed because
17 it is not recoverable as deposition costs under 28 U.S.C. § 1920(2)
18 or Civil L.R. 54-3(c).

19      The Clerk taxed $18,169.37 for deposition costs, disallowing
20 recovery of $96,624.28 for "billings in ITC case."  Am. Bill of
21 Costs.  The Court reverses this disallowance; MPS and ASUSTeK are
22 entitled to recover costs related to depositions taken in the ITC
23 proceedings.  However, the Court disallows $25.00 in expedited
24 shipping costs.  Accordingly, $114,768.65 in deposition costs is
25 taxed against O2 Micro.

26      D.   Costs for Service of Subpoenas
27      The Clerk taxed $2,130.26 for costs related to service of
28 subpoenas.  Of this amount, O2 Micro objects to $1,178.17 for costs

20

1   related to service of third-party subpoenas, asserting that these

2   subpoenas were unnecessary.  However, MPS and ASUSTeK have

3   established that such service was reasonably required.  Civil L.R.

4   54-3(a)(2).  Accordingly, the Clerk's taxation of such costs is

5   left undisturbed.

6                          CONCLUSION

7        For the foregoing reasons, the Court GRANTS in part MPS and

8   ASUSTeK's motion for attorneys' fees and non-statutory costs

9   (Docket No. 410), GRANTS MPS and ASUSTeK's motion for review of the

10  Clerk's taxation of their costs against O2 Micro (Docket No. 438)

11  and GRANTS in part and DENIES in part O2 Micro's motion for review

12  of the Clerk's taxation of costs against it (Docket No. 439).

13  Although MPS and ASUSTeK are entitled to reasonable attorneys'

14  fees, the Court DEFERS its decision on the amount to which MPS and

15  ASUSTeK are entitled and directs the parties to, within twenty-

16  eight days of the date of this Order, meet and confer to attempt to

17  determine this amount.  If the parties cannot agree, within thirty-

18  five days of the date of this Order, MPS and ASUSTeK shall file

19  documentation supporting its fees request.  Such documentation

20  shall include detailed time records from which the Court can

21  determine the nature of the tasks billed.  Additionally, any fees

22  request shall not contain any amounts for costs taxed.  In support

23  of their fees request, MPS and ASUSTeK may file a brief, not to

24  exceed twenty pages.  O2 Micro may respond, in a brief not to

25  exceed twenty pages, within fourteen days of the date MPS and

26  ASUSTeK file their supplementary documentation.  If O2 Micro files

27  a response, MPS and ASUSTeK may reply, in a brief not to exceed ten

28  pages, within seven days of the date that response is filed.

**United States District Court**
For the Northern District of California

21

1    MPS and ASUSTeK's costs are taxed against O2 Micro as follows:

2  $2,130.26 for service of subpoenas; $114,768.65 for deposition

3  transcripts; $205,194.27 for exemplification and copying services;

4  and $17,221.95 for compensation for the court-appointed expert.

5  For these costs, O2 Micro shall remit $339,315.13 to MPS and

6  ASUSTeK forthwith.

7    IT IS SO ORDERED.

8

9  Dated: 3/3/2011

10                                    CLAUDIA WILKEN
                                      United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

1

2

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6               FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8

9
MONOLITHIC POWER SYSTEMS, INC.,                    No. 08-04567 CW
10
          Plaintiff,                               ORDER REGARDING
11                                                 ATTORNEYS' FEES
     v.                                            AND NON-TAXABLE
12                                                 COSTS
O2 MICRO INTERNATIONAL LIMITED,
13
          Defendant.
14  _____

15  O2 MICRO INTERNATIONAL LIMITED,

16          Counterclaimant,

17     v.

18  MONOLITHIC POWER SYSTEMS, INC.,
    ASUSTEK COMPUTER INC., ASUSTEK
19  COMPUTER INTERNATIONAL AMERICA, BENQ
    CORPORATION, and BENQ AMERICA
20  CORPORATION,

21          Counterclaim-Defendants.
    _____/
22

23
        On March 3, 2011, the Court issued an Order Granting Plaintiff
24
    Monolithic Power Systems, Inc. (MPS) and Counterclaim-Defendant
25
    Asustek's Motion for Attorneys' Fees and Non-Taxable Costs on the
26
    ground that the case was exceptional under 35 U.S.C. § 285.  The
27
    Court stated that "based on O2 Micro's vexatious litigation
28

strategy, litigation misconduct and unprofessional behavior, MPS and Asustek are entitled to reasonable attorneys' fees," and reserved its decision on the amount pending the filing of documentation for the fees.  On May 5, 2011, MPS submitted the required documentation and requests attorneys' fees in the amount of $13,290,092, non-taxable costs in the amount of $663,151[1] and expert witness fees of $269,150.[2] Defendant 02 Micro International Limited (02 Micro) objects to the amount of attorneys' fees requested and the request for expert witness fees.  In response to 02 Micro's opposition, MPS reduces the amount of attorneys' fees requested to $11,519,987.

Having considered all the papers filed by the parties, the Court awards $663,151 in non-taxable costs and denies the request for expert witness fees.  Because of the complexity of calculations involved in determining the amount of the attorneys' fee award, the Court will not calculate it but will indicate what will be allowed and disallowed.  MPS must then submit its calculation of attorneys' fees awarded based on the Court's determination.

BACKGROUND

MPS initially retained the Fish & Richardson (FR) law firm, which was replaced by the law firms of Finnegan, Henderson, Farabow, Garrett & Dunner (Finnegan) and Latham and Watkins (Latham).  Latham was lead counsel for MPS in this case and co-

---

[1] The Court's March 3, 2011 Order awarded MPS $339,315 in taxable costs.  MPS indicates that 02 Micro has not paid these costs.

[2] All amounts less than one dollar will be rounded down or up to the closest whole number.

2

**United States District Court**
For the Northern District of California

1  counsel for MPS in an action before the International Trade
2  Commission (ITC).  Finnegan was lead counsel for Asustek and co-
3  counsel for MPS in this case.  Finnegan was lead counsel in the ITC
4  case.  The fee request includes the services of these three firms.

5      MPS and FR agreed that FR's services would be compensated at
6  its market rate less a ten percent discount.  MPS and Latham agreed
7  that Latham's legal services would be compensated at its normal
8  billing rate less a ten percent discount.  In addition, MPS and
9  Latham agreed to a fee limitation, but the conditions triggering
10 the limitation never arose.  Therefore, MPS has compensated Latham
11 at its normal rate less ten percent.  Finnegan also billed at its
12 market rate less ten percent.  In early March 2009, the fee
13 agreement between MPS and Finnegan was changed to include a series
14 of incentives based upon the outcome of the litigation.  MPS and
15 Finnegan finally agreed to a fixed monthly payment plan, the total
16 of which would not exceed $4,000,000, beginning on March 1, 2009.
17 Later, because of the large number of depositions required, MPS
18 agreed it would renegotiate the amount it would pay Finnegan.
19 However, this renegotiation has not occurred; MPS indicates that it
20 will complete fee negotiations with Finnegan after the Court
21 resolves the current fee dispute.  Since March 2009, Finnegan has
22 received approximately $4,000,000 from MPS.  Finnegan's invoices
23 reflect time entries corresponding to an amount that exceeds
24 $7,000,000.

25     Finnegan partner Scott Mosko declares that MPS gave him the
26 invoices from FR and Latham, and Finnegan created a single Excel
27 spreadsheet that includes the entries of each timekeeper from the
28

3

three law firms.  This spreadsheet contains over 9,000 entries.
Finnegan sorted these entries into seventeen categories of
activities, separating out all entries relating to the ITC
proceeding into a non-billable (NB) category.  This category
amounts to $1,890,197.  Another category, labeled "Combination
(C)," consists of block-billed entries for both the ITC and
district court proceedings.  This category amounts to $806,882.
The fifteen other categories, listed on pages six and seven of
MPS's motion, include activities such as, "Pleadings/Motions, Party
Analysis and Meeting/Correspondence with Client, Case Strategy,
Expert-Related Activities."  To avoid double-billing, if a time
entry was block-billed and covered two or more categories, the
total amount was assigned to only one category.

LEGAL STANDARD

In the Ninth Circuit, reasonable attorneys' fees are
determined by first calculating the "lodestar." Jordan v.
Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987).  "The
'lodestar' is calculated by multiplying the number of hours the
prevailing party reasonably expended on the litigation by a
reasonable hourly rate." Morales v. City of San Rafael, 96 F.3d
359, 363 (9th Cir. 1996).  There is a strong presumption that the
lodestar figure represents a reasonable fee. Jordan, 815 F.2d at
1262.  However, the court may adjust the award from the lodestar
figure upon consideration of additional factors that may bear upon
reasonableness. Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70
(9th Cir. 1975).

JA 00079

United States District Court
For the Northern District of California

DISCUSSION

I. General Objections

    A. Not Exceptional Under Section 285

    02 Micro argues that this case is not exceptional under § 285 and, thus, attorneys' fees should not be awarded.  This issue was previously litigated and decided in the March 3, 2011 Order. Therefore, this argument is a motion for reconsideration improperly brought in this proceeding for the determination of the amount of attorneys' fees to be awarded, and is denied.

    B. Disorganized Evidence

    02 Micro argues that MPS's evidence is disorganized, making it difficult to respond to the fee request.  The fact that MPS sorted and categorized the 9,000 billing entries made it easier to analyze the huge amount of documentation.  02 Micro has responded effectively.  Thus, its argument that it could not respond is unpersuasive.

II. Reasonable Rate

    A. Legal Standard

    Determining a reasonable hourly rate is a critical inquiry. _Jordan_, 815 F.2d at 1262.  The fee applicant has the burden to produce evidence, other than the declarations of interested counsel, that the requested rates are in accordance with those prevailing in the community for attorneys of comparable skill and reputation.  _Id._ at 1263.  In establishing the reasonable hourly rate, the court may take into account: (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the quality of representation; and (4) the results

5

1  obtained.  <u>Cabrales v. County of Los Angeles</u>, 864 F.2d 1454, 1464

2  (9th Cir. 1988).  Other factors that can be considered are

3  (1) the time and labor required; (2) the preclusion of other

4  employment by the attorney due to acceptance of the case; (3) time

5  limitations; (4) the amount involved and the results obtained;

6  (5) the "undesirability" of the case; and (6) awards in similar

7  cases.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 430 n.3 (1983).  These

8  factors are subsumed in the initial lodestar calculation, and

9  should not serve as independent bases for adjusting fee awards.

10 <u>Morales</u>, 96 F.3d at 363-64.

11      B. Discussion

12      A list of the rates for each timekeeper from Latham and

13 Finnegan for 2009 and 2010 was filed under seal.  To support the

14 reasonableness of the attorneys' rates, MPS submits three different

15 surveys of hourly rates charged by law firms, which were undertaken

16 by the American Intellectual Property Law Association (AIPLA), the

17 National Law Journal (NLJ) and PricewaterhouseCoopers.

18      The AIPLA survey indicates that, for 2008 in San Francisco,

19 partners' median rate was $578 and the "third quartile" rate was

20 $660; nationally, the median partners' rate in large firms was $598

21 and the "third quartile" rate was $696.[3]  The rates in the surveys

22 generally support the partners' rates.  <u>See</u> <u>View Engineering, Inc.</u>

23 <u>v. Robotic Vision Sys., Inc.</u>, 208 F.3d 981, 987-88 (Fed. Cir. 2000)

24 (approving reasonable rates based on AIPLA survey).

25  _____

26      [3]The NLJ and PricewaterhouseCoopers surveys were filed under
    seal.  However, they support a finding that MPS's requested rates
27  are reasonable.

28                                  6

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   The AIPLA survey shows that, in 2008 in the San Francisco Bay

2   Area, associates were billed at a median hourly rate of $338, an

3   average hourly rate of $366 and a "third quartile" rate of $488.

4   The AIPLA and NLJ surveys support the associates' billing rates

5   requested here.

6   02 Micro does not address these surveys, but cites two recent

7   cases from this district in which fees were awarded based on rates

8   of $650 for partners, $500 for associates and $150 for paralegals

9   in the San Francisco Bay Area.  See Suzuki v. Hitachi Global

10  Storage Techs., 2011 WL 956896, *4 (N.D. Cal.); Faigman v. AT&T

11  Mobility LLC, 2011 WL 672648, *5 (N.D. Cal.).  The rates awarded in

12  these cases generally support the rates requested by MPS.

13  02 Micro argues that, in cases where the attorneys' fees are

14  high, such as here, the market requires the attorneys to discount

15  their rates.  02 Micro acknowledges that the attorneys have already

16  discounted the requested rates by ten percent and argues that a

17  further discount of twenty percent is warranted.  02 Micro disputes

18  MPS's claim that, if the attorneys had not been working on this

19  case, they would have been working on other full-fee paying matters

20  and, in support, submits articles from the legal press indicating

21  that this case was litigated during a deep economic recession which

22  adversely affected the legal profession.

23  Given the large attorneys' fees award requested in this case

24  and the fact that the litigation took place during a severe

25  economic recession, the Court agrees that the market would require

26  a discount.  The Court finds that the rates should be discounted by

27  the ten percent that Latham, Finnegan and FR negotiated with MPS

28

7

United States District Court
For the Northern District of California

1  and understands that the attorneys' fees requested have been

2  discounted by this amount.  If MPS's attorneys' fees request does

3  not incorporate a ten percent discount, it shall so inform the

4  Court.

5  III. Reasonable Hours

6      A. Legal Standard

7      In calculating a reasonable number of hours, attorneys must

8  justify their claim by submitting detailed time records.  The court

9  may adjust the hours downward if the documentation is inadequate,

10  or the hours are duplicative, excessive or unnecessary.  Chalmers,

11  796 F.2d at 1210.

12      B. Limit Award to Actual Fees Paid

13      02 Micro points out that Finnegan agreed to a $4,000,000 fee

14  cap and that, since March 2009, MPS has not paid fees to Finnegan

15  beyond that cap.  02 Micro argues that it should not have to

16  reimburse MPS on account of Finnegan's fees for more than

17  $4,000,000, plus pre-March 2009 fees MPS paid to Finnegan, because

18  it would be reimbursing MPS for fees it never paid.  MPS responds

19  that the fee agreements were negotiated early in the case when MPS

20  and Finnegan did not know that 02 Micro would undertake acts that

21  would prolong the litigation and unreasonably increase attorneys'

22  fees.  MPS indicates that, after it became clear that more work

23  would be necessary than MPS and Finnegan had contemplated, they

24  agreed to renegotiate the fee arrangement.  MPS cites Junker v.

25  Eddings, 396 F.3d 1359, 1365 (Fed. Cir. 2005), which stated:

26      Although the amount the client paid the attorney is one
        factor for the court to consider in determining a
27      reasonable fee, it does not establish an absolute

28                                  8

1   ceiling.  The determination of a reasonable attorney fee
2   requires the court to consider all relevant circumstances
    in a particular case.

3   02 Micro's argument is persuasive.  Although MPS may have

4   agreed to renegotiate the fee agreement with Finnegan, this has not

5   occurred.  The possibility that the fee agreement will be

6   renegotiated after the Court issues its order is not relevant to

7   this analysis.  It is undisputed that, from March 2009 to the

8   present, Finnegan has received a fee of $4,000,000 in accordance

9   with the fee cap agreement.  It would be inequitable to require 02

10  Micro to pay MPS millions more in fees than MPS paid to Finnegan.

11  Therefore, the Court disallows fees requested for Finnegan's work

12  above $4,000,000 after March 2009.

13  02 Micro also argues that recovery for all attorneys' fees

14  should be capped at $4,000,000 because the billing records

15  intermingle the work of Latham and Finnegan so it is not possible

16  to separate the work done by Finnegan from the work done by Latham.

17  This last argument is not well-taken because MPS' chart of

18  attorneys' hours worked shows the hours worked by attorneys at each

19  law firm.

20  C. Fish and Richardson Legal Fees

21  Although MPS requests fees on behalf of FR, it does not

22  indicate the amount of this request.  In its opposition, 02 Micro

23  identifies from MPS' billing records a total of $281,162 in billing

24  entries by FR and argues that MPS should not be awarded any of this

25  amount because FR's work has not been adequately documented and

26  because FR was ethically barred from representing MPS.

27  MPS argues that it has adequately documented FR's work

28                                    9

United States District Court
For the Northern District of California

1  because it has listed the time entries for FR's attorneys in

2  Exhibit A to the Mosko Declaration, from which 02 Micro has

3  identified FR's total time entries.  The Court finds the time

4  entries to be sufficient documentation.  Also, 02 Micro presents no

5  evidence that FR was ethically barred from representing MPS.

6      Accordingly, no reduction of the fees MPS paid to FR is

7  warranted.

8      D. Fees Must Be Caused By or Traced To Exceptional Behavior

9      02 Micro cites Beckman Instruments, Inc. v. LKB Produkter AB,

10  892 F.2d 1547, 1552 (Fed. Cir. 1989), for the proposition that

11  there should be a close nexus between the alleged misconduct and

12  the fees awarded.  02 Micro points out that the Court's vexatious

13  litigation finding flowed from the fact that 02 Micro covenanted

14  not to sue after substantial litigation had taken place.  Based on

15  this, 02 Micro argues that the attorneys' fees awarded should be

16  limited to those incurred after the day it realized that defeat was

17  inevitable and before the day it actually granted the covenants not

18  to sue.  02 Micro argues that it became aware of the inevitability

19  of its defeat when it received the Court's expert's report on June

20  14, 2010 and, on June 18, 2010, it decided not to proceed with the

21  case.  According to 02 Micro, this should limit the attorneys' fees

22  award to those incurred during the five days from June 14 to June

23  18, 2010, which it calculates to be $191,595.

24      Beckman explained that the purpose of awarding attorneys' fees

25  under § 285 is to discourage infringement by penalizing the

26  infringer and to prevent gross injustice when the infringer has

27  litigated in bad faith.  Id.  It also explained that only a few

28                              10

United States District Court
For the Northern District of California

1   cases have awarded attorneys' fees solely on the basis of

2   litigation misconduct, without a concurrent finding of willful

3   infringement.  <u>Id.</u> at 1552-53.  Where there is no willful

4   infringement, the penalty imposed must be related to the bad faith

5   and misconduct.  <u>Id.</u>

6        The Court found in the March 3, 2011 Order that O2 Micro's

7   misconduct was pervasive throughout the entire case, and an award

8   of fees for the entire case is appropriate.  O2 Micro's argument

9   otherwise is unpersuasive.[4]

10       E. Limit Award to O2 Micro's Expert's Damages Estimate

11       O2 Micro argues that the attorneys' fees award should be

12   limited to the amount in controversy, which it defines as its

13   expert's estimate of $4,398,551 in damages through August 31, 2009.

14   O2 Micro argues that an award that is three times the damages

15   amount is unreasonable, but provides no authority for this

16   argument.

17       MPS points out that O2 Micro's expert stated that he expected

18   to update his damages estimate through the date of the trial, as

19   new data became available.  MPS also points out that the damages

20   estimate was faulty because it did not account for MPS's entire

21   revenue stream for the accused products, which could be

22   $430,000,000 over the lifetime of the patent.

23   ─────────────

24       [4]O2 Micro submits, as recent authority, <u>Fox v. Vice</u>, 131 S.
     Ct. 2205 (2011), in which the Supreme Court held that, when a
25   plaintiff's civil rights suit involves both frivolous and non-
     frivolous claims, reasonable attorneys' fees may be awarded to the
26   defendant under 42 U.S.C. § 1988, but only for fees that the
     defendant would not have incurred but for the frivolous claims.
27   This case is inapplicable; the issue here is not frivolous versus
     non-frivolous claims.

28                                    11

United States District Court
For the Northern District of California

1   02 Micro's argument for the limitation of fees on the basis of
2   its estimated damages is unpersuasive.

3   F. Objections to Specific Time Entries

4   02 Micro objects to time entries totaling $4,227,314 of the
5   original $13,290,092 fee request.  It submits a chart showing the
6   amount of fees related to each objection.  Lydon Dec., Ex. N.  As
7   stated previously, based on 02 Micro's objections, MPS reduced its
8   fee request to $11,519,987.  The Court will address the objections
9   that remain in dispute.

10   1. ITC and Domestic-Industry-Related Entries

11   In its original fee request, MPS created two categories
12   related to the ITC litigation.  Category "C," standing for
13   "Combination," in the amount of $806,882, consisted of ITC and
14   district-court-related entries that were block-billed together.
15   Category 17, in the amount of $1,890,197, consisted of entries
16   solely related to the ITC litigation, and was not included in the
17   fee request.  MPS proposed that it be reimbursed for fifty percent
18   of the amount in Category "C," which would be $403,441.  MPS
19   acknowledged that this was an arbitrary amount because it could not
20   ascertain what percentage of the block-billed entries was devoted
21   to the district court litigation.

22   02 Micro has gone through MPS's billing entries and, in
23   addition to the entries MPS originally included in Category 17 and
24   Category "C," has identified $2,853,490 in purportedly non-
25   recoverable billings directed at the ITC and domestic-industry-
26   related proceedings.  MPS responds that 02 Micro has double-counted
27   some entries and, excluding the double-counting, $2,175,944 is in

28   12

United States District Court
For the Northern District of California

1  dispute.  Nevertheless, MPS concedes that 02 Micro's objection is
2  valid and has created a spreadsheet of entries to which 02 Micro
3  objected.  This spreadsheet, labeled Exhibit 22, includes three
4  categories: (1) entries for which full compensation is appropriate
5  because none of the activities are related to the ITC proceeding,
6  amounting to $218,034; (2) a second category "C" with combined
7  entries totaling $967,960, of which MPS requests fifty percent
8  reimbursement; and (3) ITC-only entries in the amount of $989,950
9  for which the compensation request is withdrawn.

10      The Court accepts MPS' characterization of the three
11  categories and the amount of attorneys' fees in each category.  The
12  Court awards one hundred percent of the $218,034 in the first
13  category, where attorneys did not undertake ITC-related work, and
14  twenty-five percent of the $1,860,768 total amount in category "C."
15  Thus, $465,192 is awarded for the entries in category "C."  The
16  Court awards a lower percentage for category "C" than the fifty
17  percent suggested by MPS because the entries are improperly block-
18  billed, MPS acknowledges that it does not know how much of the
19  block-billed amounts were incurred in litigating this case and MPS
20  did not itself identify in its motion all of the improperly block-
21  billed entries, which required 02 Micro to comb through the 9,000
22  billing entries to identify all of the improper entries.

23      2. Lawsuit Against Professor Mercer
24      02 Micro objects to the inclusion of hours for work done on a
25  lawsuit against Professor Ray Mercer.  MPS concedes the point and
26  has placed all the entries 02 Micro has identified as Mercer-
27  related in a separate spreadsheet labeled Exhibit 23, which

28                              13

United States District Court
For the Northern District of California

1   contains three categories: (1) entries for which full compensation

2   is appropriate because none of the activities are related to the

3   Mercer lawsuit, amounting to $5,092; (2) block-billed entries

4   totaling $85,962, which contain some activities related to the

5   Mercer lawsuit and which MPS has added to category "C;" and

6   (3) entries which only relate to the Mercer lawsuit, totaling

7   $141,813, for which MPS withdraws its request for reimbursement.

8        The Court accepts MPS' characterization of the three

9   categories and the amount of attorneys' fees in each category.  The

10  Court awards one hundred percent of the $5,092 in the first

11  category, where attorneys did not undertake Mercer-related work.

12  As in the previous section, the Court awards twenty-five percent of

13  the block-billed entries in category "C."

14           3. ITC Discovery

15       MPS points out that, although 02 Micro created a category

16  consisting of $341,100 in billings for time spent on ITC discovery

17  before the Court allowed the parties to use ITC discovery in this

18  case, it did not object to this category in its opposition.

19  Because 02 Micro did not object to time spent on this category, no

20  reduction of fees is required.

21           4. Fees Generated Since 02 Micro Filed Motion to Dismiss

22       02 Micro argues that, as of June 19, 2010, when it filed its

23  motion to dismiss, all issues were resolved with the exception of

24  attorneys' fees and expenses.  02 Micro argues that the fees

25  requested for this time period, which it quantifies as $432,808,

26  should be discounted by fifty percent because litigating attorneys'

27  fees does not require the same level of expertise as litigating

28                                    14

**United States District Court**
For the Northern District of California

1   intellectual property disputes.  O2 Micro cites <u>Gates v. Rowland</u>,

2   39 F.3d 1439, 1449 (9th Cir. 1994), where the Ninth Circuit

3   affirmed the district court's decision to award Sacramento rates

4   instead of San Francisco rates for fees litigating the amount of

5   attorneys' fees because "the justification of complex, specialized

6   knowledge and experience did not apply."

7        MPS argues that, after O2 Micro filed its motion to dismiss,

8   counsel were required to undertake numerous activities not related

9   to seeking attorneys' fees.  It points out that the Court did not

10  immediately rule on the motion to dismiss, so both sides continued

11  preparing for trial.

12       O2 Micro's argument is not persuasive and requires no fee

13  reduction.

14            5. Expert Fees

15       MPS requests payment of its expert witness fees in the amount

16  of $269,150, arguing that expert fees should be included in the

17  attorneys' fees award based upon the Court's findings that O2

18  Micro's behavior throughout the litigation was vexatious.  O2 Micro

19  cites <u>Amsted Indus., Inc. v. Buckeye Steel Castings Co.</u>, 23 F.3d

20  374, 378-79 (Fed. Cir. 1994), to support its argument that recovery

21  of expert witness fees requires a level of misconduct not present

22  in this case.

23       Section 285 does not authorize the award of expert witness

24  fees.  <u>Id.</u>  Courts may award expert witness fees under 28 U.S.C.

25  § 1920, within the incorporated limits of 28 U.S.C. § 1821(b).  <u>Id.</u>

26  Section 1821(b) provides that a witness shall be paid an attendance

27  fee of forty dollars per day for each day's attendance and for the

28                                15

**United States District Court**
For the Northern District of California

1   time going to and returning from the place of attendance plus a

2   subsistence allowance when an overnight stay is required.  Courts

3   may also award expert witness fees under their inherent power to

4   impose sanctions for bad faith and vexatious conduct.  <u>Id.</u> at 378.

5   "Without a finding of fraud or bad faith whereby the 'very temple

6   of justice has been defiled,' a court enjoys no discretion to

7   employ inherent powers to impose sanctions."  <u>Id.</u>  A court should

8   resort to its inherent power to sanction only where the rules or

9   statutes do not reach the acts which degrade the judicial system.

10  <u>Id.</u>

11      The high attorneys' fees award under § 285 sufficiently

12  addresses 02 Micro's litigation misconduct.  Therefore, the request

13  for expert witness fees is denied.

14  IV. Costs

15      02 Micro has not objected to the non-taxable costs requested.

16  Therefore, the Court awards $663,151 in non-taxable costs.

17  V. Leave to File Fee Application for Preparing This Fee Request

18      The Court grants MPS leave to file a second fee application

19  for the work entailed in the preparation of the instant fee

20  application and reply to 02 Micro's opposition.

21                          CONCLUSION

22      For the foregoing reasons, MPS' request for non-taxable costs

23  is granted in the amount of $663,151 and its request for expert

24  fees is denied.  The attorneys' fees request is to be recalculated

25  by MPS in accordance with this order.  The revised calculation is

26  due no later than two weeks from the date of this Order.  If 02

27  Micro believes the calculation is incorrect, it may file its

28                              16

1  calculation one week thereafter and MPS may file a reply one week

2  later.

3

4

5      IT IS SO ORDERED.

6

7  Dated:  1/17/2012

8                                          CLAUDIA WILKEN
                                           United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                   17

1

2

3

4                   IN THE UNITED STATES DISTRICT COURT

5               FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7

8

MONOLITHIC POWER SYSTEMS, INC.,              No. C 08-4567 CW

     Plaintiff,                              ORDER GRANTING
                                             MPS' MOTION FOR
     v.                                      ATTORNEYS' FEES
                                             AND NON-TAXABLE
02 MICRO INTERNATIONAL LIMITED,              COSTS

     Defendant.
_____/

02 MICRO INTERNATIONAL LIMITED,

     Counterclaimant,
     v.

MONOLITHIC POWER SYSTEMS, INC.;
ASUSTEK COMPUTER INC.; ASUSTEK
COMPUTER INTERNATIONAL AMERICA;
BENQ CORPORATION; AND BENQ AMERICA
CORP.,

     Counterclaim-Defendants
_____/

     Plaintiffs and Counterclaim-Defendants Monolithic Power

Systems, Inc., Asustek Computer and ASUS Computer International

(together, MPS) have recalculated their attorneys' fees request in

accordance with the Court's January 17, 2012 Order.  Defendant and

Counterclaimant 02 Micro International Limited (02 Micro) has

filed a response and MPS has filed a reply.  The matter was taken

28

United States District Court
For the Northern District of California

under submission on the papers.  Having read all the papers filed

by the parties, the Court approves MPS' recalculation of its

attorneys' fees and awards attorneys' fees in the amount of

$8,419,429 and non-taxable costs in the amount of $663,151.

BACKGROUND

In its January 17, 2012 Order Regarding Attorneys' Fees and

Non-Taxable Costs, the Court granted MPS' request for non-taxable

costs in the amount of $663,151 and ordered MPS to recalculate its

attorneys' fees request in accordance with the Court's

determination.  The Order (1) limited the recovery of fees for the

legal services of the Finnegan firm to $4,000,000 for work done

after March 2009, in accordance with a fee cap agreement between

Finnegan and MPS; (2) limited the recovery for fees corresponding

to block-billed time entries to twenty-five percent of those fees;

and (3) granted MPS leave to file an additional fee application

for work done in preparation of the fee application.

///

///

///

///

2

MPS recalculated its fee request as follows:

| | |
|---|---|
| Fees generated by the Fish and Richardson (FR) firm | $ 281,162 |
| Fees generated by the Latham firm | $3,455,333 |
| Fees generated by the Finnegan firm prior to the March 2009 fee cap agreement | $ 339,899 |
| Fees generated by the Finnegan firm after the March 2009 fee cap agreement | $4,000,000 |
| Fees generated in preparing attorneys' fees application | $ 343,035 |
| Total Attorneys' Fees | $8,419,429[1] |
| Non-taxable costs | $ 663,151 |
| Total Fees and Non-taxable Costs Request | $9,082,580 |

MPS clarifies that all fees requested have been discounted by ten percent, as was assumed by the Court in the January 17, 2012 Order.  MPS documents the recalculated amounts with new spreadsheets of billing records for the Finnegan and Latham firms adhering to the Court's instructions in the January 17, 2012 Order.  MPS has separated its billing records into work performed by the Finnegan firm and work performed by the Latham firm, including the work performed in preparing the fee application. The billing records show that Finnegan provided $6,445,862 in legal services after March 2009, but, in keeping with the Court's directive, MPS is calculating reimbursement of $4,000,000.  MPS

---

[1] MPS indicates that the subtotal is $8,423,129.  This appears to be an error; the Court calculates the subtotal to be $8,419,429.

United States District Court
For the Northern District of California

3

**United States District Court**
For the Northern District of California

has also provided a separate category for all the block-billed time entries it previously identified and, in keeping with the Court's directive, has calculated reimbursement of twenty-five percent of the total amount. MPS explains that the new reports "reflect the specific rates assigned to each time keeper at the time each entry was made. (The rates on the original spreadsheet, and therefore on the initial reports, reflected billing rates for each particular individual that were the result of averaging the individual's rates for 2009 and 2010)."

MPS also requests an award of interest at the legal rate on the amount of $9,082,580 from March 3, 2011, the day the Court granted its motion for attorneys' fees pursuant to 35 U.S.C. § 285. 02 Micro objects on several grounds to MPS' re-calculation of its fees.

DISCUSSION

I. Finnegan's Fees for Preparation of Fee Application

02 Micro objects to the $249,834 for services performed by Finnegan in preparing the fee application. 02 Micro argues that this Court has held that recovery of work performed by Finnegan is limited to the $4,000,000 fee cap negotiated between the parties on the ground that it would be inequitable to require 02 Micro to pay MPS more in fees than MPS paid to Finnegan. MPS responds that Finnegan's fees for preparing the fee application were incurred after dismissal of the 02 Micro infringement claims and, thus, were not covered by the fee cap. See Supplemental Declaration of

4

United States District Court
For the Northern District of California

Finnegan partner, Scott Mosko, at ¶ 3.  MPS also asserts that it

has paid the $249,834 to Finnegan for its work on the fee

application.  Id.  In its January 17, 2012 Order, the Court

allowed MPS to submit an additional request for fees incurred in

the preparation of its attorneys' fees application and did not

limit the fee request to work performed by Latham.  Thus, an award

of these fees will not require 02 Micro to pay MPS more than MPS

has paid to Finnegan.  Therefore, 02 Micro's objection to the

$249,834 for Finnegan's work in preparing the fee application is

overruled.

II. Different Billing Rates

     02 Micro objects to the fact that MPS has altered its

attorneys' billing rates to "reflect the specific rate assigned to

each time keeper at the time each entry was made."  02 Micro

points out that the Court did not require MPS to revisit the issue

of reasonable attorney billing rates and only instructed MPS to

recalculate its fee request based on the hours allowed or

disallowed.  02 Micro suggests that, to remedy this, all billing

entries associated with MPS' recalculation be reduced by two

percent, which amounts to $69,107, or that MPS be required to

resubmit its billing entries using the previous rates.

     MPS indicates that it used the actual rates in this fee

application "to provide the Court with an even more exact

accounting."  MPS explains that the net effect of using the actual

billing rates for the years 2009 and 2010, rather than the blended

5

rates that it used in its original fee application, was to reduce the fees requested by $6,207.

The Court did not require MPS to change the rates billed by each attorney. However, because the change in the billing rates is minor, it represents a more accurate picture of the attorneys' rates and it results in a reduction of total fees requested, the Court concludes that any further reduction is not warranted. Therefore, 02 Micro's objection to the change in billing rates is overruled.

III. Unreasonable Hours in Preparing Fee Application

02 Micro objects to the "unreasonably high number of hours" expended in preparing the fee application and requests a twenty-five percent reduction of fees requested for work performed by Latham.[2]  This argument is without merit. As acknowledged by 02 Micro, the Court denied its previous request for a reduction in fees for preparing the fee application. The fees incurred in preparing the fee application were reasonable and necessary in light of the fact that Latham and Finnegan were required to review, analyze and summarize two years of extensive billing records. Therefore, 02 Micro's objection to the number of hours expended in preparing the fee application is overruled.

---

[2] As noted above, 02 Micro objects to all the fees requested for the work performed by Finnegan.

United States District Court
For the Northern District of California

IV. Accrual of Post-Judgment Interest

02 Micro argues that MPS is not entitled to an award of interest from March 3, 2011, the day the Court granted MPS' motion for attorneys' fees, because the fees had not been quantified at that time.  Citing 28 U.S.C. § 1961(a), which provides that post-judgment interest accrues from the date of entry of judgment, 02 Micro argues that interest cannot accrue until the Court enters judgment as to the fee amount.  02 Micro also cites Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1343 (Fed. Cir. 2001), for the proposition that there is no final judgment regarding a fee award until the district court enters judgment as to the amount of fees.

Special Devices is inapplicable here.  It addressed the question of whether an unquantified award of attorneys' fees pursuant to 35 U.S.C. § 285 is final for purposes of conferring jurisdiction on the Federal Circuit.  Id. at 1343.  It did not address when interest begins to accrue on an award of attorneys' fees.

Under 28 U.S.C. § 1961(a), interest is allowed on money judgments in civil cases recovered in a district court accruing "from the date of the entry of the judgment."  Courts have interpreted this to mean that post-judgment interest is calculated "from the date of the judgment establishing the right to the award."  Takeda Chem. Indus. Ltd. v. Mylab Labs., Inc., 2007 WL 840368, *14 (S.D.N.Y.) (attorneys' fees award under § 285); Mathis

United States District Court
For the Northern District of California

7

<u>v. Spears</u>, 857 F.2d 749, 769 (Fed. Cir. 1988) (same); <u>Friend v. Kolodzieczak</u>, 72 F.3d 1386, 1391-92 (9th Cir. 1995) (on attorneys' fee award under 42 U.S.C. § 1988, post-judgment interest accrues from date entitlement to fees is secured, rather than from date exact quantity of fees is set).

Thus, MPS is entitled to post-judgment interest on its award of attorneys' fees and non-taxable costs accruing from March 3, 2011, the date the Court issued its order determining MPS' entitlement to such an award. This amount does not include the $343,035 in attorneys' fees subsequently incurred in the preparation of the fee application, which shall accrue interest commencing on the date of this Order. Interest is to be calculated at the legal rate as set forth in 28 U.S.C. § 1961(a).

V. 02 Micro's Objection to Non-taxable Costs

In its January 17, 2012 Order, the Court stated that 02 Micro had not objected to MPS' request for non-taxable costs. 02 Micro clarifies that it objected to non-taxable costs and cites to page eleven in its opposition to MPS' May 5, 2011 submission documenting fees and costs, in which 02 Micro stated, "The court has previously ruled that discovery costs not solely related to the ITC investigation are recoverable. 02 disagrees and preserves its objection for appeal, but even without challenging that decision, it is clear that fees related to work on issues that were in no way part of this case should not be awarded." 02 Micro also points to a footnote on the same page in which it stated, "02

8

also separately objects to any ITC Discovery costs incurred before this Court entered the order allowing parties to use ITC discovery in this case.  Until that order issued, the parties' discovery efforts could not have been considered to be related to this case. Those costs total $341,100.05."

The Court acknowledges that 02 Micro objects to MPS' request for non-taxable costs, but overrules the objection.

VI. Payment of Taxable Costs

MPS indicates that 02 Micro has not paid the $339,315 that was taxed as costs by the Court and requests that the Court order 02 Micro to pay this amount with interest accruing from March 3, 2011, the day the Court ordered 02 Micro to remit $339,315 in taxable costs forthwith.  02 Micro does not respond to this request.  Therefore, the Court orders 02 Micro immediately to pay the $339,315 in costs previously taxed by the Court, with interest at the legal rate accruing from March 3, 2011.

CONCLUSION

For the foregoing reasons, the Court awards attorneys' fees in the amount of $8,419,429 and non-taxable costs in the amount of

///

///

///

9

$663,151, with interest accruing as set forth in this Order.  A

separate judgment shall be entered by the Clerk of the Court.

     IT IS SO ORDERED.

Dated: 5/3/2012

_____
CLAUDIA WILKEN
United States District Judge

**JA 00102**