2012–1221

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

MONOLITHIC POWER SYSTEMS, INC.,

*Plaintiff-Counterclaim Defendant-Appellee*,

and

ASUSTeK COMPUTER, INC. and
ASUSTeK COMPUTER INTERNATIONAL AMERICA,

*Counterclaim Defendants-Appellees*,

v.

O2 MICRO INTERNATIONAL LTD.,

*Defendant-Counterclaimant-Appellant.*

---

Appeal from the United States District Court for the Northern District of California
in Case No. 08–CV–04567, Judge Claudia Wilken

---

## APPELLEES' RESPONSE BRIEF

Dan L. Bagatell
  *Principal Attorney*
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012–2788
Phone:  (602) 351–8250
Fax:      (602) 648–7150
E-mail:  DBagatell@perkinscoie.com

Counsel for All Appellees

Dean G. Dunlavey
LATHAM & WATKINS LLP
650 Town Center Drive, Suite 2000
Costa Mesa, California 92626–1925
Phone:  (714) 755–8260
Fax:      (714) 755–8290
E-mail:  Dean.Dunlavey@lw.com

Mark A. Flagel
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071–1560
Phone:  (213) 891–7581
Fax:      (213) 891–8763
E-mail:  Mark.Flagel@lw.com

January 28, 2013

Counsel for Monolithic Power Systems, Inc.

## CERTIFICATES OF INTEREST

Counsel for appellee Monolithic Power Systems, Inc. certifies the following:

The full name of the party represented by me is:

Monolithic Power Systems, Inc.

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

n/a

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

n/a

The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court are listed below:

PERKINS COIE LLP

Dan L. Bagatell

LATHAM & WATKINS LLP

Dale Chang
Dean G. Dunlavey
Mark A. Flagel
Franklin D. Kang
Jeff Myung
Robert Steinberg

– i –

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

John R. Alison
Smith R. Brittingham, IV
Lionel M. Lavenue
Scott R. Mosko
John M. Mulcahy


FISH & RICHARDSON P.C.

Desa Leontrau Burton
Yun Louise Lu
Cheng C. (Jack) Ko
John P. Schnurer


Dated:  January 28, 2013                  /s/Dan L. Bagatell

                                        Dan L. Bagatell

Counsel for the ASUSTeK appellees certifies the following:

The full name of the parties represented by me is:

ASUSTeK Computer, Inc. and ASUSTeK Computer International America

The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

the correct name of ASUSTeK Computer International America
is ASUS Computer International

All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

n/a

The names of all law firms and the partners or associates that appeared for the parties represented by me in the trial court or are expected to appear in this Court are listed below:

PERKINS COIE LLP

Dan L. Bagatell

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

John R. Alison
Smith R. Brittingham, IV
Lionel M. Lavenue
Scott R. Mosko
John M. Mulcahy

Dated: January 28, 2013       /s/Dan L. Bagatell

Dan L. Bagatell

## TABLE OF CONTENTS

Certificates of Interest .................................................................................i

Table of Authorities .................................................................................vi

Table of Abbreviations and Conventions ...................................................x

Related Cases ..........................................................................................xi

Introduction ...............................................................................................1

Statement of Issues....................................................................................3

Statement of Facts .....................................................................................3

    A.    MPS, O2, and O2's Continual Infringement Allegations .........................3

    B.    This Litigation and the Parallel ITC Investigation................................7

        1.    O2's Abandonment of Its Claims on the '519 Family ......................8

        2.    O2's Repeated and Concerted False Testimony Regarding the Invention of Its '382 Patent Claims.......................................9

        3.    O2's Desperate But Doomed Attempt to Salvage Its Claims of '382 Patent Infringement ................................15

        4.    O2's Abrupt Eve-of-Trial Dismissal of Its Remaining Infringement Claims ........................................17

    C.    The District Court's "Exceptional Case" Finding and Its Award of Partial Attorneys' Fees and Costs............................17

Summary of Argument .............................................................................22

Argument..................................................................................................25

I.    This Court Applies a Very Deferential Standard of Review ...........................25

II.    The District Court Did Not Commit Clear Error in Finding This Case to Be an Exceptional Case.................................................27

    A.    O2's False Testimony and Dissembling After the Truth Was Exposed Easily Justified the "Exceptional Case" Finding ....................28

> > 1.   How Lin's Schematics Were Dated Was Crucial Because O2 Needed Corroboration of Lin's Supposed Conception Date to Contend Both that MPS Infringed and that O2 Invented First.........28
> >
> > 2.   O2's False Testimony and Discovery Responses Were Not Mere Innocent Mistakes ..................................................31
> >
> > 3.   The District Court Properly Found that O2 Dissembled After Its False Statements Were Exposed and Tried to Cover Up Its Problem by Filing Baseless Motions...............................35
>
> B.   The District Court Properly Found that O2's Vexatious Litigation Strategy Also Made This an Exceptional Case ......................40
>
> > 1.   Because the District Court Found the Case Exceptional Based on O2's Litigation Misconduct, It Did Not Need to Decide Whether O2's Claims Were Objectively Baseless ..........................41
> >
> > 2.   The District Court's Finding of Vexatiousness Was Well-Supported ...........................................................44

III.   The District Court Did Not Abuse Its Discretion in Determining the Size of MPS's Award ...........................................49

> A.   O2's Misconduct Was Pervasive, Justifying an Award for Fees and Costs Throughout the Case ......................................49
>
> B.   MPS Was Entitled to Recover Fees and Costs for Discovery Taken for Both the ITC Proceeding and This Case .................50
>
> > 1.   O2 Waived Its Current "But-For" Argument by Failing to Make It Below ......................................................51
> >
> > 2.   *Fox v. Vice* Involved a Different Issue, and O2's Simplistic "But-For" Argument Makes No Sense.............................54

IV.   Even If This Court Does Not Affirm, the Best O2 Can Hope for Is a Remand for Further Findings.............................................57

Certificate of Compliance .........................................................59

Proof of Service ......................................................................60

# TABLE OF AUTHORITIES

| Cases | Pages |
|---|---|

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002) ........................................................................39

*Already, LLC v. Nike, Inc.*,
No. 11-982 (U.S. Jan. 9, 2013) .....................................................................4, 45

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*,
605 F.3d 1305 (Fed. Cir. 2010) ......................................................................42

*Beckman Instruments, Inc. v. LKB Produkter AB*,
892 F.2d 1547 (Fed. Cir. 1989) .............................................. 26, 41, 42, 44, 45

*Brasseler, USA I, LP v. Stryker Sales Corp.*,
267 F.3d 1370 (Fed. Cir. 2001) ......................................................................42

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
393 F.3d 1378 (Fed. Cir. 2005) ......................................................................43

*Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003) ......................................................................29

*Costello v. IBM Corp.*,
No. 02 Civ. 5870 (RCC), 2006 WL 2370246 (S.D.N.Y. Aug. 16, 2006) .........40

*Durkin v. Shea & Gould*,
92 F.3d 1510 (9th Cir. 1996) ......................................................................38, 39

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) ......................................................................54

*Eon-Net LP v. Flagstar Bancorp*,
653 F.3d 1314 (Fed. Cir. 2011) ..............................................................25, 27, 42

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) ......................................................................54

*Forest Labs., Inc. v. Abbott Labs.*,
339 F.3d 1324 (Fed. Cir. 2003) ......................................................................42

**Cases**                                                                    **Pages**

*Fox v. Vice,*
   131 S. Ct. 2205 (2011) ....................................................... 26, 27, 53, 54, 55, 56

*Glaxo Group Ltd. v. Apotex, Inc.,*
   376 F.3d 1339 (Fed. Cir. 2004) .........................................................43

*Global-Tech Appliances, Inc. v. SEB S.A.,*
   131 S. Ct. 2060 (2011) .....................................................................33

*Hahn v. Wong,*
   892 F.2d 1028 (Fed. Cir. 1989) .........................................................30

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.,*
   687 F.3d 1300,
   *reh'g denied*, 701 F.3d 1351 (Fed. Cir. 2012) .....................................41, 44, 55

*In the Matter of Certain Cold Cathode Fluorescent Lamp ("CCFL")*
   *Inverter Circuits and Products Containing Same,*
   U.S.I.T.C. Inv. No. 337-TA-666 ......................................... 7, *passim*

*Medichem, S.A. v. Rolabo, S.L.,*
   437 F.3d 1157 (Fed. Cir. 2006) .........................................................29

*Medtronic Navigation, Inc. v. BrainLAB Medizinische*
   *Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010) ..........................26, 44

*Microsoft Corp. v. Motorola, Inc.,*
   696 F.3d 872 (9th Cir. 2012) .............................................................42

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
   No. C 04-2000-CW (N.D. Cal. Oct. 11, 2006) ...............................6, 46

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
   Nos. C 04-2000, 06-2929, 2007 WL 801886 (N.D. Cal. Mar. 14, 2007) ..........7

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
   No. C 07-2363-CW (N.D. Cal. Aug. 26, 2008) .............................7, 46

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.,*
   558 F.3d 1341 (Fed. Cir. 2009) ............................................6, 39, 46

**Cases**                                                               **Pages**

*Nilssen v. Osram Sylvania, Inc.*,
  528 F.3d 1352 (Fed. Cir. 2008) ...............................................25, 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ...........................................7

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  467 F.3d 1355 (Fed. Cir. 2006) ........................................5, 46

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  221 Fed. App'x 996 (Fed. Cir. 2007) ...............................5

*O2 Micro Int'l Ltd. v. Taiwan Sumida Elecs., Inc.*,
  315 Fed. App'x 266 (Fed. Cir. 2009) .............................6

*Phonometrics, Inc. v. Westin Hotel Co.*,
  350 F.3d 1242 (Fed. Cir. 2003) ......................................42

*Praxair, Inc. v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008) ......................................39

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009) .......................................30

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ........................................................43

*Sun-Tek Indus., Inc. v. Kennedy Sky Lites, Inc.*,
  929 F.2d 676 (Fed. Cir. 1991) .......................................45

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
  549 F.3d 1381 (Fed. Cir. 2008) .........................25, 26, 49

*Taltech Ltd. v. Esquel Enters. Ltd.*,
  604 F.3d 1324 (Fed. Cir. 2010) .................................33, 48

*Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*,
  576 F.3d 1302 (Fed. Cir. 2009) ......................................42

**Statutes and Regulations**                                                                                    **Pages**

35 U.S.C. § 285 ................................................................................ 1, *passim*

42 U.S.C. § 1988(b) ............................................................................54

19 C.F.R. § 210.9(a) ...........................................................................44

**Other Authorities**                                                                                            **Pages**

Dan B. Dobbs et al., *The Law of Torts* (2d ed. 2011):

    Vol. 1 § 189 ...................................................................................56
    Vol. 3 § 594 ...................................................................................42

Restatement (Second) of Torts § 682 (1977) ........................................43

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Appellees | MPS and the ASUSTeK appellees, collectively |
| ASUS | Appellees ASUSTeK Computer, Inc. and ASUSTeK Computer International America |
| BenQ | BenQ Corporation and BenQ America Corporation |
| CCFL | cold cathode fluorescent lamp |
| ITC | International Trade Commission |
| LCD | liquid crystal display |
| LED | light-emitting diode |
| MPS | Appellee Monolithic Power Systems, Inc. |
| O2 | Appellant O$_2$Micro International Ltd. |
| PTO | Patent and Trademark Office |
| Sumida | Taiwan Sumida Electronics, Inc. |
| '129 patent | U.S. Patent No. 6,804,129 |
| '382 patent | U.S. Patent No. 7,417,382 |
| '519 family | patents related to U.S. Patent No. 6,856,519 |
| '615 patent | U.S. Patent No. 6,259,615 |
| '722 patent | U.S. Patent No. 6,396,722 |

## RELATED CASES

No other appeal from the district court action has been before this Court or any other appellate court. This case is, however, indirectly related to two previous appeals in which O2 accused MPS of infringing the same family of patents:

- *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, No. 2006-1064, 467 F.3d 1355 (Fed. Cir. 2006) (opinion by Judge Dyk, joined by Chief Judge Michel and Judge Prost); and

- *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, Nos. 2008-1128 & -1136, 558 F.3d 1341 (Fed. Cir. 2009) (opinion by Judge Rader, joined by Senior Judge Plager and Judge Gajarsa).

At least three other appeals to this Court have involved claims by O2 against other parties involving the same family of patents:

- *O2 Micro Int'l Ltd. v. Taiwan Sumida Elecs., Inc.*, No. 2006-1411, 315 Fed. App'x 266 (Fed. Cir. 2009) (nonprecedential) (opinion by Judge Rader, joined by Senior Judge Plager and Judge Gajarsa);

- *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Nos. 2007-1302 et al., 521 F.3d 1351 (Fed. Cir. 2008) (opinion by Judge Prost, joined by Judge Lourie and Senior Judge Clevenger); and

- *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, No. 2011-1054, 449 Fed. App'x 923 (Fed. Cir. 2011) (nonprecedential) (opinion by Judge Lourie, joined by Chief Judge Rader, with Judge Prost dissenting).

The Court's decision in this appeal is not expected to affect any other pending case.

**INTRODUCTION**

From the late 1990s until recently, O2 and MPS were leading suppliers of inverter controller circuits for cold cathode fluorescent lamps (CCFLs) used to backlight laptop computer screens. Throughout the 2000s, O2 continually accused MPS of patent infringement, leading to six lawsuits. Three times O2 filed suit, and three times O2's harassment of MPS customers forced MPS to seek declaratory judgments to protect itself and its customers. Each time, O2 lost—once on summary judgment, twice after trial, and three times by covenanting not to sue in the face of defeat. Nevertheless, O2 succeeded in driving customers away from MPS by fomenting fear, uncertainty, and doubt about the legality of MPS's products, costing MPS millions of dollars that MPS cannot recoup because LED backlighting has largely superseded CCFL backlighting.

In this case, O2 finally got its comeuppance. Just before trial, after many months of expensive discovery and motion practice, O2 conceded defeat, granted a covenant not to sue, and tried to walk away. This time, however, the district court (Judge Wilken of the Northern District of California) found the case exceptional and awarded MPS and co-defendant ASUSTeK attorneys' fees under 35 U.S.C. § 285. It did so for two reasons. First, relying on over a decade of experience presiding over cases involving these parties and the same family of patents, it

found that this case represented a continuation of O2's pattern of vexatious litigation.  Second, it found that O2 had committed litigation misconduct by:

- repeatedly giving false testimony and inaccurate discovery responses on a critical issue—the date on which the named inventor created schematics supposedly confirming O2's claim that he conceived his invention before MPS developed the product on which the accused products were based;

- failing to come clean once MPS's expert exposed the truth; and

- filing baseless motions to avoid the repercussions, including a motion to strike the damning expert report and a motion to bar MPS from disputing O2's claim to an earlier invention date.

Based on those findings, the district court awarded MPS and ASUSTeK about $9.1 million in attorneys' fees and nontaxable costs to reimburse a portion of their defense costs in this case.  The award included fees incurred in joint discovery for this case and the ITC action that O2 insisted on pursuing in parallel, but it excluded fees incurred in the ITC case alone.  Contrary to O2 Micro's arguments, that award was well-grounded and not an abuse of discretion.  On appeal, O2 continues to protest its innocence, but this Court should reject O2's attempt to have this Court retry the facts and reject the findings of the experienced district judge who had a ringside seat throughout over ten years of litigation and was far better positioned to assess what happened and why.

## STATEMENT OF ISSUES

1.    Did the district court commit clear error in finding this an exceptional case warranting an award of attorneys' fees?  In particular:

- Did it commit clear error in finding that O2 engaged in litigation misconduct involving O2's alleged invention date?

- Did it commit clear error in finding that O2 engaged in vexatious litigation?

2.    Did the district court abuse its discretion in calculating the amount of attorneys' fees and nontaxable costs to award?  In particular:

- Did it abuse its discretion in awarding expenses throughout the case when it found that O2's misconduct pervaded the entire case?

- Did it abuse its discretion in awarding expenses for discovery taken for both this case and the parallel ITC investigation?

The answer to each question is *no*.

## STATEMENT OF FACTS[1]

### A.    MPS, O2, and O2's Continual Infringement Allegations

Until recently, CCFLs were the predominant way of backlighting screens of laptop computers.  CCFLs need high-voltage AC current rather than the

---

[1] Because the facts and procedural history are intertwined, appellees respond to O2's Statement of the Case within this Statement of Facts.

low-voltage DC current produced by laptop batteries, and MPS and O2 developed

competing power inverter solutions for this need.  The two were direct and fierce

competitors.  O2 was founded before MPS, and O2's two-transistor "half-bridge"

design initially enjoyed some commercial success.  By 1998, however, MPS

developed the industry's first four-transistor, "full-bridge" design, the MP1010,

which gave MPS a substantial technological edge.  O2 responded with its own

full-bridge product, the OZ960, in August 2000, but it remained behind.  Rather

than compete fairly, O2 strove to create fear, uncertainty, and doubt by continually

accusing MPS and MPS customers of patent infringement.  *See Already, LLC v.*

*Nike, Inc.*, No. 11-982 (U.S. Jan. 9, 2013) (Kennedy, J., concurring) slip op. 2

("Courts should be well aware that charges of … infringement can be disruptive to

the good business relations between the manufacturer alleged to have been an

infringer and its distributors, retailers, and investors.  The mere pendency of

litigation can mean that other actors in the marketplace may be reluctant to have

future dealings with the alleged infringer.").

In July 1999, O2 filed a provisional patent application that eventually

spawned four patents.  Each time a patent issued, O2 threatened MPS and MPS

customers, leading to six patent infringement lawsuits with MPS.  Although O2

lost all six cases, O2 nevertheless benefited by scaring customers away from MPS.

All five district court cases ended up before the same district judge (Judge

– 4 –

Wilken), and the one ITC case proceeded in parallel to this case, so the district court became intimately familiar with the behavior of O2 and its attorneys.

In the first case, filed in 2001, O2 sued MPS for infringing U.S. Patent No. 6,259,615.  In 2004, the district court granted MPS summary judgment of noninfringement, holding that O2's original infringement theory was meritless and that O2's belated presentation of two new infringement theories violated the Patent Local Rules.  This Court affirmed.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir. 2006).[2]

In the meantime, O2 continued to threaten MPS and MPS customers and began engaging in forum-shopping.  In 2003, O2 sued an MPS customer, Taiwan Sumida, in the Eastern District of Texas, claiming infringement of both the '615 patent and the next patent in the family, No. 6,396,722.  To stop the harassment, MPS filed a declaratory judgment action on the '722 patent in the Northern District

---

[2] The war started in 2000, when O2 filed a declaratory judgment action contending it was not infringing two MPS patents.  MPS counterclaimed for infringement, and O2 added claims of trade secret misappropriation and infringement of the '615 patent.  After the district court granted MPS summary judgment of noninfringement, it held a trial on the remaining claims.  Both sides lost.  The jury rejected MPS's infringement claim and found no misappropriation or no damages as to 11 of O2's 12 alleged trade secrets.  The jury did award O2 $12 million on one trade secret, but the district court found the award unsupported and instead allowed O2 just $900,000 in compensatory damages.  Even with $1.8 million in enhanced damages, O2 likely spent more than it recovered.  Both parties appealed, but this Court affirmed by judgment order.  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 221 Fed. App'x 996 (Fed. Cir. 2007).

of California, where both MPS and O2 maintain their principal U.S. offices.  In

2007, a jury found all asserted claims of the '722 patent invalid for obviousness

and under the on-sale bar and no claims literally infringed.  The district court

upheld the verdict, and this Court affirmed the invalidity judgment.  *Monolithic*

*Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341 (Fed. Cir. 2009).  Because

this Court held the claims invalid, it reversed the judgment that O2 had obtained

against Sumida in the east Texas case.  *O2 Micro Int'l Ltd. v. Taiwan Sumida*

*Elecs., Inc.*, 315 Fed. App'x 266 (Fed. Cir. 2009).

    In 2004, O2 separately sued MPS and two customers in the Eastern District

of Texas for infringement of the next patent in the same family, No. 6,804,129.

After MPS succeeded (over O2's opposition) in having the case transferred to the

Northern District of California and consolidated with the '722 case, O2 dropped its

'129 patent claims and covenanted not to sue.  *Monolithic Power Sys., Inc. v.*

*O2 Micro Int'l Ltd.*, No. C 04-2000-CW, Dkt. 579 (N.D. Cal. Oct. 11, 2006).

    Nevertheless, O2 continued to accuse another MPS customer (Hon Hai) of

infringing the '129 patent in another case in the Eastern District of Texas.  That

harassment forced MPS to file another declaratory judgment action in the Northern

District of California.  After unsuccessfully moving to dismiss MPS's suit, O2

again gave up, granted a broader covenant not to sue on the '129 patent, and

dismissed its claims involving that patent. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, No. C 07-2363-CW, Dkt. No. 76 (N.D. Cal. Aug. 26, 2008).[3]

### B.    This Litigation and the Parallel ITC Investigation

O2 was undeterred. It next resorted to threatening to sue MPS customers for infringing three patents in a different family (the '519 family) unless they switched to O2 products. [*See* JA104 ¶ 8] That harassment forced MPS to file a third declaratory judgment action—this case—two months later. [JA103-06] Again seeking to avoid the parties' home court, O2 filed a complaint with the ITC asserting that MPS and customer BenQ were infringing three patents in the '519 family and MPS and customer ASUSTeK were infringing a fourth patent in the '615/'722/'129 family, No. 7,417,382. [JA290-325][4] O2's complaint caused the ITC to open Investigation No. 337-TA-666. [JA327-34] In response to O2's accusations involving the '382 patent, MPS added that patent to its declaratory

---

[3] O2 notes (at 14) that the district court rejected MPS's unfair competition claim regarding the '129 patent on grounds that O2 had successfully sued another company, BiTEK, on the '129 patent in another case. But BiTeK was not using MPS inverter products, and this Court later vacated the judgment on which that ruling was based. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008). More relevantly, the district court recognized that O2 had no basis to continue accusing MPS customers of infringing the '615 patent after this Court affirmed the summary judgment that MPS's products did not infringe that patent. *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, Nos. C 04-2000, 06-2929, 2007 WL 801886, at *5-6 (N.D. Cal. Mar. 14, 2007).

[4] O2's ITC complaint also named other respondents with different designs (Microsemi and its customer LG). Those claims are irrelevant here.

judgment complaint in this case.  [JA162-66]  O2 then counterclaimed in the district court, alleging infringement of four patents.  [JA265-71]

O2 moved to stay the district court action in light of the ITC investigation [JA272-81], but the district court refused, noting that ITC findings are not binding and that if O2 wanted to resolve everything in a single case, O2 could proceed in the district court [JA7773-78].  O2 instead chose to proceed in both forums. Nevertheless, to coordinate the cases and avoid expensive duplication, the district court ordered that discovery taken in the ITC investigation would apply equally to this case.  [JA383-84]  O2 acceded.

### 1.    O2's Abandonment of Its Claims on the '519 Family

O2 soon was forced to drop its claims involving the '519 family.  O2's theory was that inverters using MPS controllers infringed because they received two signals (a soft-start signal and a compensation signal) on the same input pin. [JA4687-89]  But as O2 and named co-inventor Yung-Lin Lin knew, O2's half-bridge OZ962 and OZ960A products operated in the same manner and were on sale in this country over a year before O2's effective filing date.  [*See* JA4693-701; JA4703-15]  O2 initially denied how its prior-art products operated [JA4717-29], but just before Lin's deposition it relented and covenanted not to sue MPS and MPS customers on the '519 family [JA4737; JA491-94].

### 2.    O2's Repeated and Concerted False Testimony Regarding the Invention of Its '382 Patent Claims

O2 continued to pursue the '382 patent, but it soon became trapped in another web of deceit. The '382 patent claimed priority to a provisional application filed July 22, 1999, but MPS's first-generation full-bridge product, the MP1010, was designed by 1998 and MPS customers were using it by early 1999. [JA4739; JA4741; JA4743-49; JA4751] O2 had previously accused the MP1010 of infringing the '722 patent, and MPS had countered that the MP1010 was invalidating prior art. O2 elected not to accuse the MP1010 of infringing the '382 patent, but O2 did accuse MPS's later-generation CCFL products of infringing that patent and the MP1010 more closely aligned with the claims than the accused products did. As a practical matter, O2 had to show invention before the MP1010 in order to claim that the '382 patent was both valid and infringed.

This was not a new problem for O2: it had been in the same predicament at the 2007 trial. There, named inventor Lin steadfastly claimed that he conceived his invention in February 1998 (shortly before MPS completed the MP1010) and diligently reduced it to practice in 1999. [JA4867] Lin hewed to the same line in a declaration to the PTO [JA4761-64], in deposition testimony in this case [JA4770-72], and when testifying at trial in the ITC [JA4787-89].

O2 and Lin needed corroboration for his self-serving testimony, however. As corroboration, they pointed to printouts of schematics bearing the date

– 9 –

"Feb., 18, 1998" [sic] and depicting a full-bridge configuration with a step-up transformer.  [JA2757-88]  Because these supposedly corroborating schematics lacked key claim elements including a capacitor divider, a feedback signal from the capacitor divider, a timer circuit, and a protection circuit, O2 and Lin tried to supplement them with various other documents, such as Lin's notes reflecting customer complaints about O2's existing products and April 1999 communications with a patent attorney.  [JA4777-800; JA4826-32; JA4837-43; JA4845-53]  But even those documents lacked critical, supposedly novel aspects of the claims.

In fact, O2's purported corroboration of its supposedly earlier invention was not just weak but fraudulent.  During the 2007 trial, Lin claimed that the software he used to create the schematics automatically inserted their creation date:

> Q      … First of all, there's a date, there's a printed date in the title block of February 18th, 1998.  What does that date indicate, Dr. Lin?
>
> A      That's the program date, which is when the file, the circuit diagram generated.  That computer automatically print the date when I save the file.
>
> Q      Okay.  So the machine printed that date; is that right?
>
> A      Yes.

[JA4867]  O2's Vice-President of Operations, Adam Badgett, likewise swore that the date was automatically inserted by O2 Micro's "PSpice" software:

> Q      Now look at [the schematics], and tell me if you recognize these documents.

– 10 –

> A     Yes, these are all schematics.  They appear to be
> generated by a standard schematic capture CAD tool.
>
> Q     There is a PSpice program used at O2 Micro?  Are
> you familiar with that program?
>
> A     I am familiar with what that is, yes.
>
> ….
>
> Q     These have a date in the title block of
> February 18th, 1998.  Can you explain to us how that
> date is put on to those documents?
>
> A     This date is automatically inserted by the software
> program.

[JA4675]  O2 emphasized this testimony in closing argument, claiming it

established February 1998 conception.  [JA4871]

Although O2 lost the 2007 trial, O2 perpetuated the same corroboration-by-

automatic-dating argument in this case and the parallel ITC investigation—until

MPS's expert exposed its falsity.  In an interrogatory response verified by Director

of Information Technology Steve Krems, O2 stated:

> Dr. Yung-Lin Lin used a PSPICE simulation program on
> February 18, 1998 to create the identified document,
> which was printed out.  The program automatically
> provided a date stamp on the day it was created.

[JA4874-78]  In the same response, O2 claimed that it saved a paper copy of the

schematics but that Lin's electronic files and computer no longer existed.  [*Id.*]

But the earliest circuit simulations O2 could document were dated June

1999, more than 16 months after the supposed February 1998 conception date and

after the MP1010 was on the market. [*See* JA623-26] Moreover, O2 produced no

credible evidence of research and development on the patented circuitry between

February 1998 and June 1999. In addition, although some printouts were redacted

to conceal the fact, others revealed that Lin had stored the circuit in an electronic

folder labeled "MPS," strongly suggesting that he had copied MPS's design.

[*See* JA4808; JA626-28] Lin denied this, insisting that "MPS" stood for "multiple

power supplies" rather than archrival MPS, but O2 never identified a single

document (internal or third-party) referring to a CCFL controller as providing

"multiple power supplies."[5]

Sensing trouble, O2's Rule 30(b)(6) designee, Krems, changed O2's story.

Krems now claimed that Lin had used OrCAD Capture, rather than PSpice, but he

and O2 continued to assert that O2's software automatically inserted the "Feb., 18,

1998" date. [JA4884-87] O2's interrogatory responses reiterated—twice—that

"the [OrCAD] program automatically provided a date stamp on the day the

document was created" and further stated that Krems had "recently re-verified with

---

[5] Lin falsely testified that O2 had produced such a document, but O2 has
failed to identify any, either in the district court or this Court. [*See* JA7724-26;
JA7649-50] O2 has cited third-party patents using the term "multiple power
supplies," but they addressed power supplies providing multiple low-voltage DC
outputs and had nothing to do with CCFL inverters.

the current version of OrCAD Capture and it automatically generates a date when the document is created." [JA4891-93]

O2's neatly-spun story unraveled when MPS served the report of PSpice expert Marc Herniter. [JA602-28] Among other things, Herniter showed that:

- Lin's schematics were actually created using PSpice (as O2 originally stated), not OrCAD (as O2 later insisted) [JA612-19];

- PSpice did *not* automatically date-stamp schematics when created and, instead, the "Feb., 18, 1998" date had been manually entered [JA620-22];

- given the manual date entry, O2's destruction of Lin's computer, and O2's lack of any backup file, there was no way to know when Lin actually created his schematics [JA622-23];

- O2 did not simulate Lin's full-bridge circuit until June 24, 1999 [JA623-26]; and

- someone had redacted the automatically printed directory path in many copies of the simulation results, thereby hiding the fact that Lin had created the circuit in a folder entitled "MPS" [JA626-28].

Caught, O2 backtracked and dissembled. A few weeks later, O2 supplemented its interrogatory responses, admitting that Lin used PSpice rather than OrCAD to create the schematics. [JA659-61] Contrary to years of repeated,

sworn statements, O2's supplementation also conceded—albeit indirectly and
evasively—that PSpice did *not* automatically date-stamp schematics:

> When version 6.2j of PSpice Schematics is used to
> create a new schematic, the program automatically
> populates the "date" field of "titlblk" with the default
> date January 1, 2000, and will print that date in the title
> block of the schematic unless changed by the user. The
> program automatically prints the date that has been
> entered into the "date" field of "titleblk" using the
> Attributes edit function. The date in the title block
> remains the same until it is edited. If the "date" attribute
> was changed using the edit function on the date the
> document was created and the document was printed on
> that date, the software would automatically print that date
> in the title block at the lower right hand corner of the
> schematic.

[*Id.*]

Desperate to preserve Lin's credibility and its priority claim, O2 schemed to
bury the problem. First, O2 moved to strike Herniter's report, contending that his
opinion was irrelevant because O2 was prepared to state that "the 'Feb., 18, 1998'
date was printed by the simulation software on the day the schematics were created
to the extent the information was entered by the user into the 'date' attribute of the
file." [JA591-97] Second, O2 claimed that collateral estoppel barred MPS from
relitigating the authenticity of the schematics because that issue supposedly was
decided in the 2007 trial—even though the jury found no such thing and any such
finding would have been based on false testimony. [JA597-98] Third, again
claiming collateral estoppel, O2 moved for summary adjudication that Lin had

– 14 –

conceived the claimed subject matter in February 1998, before MPS completed the MP1010.  [JA714-25]

Not surprisingly, the district court disagreed, observing that the issues were not necessarily decided in 2007, that collateral estoppel requires full and fair litigation of an issue, and that O2's false testimony could not be deemed fair litigation.  [JA2948-49; JA3985-87]  The district court instead granted MPS summary adjudication that O2 lacked adequate corroboration of Lin's self-interested testimony about an earlier invention date and that O2 could not establish invention before its July 1999 application date.  [JA3990-92][6]

### 3.    O2's Desperate But Doomed Attempt to Salvage Its Claims of '382 Patent Infringement

Despite the revelation that its inventor and other employee-witnesses had given false testimony, O2 pressed forward with its infringement claim on the '382 patent.  But O2 could not present any theory of infringement that did not also compel a finding that its patent claims were invalid.  O2 thus used separate experts

─────────────────────

[6] At the same time, the district court denied MPS's alternative motion for summary judgment of invalidity.  MPS contended that the 2007 judgment lacked collateral estoppel effect because the claims of the '722 and '382 patents differed significantly.  [JA3011-12]  In the alternative, however, MPS argued that if O2 were correct, the 2007 judgment of invalidity would invalidate the '382 claims. [JA3015]  The district court denied MPS's alternative motion because it agreed with MPS that the 2007 trial did not address the '382 claims.  [JA3987]

for infringement and invalidity issues, and those experts resorted to conflicting constructions of the same claim term to reach their conclusions.

All the asserted '382 claims required the "first voltage signal" to "exceed[ ] a predetermined threshold for said predetermined duration."  [JA4429-31]  O2's validity expert, Ray Mercer, agreed with MPS that this limitation meant that the first voltage signal must "exceed[ ] and continue[ ] to exceed a 'predetermined threshold' for the 'predetermined' amount of time."  [JA14935]  MPS's infringement expert showed, however, that the alleged "first voltage signal" in each accused product "squegged" (varied in amplitude from cycle to cycle) during the supposedly infringing "open-lamp" condition such that the signal did *not* exceed the threshold value for each cycle during the "predetermined duration." [JA4937-56]

O2's infringement expert, Richard Flasck, had been unaware of the squegging because he had not bothered to test the accused products.  [JA4070]  In desperation, Flasck and O2 proceeded to contradict Mercer and concoct a new infringement theory:  that one skilled in the art would understand that a signal of varying amplitude "exceeds and continues to exceed" a threshold "for" the applicable time period even if the signal does not exceed the threshold in every cycle during the period.  [JA4960-66]  That was so, Flasck insisted, because a skilled artisan would look only to the one cycle during the entire period with the

highest peak and lowest valley and ignore the tens of thousands of other cycles. [*Id.*]

That argument was nonsense, and it flopped.  O2 avoided summary judgment of noninfringement because the district court felt that Flasck's theory created a narrow fact dispute [JA3988-90], but the ITC staff, the ALJ, and the Commission itself all rejected O2's infringement claim due to the squegging voltage signal [JA4059-80; JA5762-75].  The district-court-appointed independent expert also rejected O2's infringement theory for that reason—and further agreed with MPS that the MP1010 invalidated all the asserted claims.  [JA4377-99]

### 4.    O2's Abrupt Eve-of-Trial Dismissal of Its Remaining Infringement Claims

At last, O2 recognized that the jig was up and tried to walk away.  On June 18, 2010, over 1½ years and hundreds of docket entries into the case, just days before trial was to start, and after the parties had filed their trial briefs and motions *in limine*, O2 suddenly covenanted not to sue and moved to vacate the trial date and dismiss its claims.  [JA4564-72]  The district court granted the motions. [JA4630-32]  This time, however, O2 did not get out of Oakland so easily.

### C.    The District Court's "Exceptional Case" Finding and Its Award of Partial Attorneys' Fees and Costs

MPS filed a timely motion for attorneys' fees and nontaxable costs, contending on numerous grounds that the case was "exceptional" under

Section 285. [JA4633-65][7] The district court granted the motion on March 3,

2011. [JA54-75] In its view, two grounds sufficed to deem the case exceptional,

so it did not reach MPS's other arguments, including MPS's contentions that O2's

claims were objectively baseless and brought in bad faith.[8]

First, relying on a decade of experience presiding over disputes between O2

and MPS, the district court found that O2 engaged in vexatious litigation in this

case. After recounting O2's long history of harassment [JA55-62], the district

court observed that O2 had repeatedly pursued MPS customers, prompting MPS to

file declaratory judgment actions three times, only to have O2 covenant not to sue

after substantial litigation [JA64. In this case, O2 covenanted not to sue and

dismissed its infringement claims just before the final pretrial conference, wasting

resources of MPS, ASUS, and the court. [*Id.*] The district court recognized that

"[s]ettlement and dismissal of claims on the eve of trial is not uncommon and,

indeed, is preferable to no settlement" but found that "[O2's] conduct takes on a

---

[7] Technically, both defendants moved for attorneys' fees and costs, but MPS indemnified ASUSTeK's defense costs and is the real party-in-interest.

[8] Contrary to O2's suggestions (at 6, 29), the district court neither "refused to find that O2's claims lacked merit" nor "tacitly acknowledged that none of O2's claims were objectively baseless." To the contrary, because the two cited bases "sufficiently support[ed] an exceptionality finding," the court simply "d[id] not consider whether O2 Micro committed inequitable acts before the PTO or filed baseless litigation." [JA63] Not reaching an unnecessary point is a far cry from affirmatively deciding it in one side's favor.

different hue when viewed in light of its competitive relationship with MPS and its resort to this litigation strategy on multiple occasions." [*Id.*] The district court rejected O2's contention that it was merely a "passive party, haled into [court] only because of MPS's filing of declaratory judgment actions." [JA64-65]

The district court further found that O2 committed litigation misconduct involving the "Feb., 18, 1998" schematics. It summarized O2's repeated false statements and obfuscation:

> Notwithstanding the clear typographical error in the "Feb., 18, 1998" date block, O2 Micro insisted in the '722 trial, in the ITC investigation and in this litigation that computer software, not Lin, inserted this text. O2 Micro presented three witnesses who testified that the text was computer-generated and offered verified interrogatory responses stating the same. O2 Micro admits that it did not perform its own investigation into the veracity of these representations, despite their materiality, until after MPS served it with Dr. Herniter's report. And, after concluding based on its own investigation "that the 'Feb., 18, 1998' date must have been manually inserted," O2 Micro supplemented its interrogatory responses with a convoluted paragraph in which it obfuscated the fact that Lin had entered the date.

[JA65-66 (citation omitted)] The district court also found that O2 filed frivolous motions prolonging the litigation rather than straightforwardly admitting the truth:

> O2 Micro then filed baseless motions, prolonging litigation on the "Feb., 18, 1998" schematics. O2 Micro moved to strike Dr. Herniter's report, arguing that his opinions were irrelevant because it agreed that "the 'Feb., 18, 1998' date was printed by the simulation software on the day the schematics were created to the

– 19 –

extent the information was entered by the user into the 'date' attribute." Thus, O2 Micro argued, "the parties agree on this point, eliminating any need for expert testimony on the subject." O2 Micro then asserted that the doctrine of collateral estoppel precluded MPS and ASUSTeK from re-litigating this issue, implicitly suggesting that MPS and ASUSTeK had a full and fair opportunity to litigate the "Feb., 18, 1998" date in the '722 trial, even though Lin and Badgett had offered false testimony. O2 Micro repeated these arguments in a motion for summary adjudication that Lin conceived of the subject matter claimed by the '382 patent in February, 1998.

Rather than straightforwardly admit the truth, O2 Micro dissembled and sought, through motion practice, to mask its proffer of false testimony. This constitutes litigation misconduct that, along with O2 Micro's vexatious litigation strategy, warrants designating this case exceptional.

[JA66-67 (citations omitted)]

Litigation over the amount of the award followed. On January 17, 2012, the district court awarded MPS some of the attorneys' fees claimed and all the nontaxable costs claimed, but no expert witness fees. [JA76-92] The district court agreed that MPS's lawyers' hourly rates were appropriate, and it held MPS bound by a fee-cap agreement. [JA81-84] It further rejected O2's argument that the award should be limited to fees after the independent expert issued his opinion, noting that O2's "misconduct was pervasive throughout the entire case." [JA85-86] It also refused to cut off the fee award on the date O2 moved to dismiss. [JA89-90] And it held that MPS was entitled to fees involving

overlapping discovery taken for both the ITC investigation and the district court case, noting that its order consolidating discovery in the two cases contradicted O2's claim that discovery captioned in the ITC case was not discovery for this case. [JA89] On the other hand, the district court recognized that MPS was *not* entitled to fees for work relating only to the ITC investigation [JA88], and it directed MPS to write off 75% of charges for mixed, "block-billed" time entries reflecting work on both proceedings [JA88-89]. The district court also declined to order reimbursement of expert fees. [JA90-91]

Another round of briefing followed. Finally, on May 3, 2012, the district court overruled O2's remaining objections and ordered O2 to pay MPS $8,419,429 in attorneys' fees and $663,151 in nontaxable costs, plus interest. [JA93-102] O2 now appeals the exceptional-case finding and the amount of the Section 285 award. O2 has not appealed the court's separate award of $339,315.13 in taxable costs.[9]

---

[9] Even though O2 has not appealed the taxed costs and even though the district court ordered O2 to pay the taxed costs "forthwith" [JA75] and "immediately" [JA101], O2 has not paid that debt, claiming that its supersedeas bond excuses any payment until this appeal concludes.

## SUMMARY OF ARGUMENT

1.    This Court applies a highly deferential standard of review, reviewing exceptional-case findings only for clear error and amounts of resulting awards only for abuse of discretion.  Deference is especially warranted here because the same district judge presided over a decade of litigation between O2 and MPS that provided unparalleled insight into the motivation behind and significance of O2's misconduct.

2.    The district court did not clearly err in finding this an exceptional case.  Indeed, our judicial system would be in a sorry state if O2's dishonesty, dissembling, and abuse of the judicial process were deemed *un*exceptional.  O2 dissects the district court's rulings and urges this Court to consider each issue in isolation, but this Court should look at all the misconduct together.  In any event, each finding was proper standing alone.

   a.    The district court did not clearly err in finding misconduct involving the "Feb., 18, 1998" schematics and O2's claim to a February 1998 invention date.  Automatically dated schematics were crucial to O2's case because they were O2's only hope of corroborating an invention date before MPS developed and sold the MP1010.  Furthermore, the district court was entitled to reject O2's claim that its false testimony and discovery responses were innocent mistakes:  extensive evidence belied O2's profession of innocence.  The district

court also properly found that O2 did not forthrightly admit the truth and instead gave opaque interrogatory responses and filed baseless motions in a vain effort to bury the issue.

> b.    The district court properly found vexatious litigation as well. Contrary to O2's suggestion, vexatious litigation and baseless claims are distinct offenses, and vexatious litigation does not require baseless claims.  This and other courts have recognized that a litigant may be guilty of a vexatious litigation strategy regardless of whether its positions are wholly baseless; this Court's cases routinely refer to vexatious litigation and frivolous claims separately; and the common law likewise distinguishes between the torts of abuse of process and malicious prosecution.  Moreover, this Court has recognized that objective baselessness is not required where a party has committed litigation misconduct, and vexatious litigation is one form of litigation misconduct.

On the merits, the district court's finding of a vexatious litigation strategy was well-grounded.  O2 harassed MPS and its customers for a decade.  The district court was thoroughly familiar with that history, and this Court should not disturb its first-hand assessment.  O2's belated withdrawals of claims after substantial litigation and other misconduct well exemplified its abuse of the legal process.

> 3.    The district court did not abuse its discretion in determining how much to award.

a.      O2 criticizes the district court for not tying the award to particular misconduct, but the district court properly found that O2's misconduct was pervasive.  The entire litigation was vexatious, and O2's false corroboration of its supposed invention date was critical to its case:  O2 could not credibly claim both infringement and validity without a February 1998 invention date, and O2's corroboration of that date depended on the supposedly auto-dated schematics.

b.      MPS's expenses on discovery taken for both the ITC investigation and this litigation were recoverable.  O2 argues that MPS would have spent the same amount in the ITC, but O2 waived that objection by not making it below.  In any event, the argument is misguided.  The cases O2 cites involved a different scenario:  a single suit with multiple claims, some frivolous and some not. The expenses here were for discovery taken for two parallel cases involving the same claims.  O2 cannot avoid liability simply because Section 285 is limited to district court actions.  Indeed, O2's logic would lead to absurd results and provide a windfall and get-out-of-jail-free pass for misbehaving plaintiffs.

4.      O2's misconduct in this case truly was exceptional, and the fees and costs awarded resulted from that misconduct.  The judgment should therefore be affirmed.  But even if this Court were to hold that one or both of the underlying findings were clearly erroneous or require clarification, the most that would be appropriate would be a remand for further findings.

## ARGUMENT

### I.    THIS COURT APPLIES A VERY DEFERENTIAL STANDARD OF REVIEW

This Court reviews findings that cases were "exceptional" under Section 285 only for clear error. *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1323 (Fed. Cir. 2011). "When reviewing an exceptional case finding for clear error, [this Court is] mindful that the district court has lived with the case and the lawyers for an extended period." *Id.* at 1324. "Having only the briefs and the cold record, and with counsel appearing before [it] for only a short period of time, [this Court is] not in the position to second-guess the trial court's judgment." *Id.* (affirming award based on both litigation misconduct and filing of baseless action). Indeed, this Court has repeatedly stressed the need to defer to district judges' first-hand assessments of whether litigants' misconduct warranted sanctions. *See*, *e.g.*, *Nilssen v. Osram Sylvania, Inc.,* 528 F.3d 1352, 1359 (Fed. Cir. 2008) ("[I]t ill behooves an appellate court to overrule a trial judge concerning litigation misconduct when the litigation occurred in front of the trial judge, not the appellate court."); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) (Bryson, J., concurring) ("A district judge who has lived with a case and the lawyers for an extended period … is infinitely better situated than we are to make the kind of holistic judgments about the parties' conduct of the litigation that are required to assess whether the case should be treated as

– 25 –

exceptional and whether fees should be awarded."); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 n.1 (Fed. Cir. 1989) ("It is difficult from the 'cold record' before us to get a sense of the extent of the abuses or of the good or bad faith involved.  Therefore, we defer to the opinion of the trial judge who was actively involved in the proceedings.").

This Court reviews the size of a Section 285 award only for abuse of discretion.  *See*, *e.g.*, *Takeda*, 549 F.3d at 1390-91 ("Th[e] determination lies within the discretion of the trial judge, 'who is in the best position to know how severely [a party's] misconduct has affected the litigation.'") (quoting *Beckman*); *Nilssen*, 528 F.3d at 1358, 1360 (emphasizing broad discretion and calling it the "key to the affirmance of the district court").  Thus, this Court "will affirm a district court unless its decision was 'clearly unreasonable, arbitrary or fanciful, or based on an erroneous conclusion of law or fact.'"  *Takeda*, 549 F.3d at 1390 (citation omitted).

O2's cases are not contrary.  For example, *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010), recognized that review is "highly deferential" and that this Court is "reluctan[t] to second-guess the judgment of trial judges who typically have intimate knowledge of the case."  *Id.* at 953.  As discussed below, *Fox v. Vice*, 131 S. Ct. 2205 (2011), involved a different statute and a different issue, but its observations on appellate

review of fee awards remain apropos.  In awarding fees, district courts are entitled

to aim for "rough justice, not … auditing perfection," and they may rely on

estimates and their "overall sense of a suit."  *Id.* at 2216.  Appellate courts should

defer to fee awards in light of district courts' "'superior understanding of the

litigation.'"  *Id.* (citation omitted).  Indeed, the Supreme Court could "hardly think

of a sphere of judicial decisionmaking in which appellate micromanagement has

less to recommend it."  *Id.*

## II.  THE DISTRICT COURT DID NOT COMMIT CLEAR ERROR IN FINDING THIS CASE TO BE AN EXCEPTIONAL CASE

"[M]any varieties of misconduct can support a district court's exceptional

case finding, including lodging frivolous filings and engaging in vexatious or

unjustified litigation."  *Eon-Net*, 653 F.3d at 1324.  "'[L]itigation misconduct and

unprofessional behavior may suffice, by themselves, to make a case exceptional

under § 285.'"  *Id.* (citation omitted).

In this case, ample evidence supported the district court's dual findings of a

vexatious overall litigation strategy and specific instances of litigation misconduct.

The district court presided over a decade of litigation between MPS and O2,

including the 2007 trial, and it reviewed hundreds of filings and closely observed

the parties' conduct and arguments.  O2 dissects the district court's analysis,

objecting to virtually every sentence and treating its finding of a vexatious

litigation strategy as unrelated to its findings about O2's false testimony and

attempted cover-up.  But both findings reinforced each other and supported the

determination that the case was "exceptional."  In any event, even if the two

grounds are reviewed independently, both were amply supported and the district

court did not commit clear error in declaring this an exceptional case.

### A.    O2's False Testimony and Dissembling After the Truth Was Exposed Easily Justified the "Exceptional Case" Finding

In finding that O2's litigation misconduct made this case exceptional, the

district court relied on both O2's repeated misrepresentations on an issue critical to

O2's validity and infringement claims (whether O2 conceived the claimed

invention before MPS developed the MP1010) *and* O2's efforts to avoid

repercussions by filing baseless motions to strike MPS's expert report and to bar

MPS from claiming prior invention.  [JA65-66]  There was no error, much less

clear error, in the findings that O2's concerted, repeated, and false claims regarding

the "Feb., 18, 1998" schematics constituted litigation misconduct and that O2

improperly tried to bury the issue once its falsehoods were exposed.

### 1.    How Lin's Schematics Were Dated Was Crucial Because O2 Needed Corroboration of Lin's Supposed Conception Date to Contend Both that MPS Infringed and that O2 Invented First

O2 contests the district court's finding that its false testimony regarding the

schematics' creation date was material [JA66], but that testimony was in fact

critical to O2's case.

O2's case had a fundamental problem. O2's effective filing date was July 1999, yet MPS introduced its first-generation MP1010 in 1998 and MP1010 datasheets and application notes showed a capacitor divider and timer and protection circuitry very similar to what O2 claimed to have invented. [JA4739; JA4741; JA4743-49; JA4751] O2 could not credibly argue that the MP1010 did not practice the claims because such an argument would have undercut O2's infringement claim against products derived from the MP1010. O2's only solution was to claim that Lin invented in early 1998, before MPS completed the MP1010.

Lin's schematics were crucial to O2's prior-invention claim. To establish earlier invention, O2 primarily relied on Lin's own testimony. But "when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony." *Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed. Cir. 2003). Corroboration "provides an additional safeguard against courts being deceived by inventors who may be tempted to mischaracterize the events of the past through their testimony." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006). O2 cited evidence of Lin's discussions with customers about flaws in O2's existing half-bridge products, but those documents at most pointed to a *problem*, not the claimed *solution*. [JA4777-800; JA4826-32] O2 needed evidence of a full-bridge solution with protection circuitry, and Lin's "Feb., 18, 1998" schematics at least showed a full-bridge (although little else).

Even today, O2 contends (at 52) that "the corroborating evidence that disclosed sufficient elements of the invention was the February 18, 1998 schematics."

To have a chance at succeeding, however, O2 needed to show that those schematics were *automatically* dated.  Schematics manually dated by Lin himself could not provide independent corroboration of his invention date.  *See Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989) (inventor must "provide independent corroborating evidence in addition to his own statements and documents"); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998-99 (Fed. Cir. 2009) (lab notebook did not corroborate conception where dated entry was unwitnessed).  Moreover, no one at O2 had observed any such schematics in 1998.  [JA4894]  Indeed, both the district court and the ALJ found that O2 lacked adequate corroboration and could not claim invention before July 1999 once O2 conceded that Lin's earlier testimony was false and that he himself dated the schematics.  [JA3990-92; JA4149]  And once O2 was stuck with a July 1999 invention date, O2's case was hopeless.  The accused products were based on the MP1010 yet the MP1010 was prior art, so the question became not *whether* O2 would lose, but *how*—invalidity, noninfringement, or both.

O2 argues (at 41-43) that whether the schematics were automatically or manually dated was immaterial because Lin could have forged an automatically-inserted date-stamp by resetting his computer's system clock.  That argument is

ironic because O2 denied below that such forgery was possible [JA4732], but in any event it misses the point. Lin's schematics could not count as independent corroboration, and thus proved nothing, unless they were automatically dated. Lin could not corroborate his own testimony, and no one else witnessed his supposed February 1998 work. Manual dating was fatal to O2's all-important claim of earlier invention, and the fact that O2 could have committed fraud in another way (by resetting the system clock) is irrelevant.

Indeed, O2's argument on appeal undermines its entire corroboration-by-date-stamp theory below. If, as O2 now contends, both computer- and human-entered dates are readily falsified, both are unreliable and something other than the document and its author must supply the necessary corroboration. O2 had no such corroboration for Lin's schematics, so its own logic dictates that it had no legitimate way to establish an invention date before MPS created the MP1010.

### 2. O2's False Testimony and Discovery Responses Were Not Mere Innocent Mistakes

O2 contends (at 39) that "the *only* reasonable inference … is that O2 believed in good faith that the schematics were automatically dated." In fact, the most reasonable and only plausible conclusion was the contrary. Extensive evidence showed that O2 engaged in a concerted scheme to present false testimony and then masked that scheme rather than acting forthrightly once MPS exposed the falsity. The district court was fully justified in finding litigation misconduct.

O2 has never explained how or why it thought sophisticated commercial software would automatically insert a date containing a grammatical error. Nevertheless, O2 witnesses concertedly, repeatedly, and unequivocally testified that it did.  Indeed, although O2 now pleads hazy recollection about what software it used and how it operated, its witnesses' memories were crystal clear until they were caught.  At the 2007 trial, both Lin and Badgett confidently testified that O2 used PSpice and that PSpice had automatically dated the printouts.  [JA4675; JA4867]  O2's counsel stressed that testimony in closing.  [JA4871]  O2 perpetuated the same story in discovery responses and deposition testimony in this case.  [JA4875-76; JA4884-87; JA4891-93]

As the district court found [JA66], O2 did not investigate the veracity of its automatic-dating claims.  O2 misleads in arguing (at 40) that 30(b)(6) designee Krems did so.  Krems testified that he asked Lin whether the *2009* version of *OrCAD* automatically entered dates, Lin answered yes, and another O2 engineer confirmed that answer.  [JA4885-86]  But Krems did not verify that the *1998* version of OrCAD operated that way, much less that O2 used OrCAD rather than PSpice in early 1998.  Moreover, O2 needed corroboration *independent* of Lin, yet Krems relied on Lin.  O2 describes its effort (at 40) as "unsuccessful," but it was not designed to succeed.  This was not mere negligence:  at best O2 was willfully blind because it took "deliberate actions to avoid confirming a high probability of

– 32 –

wrongdoing." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011).

O2's changing story about the software used to create the schematics was suspicious for other reasons as well. Rewriting history, O2 claims (at 38-39) that it innocently thought and said it used OrCAD (its present software) all along. But the evidence showed otherwise. In 2007, both Badgett and Lin testified—correctly—that Lin used *PSpice*, not OrCAD, to create the schematics. [JA4675; JA4867] O2 originally took that position in this case as well. [JA4876] Apparently sensing its story was unraveling, O2 switched at Krems's deposition and claimed that OrCAD was the "only software ever seen at O2 Micro." [JA4887] O2 retreated only when Herniter proved that Lin's schematics used PSpice. *Cf. Taltech Ltd. v. Esquel Enters. Ltd.*, 604 F.3d 1324, 1334 (Fed. Cir. 2010) (affirming exceptional-case finding based in part on witness's "pattern of changing his testimony to suit the theory du jour").

Other evidence also belied O2's profession of innocence. After months of denials [JA4730-31], O2 belatedly conceded that no one could corroborate Lin's supposed February 1998 invention date and that no one else saw Lin's schematics before June 1999 [JA4894]. Moreover, O2 preserved neither Lin's laptop computer nor electronic copies of the schematic file, and it claimed not to have

backup tapes. [JA4876-77][10] Lin claimed that he returned his computer

containing the files "sometime in the 1999 timeframe," but he also said he was

working on O2's commercial embodiment at the time, and both he and Krems

conceded that O2's standard practice was to transfer files for ongoing projects.

[JA7722; JA7738-39] Nevertheless, O2 produced only hard-copy print-outs.

Furthermore, although O2 redacted documents to hide the fact, Lin admitted that

the schematics were stored in a computer folder called "MPS." [JA4808; JA7724]

Lin insisted that "MPS" stood for "multiple power supplies," not MPS, yet O2

produced no documents referring to a CCFL inverter as a "multiple power supply."

[*See* JA7724-26; JA7649-50][11]

Simply put, O2's story was not credible, and the district court quite properly

declined to credit it. This Court should not substitute its own judgment for the

district court's first-hand assessment.

---

[10] O2 hid these facts for a long time. Lin testified at the 2007 trial that he thought O2 still had his computer [*see* No. C 04-2000-CW, Dkt. No. 1127 (5/3/07 Tr.) at 728], and in this case O2 denied requests for admissions that it disposed of Lin's computer and kept no backup files [JA4731-32].

[11] Citing only Lin's testimony, O2 claims (at 49 n.10) that it produced documents showing use of "multiple power supplies" "within the relevant field." That is false. The only two documents containing the term were third-party patents produced by O2's litigation counsel, and they described power supplies that produced more than one regulated DC output. The patents did not involve DC-to-AC inversion, much less CCFL inverters.

– 34 –

**3.     The District Court Properly Found that O2 Dissembled After Its False Statements Were Exposed and Tried to Cover Up Its Problem by Filing Baseless Motions**

O2's misconduct was not limited to its repeated presentations of false evidence.  The district court also found that O2 did not come clean when caught.  Instead, O2 tried to bury its misdeeds in obtuse discovery responses and baseless motion practice.  [JA66-67]  Again, that finding was correct and far from clear error.  Indeed, O2 continues to dissemble here.

Although O2 defends its supplemental interrogatory response, that response was anything but a candid admission.  O2 claims (at 45-46) that ASUSTeK's interrogatory asked "how the date stamp function of the PSpice program operates" (emphasis omitted) and that O2's updated response was "perfectly accurate."  But O2 cites the wrong interrogatory.  The relevant interrogatory was #40 (not #41), and it required O2 to

> [e]xplain the basis for O2 Micro's statement, in its response to MPS Interrogatory No. 72, that the PSpice program used by Dr. Lin "automatically provided a date stamp on the day it was created."

[JA659]  Evading the question, O2 spouted gobbledygook—that PSpice "automatically populates the 'date' field of 'titlblk' with the default date January 1, 2000, and will print that date in the title block of the schematic unless changed by the user," that it "automatically prints the date that has been entered into the 'date' field," and that "[i]f the 'date' attribute was changed using the edit function on the

– 35 –

date the document was created and the document was printed on that date, the software would automatically print that date in the title block at the lower right hand corner of the schematic." [JA659-61]

The district court reasonably found that O2 was not being forthright. And to accuse the court of not reading carefully (as O2 does at 46) is downright insulting.

The district court also properly found that O2 filed baseless motions to strike the Herniter report and bar MPS from claiming prior invention. O2's motion to strike was a blatant attempt to whitewash a devastating report and avoid the repercussions of false testimony and discovery responses. O2 claims (at 47) that Herniter's report was irrelevant because O2 eventually conceded that Lin himself dated the schematics. But both the ALJ and the district court rejected that argument [JA2741-42; JA2946-49], and it was frivolous.

Herniter's report was plainly relevant because (among other things) it clarified confusing technical issues, explained how PSpice worked, and undermined Lin and O2's credibility. [JA602-28] O2's testimony had been a moving target: O2 shifted positions on, among other things, whether electronic files still existed, whether the schematics were created with PSpice or OrCAD, and whether the schematics were automatically or manually dated. Herniter's report cut through O2's convoluted, changing explanations, clearly and coherently describing how the schematics were created and why the "Feb., 18, 1998" date said

nothing about their actual creation date.  [JA620-23]  Herniter also explained that the earliest computer-generated date appearing on O2's PSpice simulation results came from late June 1999, over 16 months after February 18, 1998, and that someone redacted the directory pathway, thereby concealing that the schematics came from a folder labeled "MPS."  [JA626-28]

    This evidence refuted O2's sworn testimony, and it did not lose its relevance simply because O2 belatedly conceded (obliquely) that Lin manually dated the schematics.  Lin and O2 continued to contend that Lin dated the schematics in February 1998 and that the schematics corroborated his alleged invention date. [JA5820]  Herniter properly relied on his technical expertise and specialized knowledge to explain why O2's invention date claim was unreliable, and MPS was entitled to use Herniter's opinions to impeach the credibility of O2's witnesses. Notably, O2 did not file a motion to strike certain passages as unduly prejudicial; it filed a motion to strike Herniter's testimony entirely.  That motion was baseless and patently designed to cover up O2's misconduct.

    Because O2 could not corroborate a February 1998 invention date and its case was hopeless without one, O2 also filed motions claiming that the verdict in the 2007 trial collaterally estopped MPS from contending that the MP1010 predated the claims asserted here.  But that argument was even more frivolous.  To establish collateral estoppel, O2 had to show that when addressing O2's '722

patent claims, the 2007 jury actually and necessarily decided that O2 conceived the later-asserted '382 patent claims before MPS developed and offered the MP1010. *See*, *e.g.*, *Durkin v. Shea & Gould*, 92 F.3d 1510, 1515 (9th Cir. 1996). That was impossible for multiple reasons.

First, the 2007 jury did not consider the '382 patent. The '382 patent did not even exist then, and the differences in the later claims were significant. For example, the '382 claims required a capacitor divider and a particular timer circuit that the '722 claims lacked. [*Compare* JA4429-31 *with* JA1179-80] Indeed, O2 could not argue that the differences were trivial because if that were so, the judgment that the '722 claims were invalid would have bound O2 in this case.

Second, the 2007 jury never found that O2 conceived the '722 claims before MPS developed the MP1010. The verdict form did not ask that question. [JA1183-87] If anything, it suggested that the MP1010 came first. O2's contrary argument misrepresents what the jury found. The jury found no anticipation by prior invention [JA1186], but that finding followed from its verdict that MPS did not literally infringe any claims, as that which does not literally infringe cannot fully anticipate, even if earlier. The jury did, however, find all the claims invalid for obviousness and under the on-sale bar [JA1187], and the MP1010 was one of the cornerstones of MPS's invalidity arguments. If, as O2 contends, the jury relied on the MP1010 in so finding, it must have found that the MP1010 was *prior* art,

not *later* art.  Contrary to O2's suggestion, the on-sale bar verdict did *not* imply a finding that the MP1010 contained all claimed elements:  the on-sale bar also applies when the pre-critical-date product rendered the claims obvious.  *See*, *e.g.*, *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002).[12]

Third, O2 ignores that it *lost* the '722 case.  Even if the jury's verdict could be tortured to imply that the MP1010 came later, MPS could not have appealed the Section 102(g) verdict because O2's claims were found invalid on other grounds.  *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1321-22 (Fed. Cir. 2008) (parties may appeal only when adversely affected by the judgment).  Moreover, O2 appealed the on-sale bar verdict it now cites, and this Court affirmed based on obviousness without reaching the on-sale bar.  558 F.3d at 1352.  Any implicit verdict that the MP1010 was later art was unnecessary to the ultimate judgment of invalidity, precluding collateral estoppel.

Finally, issue preclusion requires full and *fair* litigation of an issue.  *Durkin*, 92 F.3d at 1515.  Any finding that Lin invented before MPS would have stemmed from false testimony by Lin and Badgett that the schematics were automatically dated.  O2 cannot suggest that their testimony was immaterial when its counsel

---

[12] In actuality, we do not know for sure whether the on-sale bar verdict relied on the MP1010 because MPS also relied on O2's own pre-critical-date sales of similar "half-bridge" parts.  *See* MPS Br., No. 2008-1128, at 37-40 (Fed. Cir. May 27, 2008).  But that fact made O2's collateral estoppel motion all the weaker.

stressed the testimony in closing argument [JA4871] and both the ALJ and the district court held that O2 could not corroborate invention before July 1999 without that evidence [JA4149; JA3990-92].  As the district court observed [JA3987], false testimony is hardly fair litigation.

Summoning even more *chutzpah*, O2 blames its victim, arguing (at 52-53) that MPS should have exposed the falsity earlier.  Tellingly, however, O2 cites no case holding that a party may rely on admittedly false testimony to obtain collateral estoppel in a later case.  Collateral estoppel may be "flexible," but it is flexible to *avoid* injustices, not to perpetuate them.[13]

### B.    The District Court Properly Found that O2's Vexatious Litigation Strategy Also Made This an Exceptional Case

The district court also committed neither legal nor clear factual error in holding that O2's vexatious litigation strategy made this an exceptional case.  As a

---

[13] O2 cites *Costello v. IBM Corp.*, No. 02 Civ. 5870 (RCC), 2006 WL 2370246 (S.D.N.Y. Aug. 16, 2006), but there the district court held that the plaintiff had a colorable, albeit unsuccessful, argument that collateral estoppel did *not* apply due to a limited record in the earlier case.  That hardly helps O2, which had no basis to argue that collateral estoppel *did* apply.

In passing, O2 also argues (at 53-54) that it was justified in claiming that collateral estoppel barred MPS from challenging the schematics' *authenticity*.  But that claim was also baseless.  The district court admitted the schematics because Lin and Badgett vouched for their authenticity.  As the district court observed [JA2948-49], it did not rule that the schematics *were* authentic, just that the *jury could find* them authentic.  The 2007 jury's invalidity verdicts suggest it did not believe Lin—and anyway any such finding could not have been necessary to the judgment of invalidity.

– 40 –

matter of law, the district court did not need to find O2's claims objectively baseless to find that O2's vexatious conduct made the case exceptional. And as a matter of fact, it was entitled to find that O2's harassment of MPS was a continuation of a longstanding and improper litigation strategy.

### 1. Because the District Court Found the Case Exceptional Based on O2's Litigation Misconduct, It Did Not Need to Decide Whether O2's Claims Were Objectively Baseless

In arguing that a patentee's vexatious litigation cannot render a case exceptional unless the court also finds its claims objectively baseless, O2 defies this Court's precedent. In *Beckman*, this Court recognized that a vexatious litigation strategy may make a case exceptional *regardless* of whether any particular claim or defense was baseless. When finding LKB's litigation strategy vexatious, the trial court had cited a jurisdictional defense and antitrust counterclaim that LKB had dropped and an inequitable conduct defense that the district court had found baseless. 892 F.2d at 1551. This Court viewed those subfindings as "somewhat tenuous" individually, and particularly doubted that the inequitable conduct defense was baseless. *Id.* Nevertheless, despite the lack of objective baselessness, this Court upheld the determination that LKB's vexatious overall litigation strategy made the case exceptional. *Id.* at 1552. This Court has cited that holding numerous times, and it remains good law. *See*, *e.g.*, *Highmark*,

*Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012);

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1314 (Fed. Cir. 2010).

This Court's cases also routinely distinguish between *vexatious* litigation

(use of the litigation process to harass) and *frivolous* suits (bringing baseless

claims).  *See, e.g.*, *Eon-Net*, 653 F.3d at 1324; *Wedgetail, Ltd. v. Huddleston

Deluxe, Inc.*, 576 F.3d 1302, 1304-05 (Fed. Cir. 2009); *Phonometrics, Inc. v.

Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003); *Forest Labs., Inc. v.

Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003); *Brasseler, USA I, LP v.

Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) (all discussing both as

alternative grounds for finding a case "exceptional").

Indeed, the distinction between *baseless* claims and *vexatious* tactics is

widely recognized.  For example, the Ninth Circuit recently confirmed that

"litigation may have some merit and still be 'vexatious.'"  *Microsoft Corp. v.

Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012) (district court entitled to find that

procedural maneuver of pursuing parallel proceedings in two countries was

designed to harass and interfere with its ability to decide issues).  Likewise, the

common law has long distinguished *malicious prosecution* from *abuse of process*.

The former involves bad-faith pursuit of objectively baseless claims, whereas the

latter includes misuse of the legal process for collateral advantage regardless of

probable cause to sue.  *See* 3 Dan B. Dobbs et al., *The Law of Torts* § 594 (2d ed.

2011); Restatement (Second) of Torts § 682 (1977).  Both abuse of process and malicious prosecution are torts, and tortious litigation strategies of all kinds should be considered "exceptional," not normal.

O2 errs in relying (at 24-25) on *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), and precedent extending it to Section 285 cases.  This Court has held that "*[a]bsent misconduct in conduct of the litigation or in securing the patent*, sanctions may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (emphasis added).  But a vexatious litigation strategy is a form of litigation misconduct, *see*, *e.g.*, *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1350 (Fed. Cir. 2004), and MPS argued it as such below [JA4642-45].  Furthermore, the district court found instances of litigation misconduct even apart from O2's overall vexatious litigation strategy.  [JA65-67]  The district court thus acted entirely properly in finding this case exceptional without deciding whether O2's claims were objectively baseless.[14]

---

[14] To be clear, MPS argued and still contends that O2's accusations on all four patents-in-suit were objectively baseless.  [*See* JA4658-62; JA7643-56]  Thus, even if an objective baselessness finding were a prerequisite to an "exceptional case" finding, this Court would need to remand for further findings.  O2 asks this Court to find its claims objectively reasonable as a matter of law, but the baselessness here turned primarily on factual evidence, not claim construction

### 2. The District Court's Finding of Vexatiousness Was Well-Supported

On the facts, the district court had ample grounds to find O2 guilty of vexatious litigation. O2's focus on the district court's discussion of O2's covenants not to sue is shortsighted. The district court spent pages outlining the long, sordid history of O2's harassment of MPS and MPS customers [JA55-62] and specifically found—based on its "familiar[ity] with the parties, the technology and the patents-at-issue"—that O2 had a vexatious overall litigation strategy. [JA63-65] To consider O2's covenants alone is to view only the tip of the iceberg.

*Beckman* again illustrates the point. This Court recognized that particular instances cited by the district court were just examples of LKB's "*strategy* of vexatious activity." *Id.* at 1552. Although LKB explained away each instance, the problem was LKB's broader strategy. The record included evidence of other vexatious conduct, and this Court held that "when the [district] court's finding of vexatious litigation is based on a 'strategy,' we do not feel that it is necessary for

---

positions. Whatever the ultimate standard of appellate review (an issue that has divided this Court, *see Highmark*, 701 F.3d 1351 (Fed. Cir. 2012) (opinions on denial of rehearing en banc)), this Court is ill-equipped to make such assessments in the first instance. O2 contends that surviving summary judgment precludes a finding of objective baselessness. But that is not so when a party makes false or misleading representations to the trial court. *Medtronic*, 603 F.3d at 954. Moreover, O2 did *not* survive summary judgment as to the '519 family. O2 also cites the ITC's opening of an investigation, but that signifies nothing because the Commission merely examines complaints for facial sufficiency and does not assess their merit before opening cases. *See* 19 C.F.R. § 210.9(a).

the district court to set forth every underlying fact which contributed to its conclusion." *Id.* at 1551-52. "[T]he district judge was in much the best position to monitor LKB's litigation 'strategy,'" and this Court could "[ ]not say that the district court's finding of vexatious litigation was clearly erroneous." *Id.* at 1552.

The same is true here. As MPS explained, even though MPS prevailed against each of O2's six patent infringement assertions, O2 still raised enough fear, uncertainty, and doubt to intimidate other customers and dissuade them from buying MPS's products. [JA4638; JA4642-45] As four Supreme Court Justices recently emphasized, "charges of … infringement can be disruptive to the good business relations between the manufacturer alleged to have been an infringer and its distributors, retailers, and investors," and "the mere pendency of litigation can mean that other actors in the marketplace may be reluctant to have future dealings with the alleged infringer." *Already*, No. 11-982 (Kennedy, J., concurring) slip op. 2. This case was filed in 2008, but the district court was familiar with the parties and their litigation history, and it appropriately relied on its knowledge and experience in assessing whether O2 was guilty of continuing its vexatious litigation strategy here. *Cf. Sun-Tek Indus., Inc. v. Kennedy Sky Lites, Inc.*, 929 F.2d 676, 679 (Fed. Cir. 1991) (appropriate to look at earlier activity and find a pattern indicating vexatiousness later in a case).

Indeed, history speaks volumes here.  In the '615 case, filed in 2001, O2 prolonged the suit by manufacturing two new infringement theories ("open lamp" and "$V_{sense}$") after its expert would not support its original $I_{sense}$ theory.  The case thus dragged on until 2006, when this Court affirmed the summary judgment of noninfringement.  467 F.3d 1355.  Meanwhile, O2 began harassing MPS customers and suing them in a distant forum in east Texas.  In 2003, O2 sued Sumida on the '722 patent, leading to litigation that continued until 2009, when this Court affirmed the claims' invalidity in a parallel declaratory judgment action that MPS had filed to protect itself.  558 F.3d 1341.  In the interim, in 2004, O2 sued MPS and two MPS customers (ASUSTeK and Compal) on the '129 patent.  O2 did not give up and grant a covenant not to sue until late 2006, after the case was transferred to its home court.  No. C 04-2000-CW, Dkt. 579 (N.D. Cal. Oct. 11, 2006).  Nevertheless, O2 pursued another MPS customer, Hon Hai, in east Texas on the same patent, forcing MPS to file another declaratory judgment action.  O2 gave up and covenanted not to sue in 2008, but only after the district court denied its motions to dismiss for lack of jurisdiction.  No. C 07-2363-CW, Dkt. No. 76 (N.D. Cal. Aug. 26, 2008).

Yet O2 still was not done.  It continued to threaten and harass MPS customers on the '519 family, forcing MPS to file this declaratory judgment action two months later.  Its earlier forum-shopping gambits having been foiled, O2 tried

to avoid the Northern District of California by filing an ITC complaint and asking the district court to stay MPS's first-filed case. [JA272-81] The district court denied that motion, observing that all the issues could be resolved before it but not before the ITC. [JA383-84; JA7773-78] Nevertheless, O2 insisted on multiplying the proceedings by pursuing both cases. Then, although MPS quickly showed that the '519 claims were invalid based on O2's own prior sales, O2 resisted and did not dismiss those claims until just before co-inventor Lin was to be deposed. [JA4737]

O2 also persisted with its '382 patent claims even after MPS exposed O2's false testimony involving its invention date and the district court held that O2 could not claim invention before July 1999. At that point, O2 had no hope of threading the needle and showing that the '382 patent was both valid and infringed. Nevertheless, O2 did not concede—even after discovery was over and the ITC ALJ rejected its claims against MPS. Instead, O2 waited until a few days before trial before covenanting not to sue and moving to dismiss its remaining claim.

True, O2's concession came shortly after the ITC affirmed the ALJ's decision and the court-appointed independent expert opined that all the asserted claims were invalid and not infringed. But the district court was hardly required to applaud O2 for bailing out on the eve of trial when O2 had unnecessarily protracted and multiplied the proceedings on top of its egregious misconduct

involving the schematics on which its case hinged.  Of course, "[s]ettlement and dismissal of claims on the eve of trial is not uncommon and, indeed, is preferable to no settlement."  [JA64]  But here O2 repeatedly hassled MPS customers, prompting declaratory judgment actions that O2 fought vigorously, and O2 did not agree to drop its infringement claims until after it had forced MPS to spend millions of dollars to clear its name.

Having engaged in a strategy of hit-and-run litigation, O2 ignores the hits it inflicted and demands praise for eventually running.  But the district court was entitled to find that O2's bitter rivalry with MPS and repeated resort to hitting and running indicated vexatiousness instead.  That is all the more true given the court's parallel findings regarding O2's false testimony and disingenuousness after the truth was revealed.  Notably, this Court has previously affirmed an exceptional case finding based on similar abusive litigation tactics, including belated withdrawals of claims and changing inventor testimony.  *See Taltech*, 604 F.3d at 1334 (affirming exceptional case finding based in part on abusive litigation tactics including belated dismissal of damage claims after discovery, belated retraction of jury trial request, voluntary dismissal of claims mid-trial, withdrawal of ITC complaint shortly before hearing began, and inventor's changing testimony).

In sum, the district court was best placed to assess O2's misconduct, it rejected O2's self-serving excuses, and O2 is not entitled to a *de novo* retrial here.

Because neither the district court's ultimate "exceptional case" finding nor its subsidiary findings of vexatious litigation and litigation misconduct constituted clear error, this Court should affirm them.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THE SIZE OF MPS'S AWARD

Although O2 continues to grouse about the "massive" size of the award, O2 no longer contests that MPS actually and reasonably incurred all the fees and costs it was awarded. Appropriately so: the standard of review is abuse of discretion, and the district court carefully scrutinized MPS's request, allowing some expenses and disallowing or limiting others. [*See* JA83-84; JA87-91] *Cf. Takeda*, 549 F.3d at 1390-91 (no abuse in awarding $16.9 million even though that included 100% of the fees and expert costs requested).

Instead, O2 makes two arguments. First, O2 accuses the district court of not tying the award to the misconduct found. Second, O2 objects to the court's award of expenses for discovery taken for both the ITC case and this case on grounds that MPS would have spent the money in the ITC case anyway. Both arguments fail.

### A. O2's Misconduct Was Pervasive, Justifying an Award for Fees and Costs Throughout the Case

O2 contends (at 55) that the award was "not proportionate, much less tailored, to the putative wrongs found by the district court." But the district court considered and properly rejected that argument below. O2 argued that the award

– 49 –

should be limited to fees for the five days between its receipt of the independent expert's report and its motion to dismiss. [JA9534-36] In response, the district court recognized that fees awarded based on litigation misconduct must be related to that misconduct, but held that the time limitation urged by O2 was unwarranted because O2's "misconduct was pervasive throughout the entire case." [JA85-86] That ruling was no abuse of discretion.

O2 again argues that its motives were pure and that it deserves kudos for voluntarily dismissing after receiving the independent expert's report. But the district court was entitled to find that O2's longstanding vexatious litigation strategy and its misrepresentations and dissembling in claiming a February 1998 invention date constituted abuse of the legal process throughout this case.

Indeed, even if this Court were to overturn the vexatious litigation finding, O2's misconduct involving the invention date justified the entire award by itself. O2 says it did not matter whether Lin or his computer inserted the date on the schematics. But as discussed above, O2's case would have been a non-starter had O2 admitted from the outset that Lin manually dated the supposedly corroborative schematics. MPS was thus entitled to its fees from start to finish.

### B.    MPS Was Entitled to Recover Fees and Costs for Discovery Taken for Both the ITC Proceeding and This Case

O2 next complains that MPS was not entitled to claim expenses on discovery taken for both the ITC proceeding and this case because MPS would

have incurred those costs in the ITC anyway.  But O2 waived any such argument, and the authority on which O2 relies is inapposite anyway.

### 1.  O2 Waived Its Current "But-For" Argument by Failing to Make It Below

Contrary to O2's suggestion (at 58), O2 did *not* argue below that MPS could not recover fees for discovery taken for both the ITC proceeding and this case because MPS would have incurred those fees in the ITC proceeding.

In opposing MPS's original motion for fees and nontaxable costs in July 2010, O2 did argue that MPS should not recover fees related to the ITC investigation—but not based on its current "but-for" theory.  O2 made a different, simplistic, and formalistic argument.  According to O2, fees for discovery formally taken in the ITC investigation were not recoverable because they did not "come from this case."  [JA5291]  O2 so argued even though the parties stipulated that evidence produced in the ITC investigation could be used in the district court.  [JA5291-92]  O2 contended that other than damages-related discovery, "all of the depositions were based on notices that issued in the ITC and not in this action."  [JA5292 (emphasis deleted)]  O2 further urged that the discovery taken in the ITC investigation exceeded presumptive limits under the Federal Rules of Civil Procedure and that the respondents drove up ITC discovery costs.  [*Id.*][15]

---

[15] The latter accusation, which O2 rehashes here, was groundless.  *O2 drove up discovery costs by, for example, making ASUSTeK submit to 17 days of*

The district court rejected O2's argument, holding that the ITC discovery did arise in this case because it had ordered that discovery taken in the ITC investigation would apply in this case as well.  [JA69]  Indeed, the district court observed that O2 itself used discovery obtained in the ITC proceeding in this case, and "[d]espite now claiming ignorance," O2 was "on notice that discovery obtained through the ITC proceeding was deemed to apply to this action."  [*Id.*]

In O2's May 2011 briefing on the amount of the award, O2 noted that it was preserving its earlier objection that the discovery was not taken in this case [JA9536], but O2 gave no other reason why MPS should be denied fees for discovery taken for both cases.  O2's only arguments about the ITC investigation were that work related to "domestic industry" was irrelevant in the district court and therefore unrecoverable [JA9536-37] and that certain nondiscovery work for the ITC investigation likewise was unrelated [JA9537-38].  In reply, MPS clarified that it was not seeking fees for work related solely to the ITC proceeding and corrected its original calculation.  [JA10360-61]

---

deposition even though ASUSTeK offered to stipulate that it was importing products using MPS designs and how much it imported.  [JA9481-83]  O2 criticizes ASUSTeK for producing so many documents, but O2 drafted broad discovery requests.  In any event, despite its grumbling, O2 no longer challenges the reasonableness of MPS's discovery expenses.  It instead argues that expenses for both cases were unrecoverable *categorically*.

Before the district court ruled, O2 submitted a notice of supplemental authority citing the new decision in *Fox v. Vice*. [JA10485-86] Even then, however, O2 did not move for reconsideration or argue that *Fox* compelled denial of all costs incurred for the ITC and district court cases jointly. Instead, O2 contended that *Fox* supported the arguments in O2's previous brief. But that brief merely argued that MPS should not recover for work related *solely to ITC issues*, not that expenses on discovery for *both* cases were unrecoverable.

The district court's January 2012 order addressed the arguments that O2 actually made. [JA87-88] In a different section rejecting O2's separate contention that MPS was entitled to fees only for the five days after the independent expert issued his report, the district court observed that *Fox* was inapplicable because the issue there was allocation of fees between frivolous and nonfrivolous claims. [JA86 n.4] But the district court did not discuss how *Fox* might apply to fees for work performed for both cases because O2 never argued that point.

O2's final, February 2012 round of briefing also did not contend that any but-for causation principle barred recovery for discovery relating to both cases. [*See* JA13003-10 (focusing on narrow issues not disputed on appeal)] O2 reiterated its earlier objection to $341,100 in fees for discovery taken before the district court formally consolidated discovery in the two cases. But that objection remained premised on the formalistic theory that discovery taken before the joint-

discovery order could not qualify as discovery in this case.  [JA13009-10]

Because O2 again did not raise the argument it now raises, the district court's final

order again did not address it.  [JA93-102]  The district court did, however,

overrule O2's objection to MPS's recovery of the $341,100.  [JA100-01]

In short, O2 never raised its current objection to an award of any fees for

discovery taken for both of the parallel cases—before or after *Fox*.  That objection

has therefore been waived.  *See Energy Transp. Group, Inc. v. William Demant

Holding A/S*, 697 F.3d 1342, 1357 (Fed. Cir. 2012) ("This court will not consider

arguments raised for the first time on appeal."); *Finjan, Inc. v. Secure Computing

Corp.*, 626 F.3d 1197, 1208 (Fed. Cir. 2010) (defendants waived entire-market-

value rule objection to size of royalty base by not raising it in post-trial motions

even though they challenged the size of base on other grounds).

### 2. *Fox v. Vice* Involved a Different Issue, and O2's Simplistic "But-For" Argument Makes No Sense

Even if O2 had preserved its current argument, it is meritless.

*Fox* addressed 42 U.S.C. § 1988(b), which authorizes courts to award fees to

prevailing parties in certain civil rights cases.  The case involved a single suit with

multiple claims, some frivolous and some nonfrivolous.  The Supreme Court held

that "a court may grant reasonable fees to the defendant in this circumstance, but

only for costs that the defendant would not have incurred but for the frivolous

claims." 131 S. Ct. at 2211.  In so holding, the Court cited Section 1988's purpose

and expressed concern that "[a] standard allowing more expansive fee-shifting would furnish windfalls to some defendants, making them better off because they were subject to a suit including frivolous claims." *Id.* at 2215.

This case involves neither the same circumstance nor the same policy concerns. The district court did not hold some of O2's claims frivolous and others nonfrivolous. Instead, it found two varieties of litigation misconduct that together infected all of O2's claims throughout the case. The question here is whether O2 can avoid paying for its pervasive misconduct simply because it voluntarily chose to bring parallel infringement claims in the ITC.

The answer is *no*. O2 should not be let off the hook simply because Section 285 applies only to district court actions. Indeed, O2's logic would lead to absurd results: by filing baseless claims or committing litigation misconduct in both the district court and the ITC, plaintiffs could avoid having to reimburse fees incurred for discovery for both. *Fox*'s but-for rule was designed to prevent windfalls to defendants, 131 S. Ct. at 2216, yet O2's rule would produce a windfall of attorney-fee immunity for patentees that choose to pursue duplicative cases. The Supreme Court did not contemplate, much less endorse, that result.[16]

---

[16] Nor did this Court in *Highmark*, which involved the same scenario: frivolous and nonfrivolous claims in the same action. 687 F.3d at 1319.

Notably, although tort law also generally requires but-for causation, courts nevertheless recognize exceptions where a rigid rule would produce absurd results. For example, if *A* negligently sets one fire, *B* negligently sets another, and the two fires combine and burn the plaintiff's house, a literal, simplistic application of the "but for" test would let both defendants off: *A*'s fire would have burned down the house regardless of *B*'s, and vice versa. But the law does not permit that result. Courts substitute a "substantial factor" causation test in such cases because they cannot tolerate an unwarranted windfall to the defendants. *See* 1 Dobbs, *supra*, § 189 at 631-33.

Of course, *Fox* did not address such scenarios, but that is the point. The Supreme Court addressed the run-of-the-mill circumstance before it: frivolous and nonfrivolous claims in the same case. It did not purport to address the different problem here: litigation costs incurred for discovery taken for both of two parallel cases in different jurisdictions. In this different scenario, the district court did not abuse its discretion in holding O2 accountable for the costs of discovery taken for use in the case before it. O2's misconduct in the district court was certainly a substantial factor causing MPS to incur these discovery expenses. Moreover, reimbursing MPS for expenses for discovery used in the district court did not invade the province of the ITC, and the award here posed no comity concern because the ITC never blessed O2's misconduct. Ultimately, O2 seeks to benefit

– 56 –

from having filed a duplicative action in the ITC. Such forum-shopping may be legal, but it cannot immunize O2 from liability under Section 285 for costs incurred defending against O2's district court claims.

The entire award was therefore proper. O2 complains (at 61) that the district court awarded $341,100 for discovery taken before the order consolidating discovery. But O2 agreed to make discovery joint and did not oppose retroactivity of the order. Moreover, regardless of the discovery's formal captioning, it was taken for and used in both cases, so the logic above applies. Indeed, if the district court had not incorporated the earlier discovery into its case, MPS would have had to pay as much to perform the same discovery again. All the claimed litigation costs were fairly traceable to the district court case, and all were recoverable.

## IV. EVEN IF THIS COURT DOES NOT AFFIRM, THE BEST O2 CAN HOPE FOR IS A REMAND FOR FURTHER FINDINGS

For the reasons above, MPS submits that both grounds for finding this case exceptional were proper, that the entire award was justified, and that the entire judgment should thus be affirmed. O2 contends (at 62) that the whole award should be reversed if this Court finds fault with either or both of the underlying misconduct findings. But the most O2 can hope for is a remand.

If this Court were to affirm the vexatious litigation finding but find fault with the finding of invention-date-related misconduct, the entire award should stand because the district court found that O2's vexatious litigation strategy

pervaded the case.  Likewise, if this Court were to affirm the finding of invention-date-related misconduct but vacate the vexatious litigation finding, the entire award should stand because, as discussed above, O2 could not claim both infringement and validity without an invention date before MPS's and it could not corroborate such an earlier invention date with Lin's manually-dated schematics.  At most, this Court could remand for the district court to reassess certain issues and the amount due.  It could not reverse outright.  Indeed, even if this Court were to find *both* grounds inadequate, the proper result still would be a remand:  MPS would be entitled both to reargue litigation misconduct in light of this Court's opinion and to re-raise other grounds for finding the case exceptional that the district court's original opinion did not reach.

The correct result, however, is to affirm outright.

Respectfully submitted,

\_\_\_/s/Dan L. Bagatell_____

Dan L. Bagatell

PERKINS COIE LLP

2901 N. Central Avenue, Suite 2000

Phoenix, Arizona 85012–2788

tel. (602) 351–8250

fax (602) 648–7150

DBagatell@perkinscoie.com

| | |
|---|---|
| Dean G. Dunlavey | Mark A. Flagel |
| LATHAM & WATKINS LLP | LATHAM & WATKINS LLP |
| 650 Town Center Drive, Suite 2000 | 355 South Grand Avenue |
| Costa Mesa, California 92626–1925 | Los Angeles, California 90071–1560 |

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,997 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

January 28, 2013                                    /s/Dan L. Bagatell

                                                          Dan L. Bagatell

                                                          Principal Attorney for Appellees

**PROOF OF SERVICE**

I, Dan Bagatell, am principal attorney for the appellees in this case.

Pursuant to Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25,

I certify that I caused the foregoing to be served via the Federal Circuit's CM/ECF

system on the following counsel for appellant O2 Micro:

> Edward R. Reines
> Timothy C. Saulsbury
> WEIL, GOTSHAL & MANGES LLP
> 201 Redwood Shores Parkway
> Redwood Shores, California 94065

I declare under penalty of perjury under the laws of the United States that

the foregoing is true and correct.

Dated:  January 28, 2013, at Phoenix, Arizona

> /s/Dan L. Bagatell
> Dan L. Bagatell

38616-0009/LEGAL23214513.9